**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

WESTGATE RESORTS, LTD., a Florida
limited partnership, by and through its general
partner WESTGATE RESORTS, INC., a
Florida corporation, *et al.*,

              Plaintiffs,

vs.

REED HEIN & ASSOCIATES, LLC d/b/a
TIMESHARE EXIT TEAM, *et al.*,

              Defendants.

**CASE NO.: 6:18-cv-01088-GAP-DCI**

**(ORAL ARGUMENT REQUESTED)**

___

**PLAINTIFFS' MOTION TO RECONSIDER ORDER GRANTING SUMMARY
JUDGMENT ON PLAINTIFFS' CLAIM FOR VIOLATIONS OF FLORIDA'S
DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,
AND SUPPORTING MEMORANDUM OF LAW**

Plaintiffs Westgate Resorts, Ltd., et al. ("Plaintiffs" or "Westgate") file this Motion to Reconsider the Court's Order (DE 143) (the "Order") Granting Summary Judgment on Plaintiffs' Claims for Violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat., §§501.201, *et seq.* ("FDUTPA"), and respectfully show unto the Court as follows:

**I.    INTRODUCTION**

Westgate seeks reconsideration of the Order because the Court has entered summary judgment on claims outside the adversarial issues presented to the Court, for which summary judgment was never sought, resulting in a manifest injustice to Westgate. Westgate's claims under FDUTPA for injunctive relief and for damages based on deceptive acts and practices of the Defendants[1] ***other than TET's advertising***, specifically articulated in Count II, ¶130 of

___

[1] Reed Hein & Associates, LLC d/b/a Timeshare Exit Team ("TET"), Brandon Reed, Trevor Hein, and Thomas Parenteau (collectively, "Defendants").

Westgate's Amended Complaint and in that count's prayer for relief [DE 69], were not addressed at all in Defendants' Motion for Summary Judgment (DE 112) ("TET's Motion" or "Motion" as the context may require). Rather, Defendants focused almost entirely on the Lanham Act claim, arguing extensively that Westgate's claim for false advertising under the Lanham Act failed for lack of causation between statements in TET's advertising and Westgate's damages. They simply parroted the same argument with respect to Westgate's claim for damages under FDUTPA: "[f]or the reasons discussed in Reed Hein's argument for summary judgment on Plaintiffs' Lanham Act claims." Mot., at 35. The Court, looking no further than Defendants' Lanham Act argument that "none of the allegedly false or misleading ads or materials direct TET clients to stop making payments to Westgate," and Westgate's Lanham Act rebuttal argument, agreed without considering the abundant evidence of TET's unfair and deceptive *conduct* supporting Westgate's FDUTPA claim and entered summary judgment on the same grounds for Westgate's FDUTPA claims as for the Lanham Act claims. Order, at 7-8.

Reconsideration of the Order is necessary to address a clear error of apprehension of the nature and scope of Westgate's FDUTPA claim, and, importantly, the unrebutted evidence of TET's actionable wrongdoing – even if one ignores TET's advertising - supporting Westgate's claims for damages and injunctive relief under FDUTPA. This conduct is well articulated in the Amended Complaint (DE 69, ¶¶126 & 130), amply shown by the evidence and not addressed in TET's Motion or the Order.[2] Most notably, Defendants' Motion nowhere mentions Westgate's claim for injunctive relief under FDUTPA, with its separate standards requiring a separate analysis. *Ahearn v. Mayo Clinic*, 180 So.3d 165, 173 (Fla 1st DCA 2015). While a claim for

---

[2] While Westgate disagrees with the Court's conclusion that TET's advertising cannot be reasonably construed to direct timeshare owners to stop paying Westgate to support causation of damages for false advertising under the Lanham Act (Order, at 5), Westgate does not seek reconsideration of the Order's granting of summary judgment on the Lanham Act claim.

2

damages under FDUTPA requires proving a deceptive or unfair act or practice, causation, and actual damages, a claim for injunctive relief does not require a showing of actual damages, removing the causation element that was central to the Order. *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 S. 3d 207, 212-214 (Fla. 4th DCA 2019) (citing *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149 (Fla. 5th DCA 2012). To obtain equitable relief under FDUTPA, Westgate need only show it is "aggrieved" by an unfair or deceptive practice that is injurious to consumers, something the record already amply shows. *Id.*, at 214.

As noted in its Summary Judgment Opposition, Westgate's claim for injunctive relief is amply supported by the evidence. (DE 122, at 35). Defendants' Motion and, as a result, the Court's Order ignored Westgate's FDUTPA claim for injunctive relief. Westgate's claims for injunctive relief and damages have never been limited to only TET's false advertising. The reasons to enjoin TET's business practices start with its advertising, but do not, as the Order implies, end there. This case, Westgate's pleadings and the evidence Westgate has proffered portray a continuum of unfair, deceptive and unconscionable acts and practices only starting with the advertising and solicitation to which the timeshare owner responds.[3] The advertising, without which the timeshare owner would never have contacted TET, necessarily leads to the platform from which TET perpetrates the rest of the unfair, deceptive and unconscionable

---

[3] The broad range of TET's deceptive and unfair practices detailed by Westgate in its Opposition (*see* DE 122, at ¶¶ 9-14, 25-35, 40-51, and cited exhibits) is amplified in a civil enforcement action filed against TET and its owners by the Washington Attorney General on February 4, 2020, which enumerated no fewer than 42 specific acts of deception (¶¶6.2(a)-(pp)) and portrayed "[v]irtually every aspect of Defendants' operation is deceptive and/or unfair in violation of the Consumer Protection Act (CPA), and thousands of people across the country and in Canada—including over 2,500 consumers in Washington—have fallen victim to Defendants' practices." *See State of Washington v. Reed Hein & Associates, LLC, et al.*, Case No. 20-2-03141-1 SEA, King County (Wash.) Sup. Ct., Complaint (Feb. 4, 2020) (**Exhibit "A"**), at ¶1.5.

conduct Westgate has shown: sales presentation misrepresentations, fictitious services, illusory legal representation, broken promises and rejected refund requests. The advertising is inextricably linked to the sales presentation that follows; this, often coupled with the rest, inevitably results in the owners' cessation of payments to Westgate. The Order's narrow perspective, untethering TET's advertising from the litany of deceptive acts that follow, ignores how TET's scheme operates.

So while the parties can and have disagreed whether the advertising alone *caused* Westgate's actual damages, the record evidence makes clear that the advertising starts an irreversible process inevitably resulting in the Westgate owner withholding payment and breaching it contract with Westgate. The first link of the unbroken chain of deception is the advertising, the next link is the sales presentation misrepresentations, then the direction/"suggestion" to stop paying Westgate and so on, until the last link, 3, 4 or more years of waiting, lies and broken promises by TET.

In the Amended Complaint, Westgate alleged a non-exhaustive list of eight deceptive acts and practices, only two of which involved advertising. *See* DE 69, at ¶26(a)-(h). In discovery, Westgate listed 34 statements or acts that were false, misleading, unfair, and/or deceptive, including many statements, acts, and practices unrelated to TET's advertising. *See* DE 112-18, at 8-14. And in briefing summary judgment, Westgate put forth substantial evidence supporting its claims for damages and injunctive relief, detailing a multiple deceptive and unfair trade practices unrelated to advertising, including testimony showing customers were deceived and injured by TET's *conduct*.

Indeed, Westgate has presented 21 TET customers who testified that they stopped paying Westgate under their timeshare contracts specifically because TET instructed or encouraged

4

them to stop paying, both during the sales presentations and after they hired TET. *See infra,* at n. 5. Westgate submits this is *per se* a deceptive and unfair trade practice, particularly in the context of TET's other deceptive practices:

- holding itself out as an "timeshare exit" expert, when it has no expertise;

- offering a "safe," "legitimate," and "legal" means of divesting timeshare ownership, when it merely instructs persons to default, then, purposefully, does absolutely nothing and waits for Westgate to foreclose, brazenly claiming credit for achieving an "exit;" and

- telling customers "attorneys" who they do not know and who will not speak with them are negotiating with Westgate after cutting off communications between Westgate and its customers, when they know no work is being done and Westgate will not negotiate with TET or its outside attorneys.

These deceptive business practices are injurious to consumers, as their timeshares are simply foreclosed by Westgate, impairing customers' credit and costing them of thousands of dollars each paid to TET for a result they could have gotten without paying a fee to anybody. Westgate is aggrieved, and suffers actual damages in the form of, among other things to be proven at trial, lost payments, as a direct result of these deceptive acts and practices.

Accordingly, Westgate has presented unrebutted evidence raising issues of material fact that TET's deceptive acts and practices apart from its advertising, that is, ***its fraudulent, deceptive, or unconscionable conduct***, caused Westgate actual damages, and that Westgate is aggrieved by such acts that are injurious to consumers, that is, Westgate's customers in this case. Fundamental to this claim is that these timeshare owners were all Westgate's customers well before they were seduced by TET and they remain Westgate's customers even after that.

The Court has misapprehended Westgate's FDUTPA claims, limiting them to deceptive and false statements in TET's advertising, with damages the only remedy sought. But that is not what Westgate pleaded – DE 69, ¶¶126, 130 & Count II prayer for relief - and not what Westgate

5

has proved. As such, summary judgment on Westgate's FDUTPA claims for damages and injunctive relief was clear error, warranting reconsideration of the Order and denial of summary judgment on Westgate's FDUTPA claims.

## II. MEMORANDUM OF LAW

### a. Legal Standard for Reconsideration

Motions for reconsideration are appropriate when there is "(1) an intervening change in controlling law, (2) the availability of new evidence, and (3) the need to correct clear error or manifest injustice." *Id*. Clear error exists when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992). A motion for reconsideration must be granted when it raises new issues overlooked by the court justifying reconsideration of its prior decision. *Fla. Coll. of Osteopathic Med., Inc. v. Dean Witter Reynolds, Inc.*, 12 F.Supp.2d 1306, 1308 (M.D. Fla.1998); *see Sandshaker Lounge & Package Store LLC v. RKR Beverage Inc*., 3:17-cv-686-MCR/CJK, 2018 WL 7351689 (N.D. Fla. Sept. 27, 2018) (granting reconsideration and reversing dismissal of FDUTPA claim, finding plaintiff alleged sufficient facts to show consumer harm and was not required to allege an actual consumer injury to state a claim for relief).

While there is no specific timeframe for filing a motion to reconsider a non-final order under Rule 54(b), a Court in this district recently found the standards for motions to alter or amend a judgment under Rule 59 and motions for relief from a judgment or order under Rule 60 to be "instructive." *See Club Exploria, LLC v. Aaronson*, Case No. 6:18-cv-576-Orl-28DCI, 2020 WL 686010, at n. 2 (M.D. Fla. Feb. 11, 2020). Given that those rules each prescribe a

period of 28 days to file a motion, and this Court's Order was entered on February 11, 2020, Westgate timely moves for reconsideration applying an "instructive" standard from those rules.

  **b. Reconsideration Is Warranted to Address a Clear Error of Apprehension by the Court in Entering Summary Judgment on Westgate's FDUTPA Claim**

  Reconsideration of the Order is required because the Court looked only at one component of Westgate's FDUTPA claim: TET's *false advertising*, ignoring the other pleaded components of the FDUTPA claim: TET's deceptive acts and practices *separate from the advertising i.e.* its conduct, and the substantial evidence supporting that aspect of the claim. For example, Defendants ignored testimony in exhibits to their own Motion from customers like Richard Snyder, who paid $7,870 to TET after being told in a sales meeting that the company would negotiate with Westgate to provide him a "safe" and "legal" exit from his timeshare, and then being instructed to stop paying and communicating with Westgate. DE 112-15, at 21:14-23:19, 37:14-17. Mr. Tanner described multiple deceptive practices and statements by TET, both at the sales presentation and after he hired the company:

> **Q. After hiring Timeshare Exit Team, did you find that any of the statements by its representatives in the sales meeting ended up being untrue?**
> 
> A. Yes.
> 
> **Q. Which ones?**
> 
> A. All of them.
> 
> **Q. How were they untrue?**
> 
> A. Well, number one, I had no idea that they were going to let this go to foreclosure. The release was to be honorable, and would not affect our credit rating.
>  Number two, they did not stay in touch with us.
>  Number three, I was not aware, until reading this letter that you just showed me, that they were going to allow the account to languish until foreclosure took place, which apparently they knew from the moment we contracted them. Instead, I was provided with all

7

>    sorts of excuses in writing -- and you have the
>    emails -- as to why the case was not moving forward.
>    **Q. After hiring Timeshare Exit Team, did you find that any of the statements and communication with their representatives during this process ended up being untrue?**
>
>    A. Well, I never doubted their representatives when they communicated to us -- with us by telephone -- they were very believable -- or by email. So we accepted what they said because we had paid them so much money. But it became clear in March of this year, when we received notice of foreclosure, that they had done nothing.
>    And so all of their statements appeared to have been untrue…

*Id*, at 41:1-42:8.  Mr. Tanner's timeshare was foreclosed by Westgate. *Id.*, at 44:6-25.

Defendants' Motion did not even mention Westgate's claim for injunctive relief, which requires a separate analysis and has different elements under FDUTPA. Instead, Defendants repeated their Lanham Act arguments, which are by definition limited to false advertising and do not, by statutory design, consider conduct. The Court granted summary judgment on both of Westgate's claims for lack of causation. Order, at 5-8. But causation is not an element of a claim for injunctive relief under FDUTPA, which instead requires Westgate only to show it is "aggrieved" by a deceptive act or practice injurious to consumers. *See Stewart*, 266 So. 3d at 214.

Accordingly, the Court has entered summary judgment on Westgate's FDUTPA claims without considering all of the claims asserted and relief sought under FDUTPA and without viewing all of the evidence and drawing all reasonable inferences from the evidence in the light most favorable to Westgate, as required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Reconsideration of the Order's granting of summary judgment on Westgate's FDUTPA claim is required to prevent manifest injustice and correct a clear error of apprehension as to the scope of

conduct underlying Westgate's claim for damages, and to correct a decision outside the adversarial issues presented to the Court, including Westgate's claim for injunctive relief.

### c. Triable Issues of Fact Support Westgate's Claims for Damages and Equitable Relief under FDUTPA

Unlike its false advertising claim under the Lanham Act, only a part of Westgate's claim under FDUTPA focused on TET's advertising as the cause of its damages. Westgate's claim for damages and right to injunctive relief under FDUTPA is not so constrained. A Lanham Act plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). By comparison, the scope of actionable conduct under FDUTPA is substantially more expansive: "unfair or deceptive acts or practices" committed "in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

The Florida Supreme Court has defined an "unfair practice" as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and a "deception" as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So. 2d 773, 777 (Fla. 2003). FDUTPA standing is not limited to consumers, but rather a person "aggrieved," who must, regardless, prove an injury to consumers. *Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015).

FDUTPA scope and remedies are to be "construed liberally to promote" the policy of "protect[ing] the consuming public and legitimate enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct

of any trade or commerce." §501.202(2), Fla. Stat; *see Samuels v. King Motor Co.*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001) To promote the public policy of the statute, FDUTPA provides a private right of action to pursue monetary damages under Section 501.211(2) and declaratory and injunctive relief under Section 501.211(1). Although these remedies may be combined in a single count in a complaint, as Westgate has done here, the "allegations implicate two separate paragraphs of FDUTPA, each of which requires a separate analysis." *Ahearn*, 180 So. 3d at 171.

### 1. Overlooked Issues of Fact Preclude Summary Judgment on Westgate's Claims for Damages under FDUTPA

Abundant record evidence shows that TET engaged in unfair and deceptive acts and practices, *i.e.* **conduct**. Although TET's Motion left Westgate's FDUTPA claim for damages for conduct other than advertising (DE 69, ¶126) and for injunctive relief (DE 69, ¶130) unchallenged, Westgate still made an unrebutted record supporting those components of its FDUTPA claim. The analysis that follows, unneeded to rebut a summary judgment argument never made, shows why summary judgment on the FDUTPA claim was wrong.

To prevail on a claim for damages under FDUTPA, a plaintiff must prove (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (citing *Rollins, Inc. v. Butland*, 851 So. 2d 860, 869 (Fla. 2d DCA 2006)). Additionally, an aggrieved-person plaintiff must an prove the additional element of consumer harm. *Caribbean Cruise Line*, 169 So. 3d at 169. Courts cannot always determine if an act or practice is likely to mislead an objective reasonable consumer, and hence be considered "deceptive" under FDUTPA, by considering an act or practice in isolation:

> Additional evidence, such as "the circumstances" surrounding a particular representation, omission or practice—which inevitably includes, for example, other related representations, omissions, or practices of the defendant—is often relevant to determine whether

10

> the specific act is likely to mislead an objective reasonable consumer.

*Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 694 (S.D. Fla. 2010)

To show consumer harm, a party need only show that the deceptive act or practice is likely to mislead or deceive consumers, and "[t]his standard does not require subjective evidence of reliance, as would be the case with a common law action for fraud." *Davis v. Powertel*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000). In other words, for Westgate to show causation of consumer harm it need only show that the deceptive practice would, in theory, deceive an objectively reasonable consumer, a conclusion the record evidence already before this Court amply supports. *Fitzgerald*, 263 F.R.D. at 694-95 (citing *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 Fed. Appx. 565, 567 (11th Cir. June 3, 2009)) [emphasis in original]. Causation is a necessary element of a FDUTPA actual damages claim under Section 501.211(2). *Hennegan Co. v. Arriola*, 855 F.Supp.2d 1354, 1361 (S.D.Fla.2012). .

To be sure, Westgate has shown, and the Order did not find otherwise, that numerous statements in TET's advertising are deceptive, including that TET can provide a timeshare exit that is safe and legal, that it offers a 100% money-back guarantee and has a 100% success rate, and that it has attorneys who work directly with the timeshare resorts. DE 122, at ¶¶9-11, 14. The Court's focus on the causation element of Westgate's claim for damages under FDUTPA leaves the truth or falsity of TET's advertising unresolved. So TET's advertising remains as "related representations" of the Defendants that are relevant to determining whether the other specific acts and practices of TET, that is, its acts and conduct, are "likely to mislead an objective reasonable consumer." *Fitzpatrick*, 263 F.R.D. at 694

In addition to TET's advertising, Westgate has identified a host of acts and conduct by TET unrelated to its advertising that are likely to mislead or deceive a objectively reasonable

11

consumer. *See* DE 112-18, at 8-14; DE 122, at ¶¶31-52. Westgate quotes TET customers who were deceived by some of these very acts. *See e.g.* DE 112-15, at 41:1-25 (TET falsely claimed credit for exit and failed to disclose owner was foreclosed). For instance, TET instructs its customers who own Westgate timeshares to stop communicating with Westgate and has its contracted attorneys send demand letters to Westgate prohibiting Westgate from communicating with its own customers. *See e.g.* DE 112-8, at 11:15-12:1. Those customers – Westgate's customers first – are rarely told they "have" a lawyer, with good reason as those lawyers, by contract, refuse to talk to their supposed clients. DE 122 at ¶¶42-43. In this manner, TET controls the narrative with the customer as to what is going on – just like Mr. Snyder testified in his deposition. *See* DE 112-15, at 43:25-44:6 ("they were very believable … So we accepted what they said … [but] they had done nothing"). TET customers are regularly provided email updates by company representatives falsely assuring them that TET's "attorneys" are negotiating with Westgate, when TET knows Westgate will not negotiate with TET or TET's contracted attorneys. DE 111-3 at 243:7-11; DE 111-1 at 82:9-83:6; 51:3-9; 112:2-9. TET has even admitted to providing false updates to customers, and Westgate owners testified they received updates from TET containing false information about their cases. DE 111-3 at 243:7-11; DE 122-3 at 54:8-55:24; 58:9-59:16; *see also* DE 122, at ¶50 (citing deposition testimony of four TET customers).

      TET also deceives its customers by using vague references to "the lawyers" or "our lawyers" in its communications, and using its legal name "Reed Hein & Associates" (conjuring an image of a law firm) interchangeably with "Timeshare Exit Team." This creates confusion among customers about who these attorneys are, and many Westgate timeshare owners who retained TET have testified that believed Reed Hein & Associates was a law firm. *Id.*, at ¶48. Westgate owner first and then TET customer Richard Tanner believed Reed Hein & Associates was

a law firm because "they said they were." DE 112-7 at 8:10-15. Having been so deceived, Mr. Tanner testified that he stopped paying Westgate for his timeshare after hiring TET based on the advice of someone at TET he believed was a lawyer: "I was advised by a lawyer to stop paying it while they were negotiating." *Id.*, at 10:4-8.[4] Mr. Tanner was ultimately foreclosed by Westgate (*Id.*, at 28:7-9).

Like Mr. Tanner, twenty other Westgate timeshare owners stopped paying their timeshare contracts because TET instructed them not to pay. Carolyn Dupuie, Marlene Thorne, Denise Stewart, Lorraine Stoll, Brandie Russette, Richard Tanner, Richard Synder, Scott Brown, David McDaniel, Edgar Raymond Arnett, Roberto Martinez, Ben Trowell Jr., Shawna Cochran, Arnold Wayne Mullins, Eric Damron, Craig Spears, Gregory Jorgenson, Emeka Nicholas, Glen Edward Gaugh, and Sophia Elmore each hired TET to "exit" their Westgate timeshares and each testified they (1) were current on their mortgages and/or maintenance fee obligations for their timeshares when they hired TET; (2) TET directed them to stop paying those obligations; and (3) they stopped paying Westgate based upon TET's instructions.[5]

Because TET instructed these owners to stop paying but concealed its role and instructed the Westgate owners to do the same, Westgate foreclosed on the timeshares of most of these owners, including owner Carolyn Dupuie. She testified that she received a "congratulations" letter from TET taking credit for her timeshare "exit" and was totally unaware until her

---

[4] TET is not a law firm, as disclosed on its website. *See Is Timeshare Exit Team a law firm?*, https://timeshareexitteam.com/faqs/timeshare-exit-team-lawfirm/ (accessed Dec. 4, 2019) (DE 128-13) ("[TET] is not a law firm" and "does not provide legal advice or representation").

[5] *See* DE 111-14 at 53:19-54:14, 59:25-60-1; DE 111-20 at 20:5-23:1; DE 111-6 at 18:22-20:4; DE 111-22 at 10:5-9; 18:24-19:25; 32:8-15; DE 111-23 at 6:25-7:15; 12:18-13:11; 19:17-22; DE 111-24 at 14:13-15:12; 23:19-24:1; DE 111-25 at 12:10-15; 24:15-25:10; 38:8-14; DE 111-26 at 8:5-10; 15:25-16:23; 25:16-26:4; DE 112-12, at 57:14-58:7; DE 128-1 at 10:4-11; 18:16-19:11; 27:21-28:10; DE 128-2 at 8:4-11; 15:15-16:3, 23:15-24:8; DE 128-3 at 7:23-8:7; 14:25-15:21, 24:16-25:7; DE 128-4 at 8:14-19; 15:11-24; 23:19-24:7; DE 128-5 at 9:8-14; 17:24-18:2; 26:24-27:20; DE 128-6 at 8:5-11; 13:24-14:10; 21:8-21; DE 128-7 at 16:11-18; DE 128-8 at 8:9-14; 14:19-15:13; 22:17-23:6; DE 128-9 at 17:8-17; 29:14-30:9; 40:7-41:4; DE 128-10 at 6:19-25; 13:3-11; DE 128-11 at 19:3-17; 28:19-29:15; DE 128-12 at 9:24-10:6; 20:2-21:6; 33:15-35:10.

deposition in this case that Westgate had foreclosed on her timeshare. DE 111-17, at 103:9-104:22, 114:21-22. In fact, when shown a letter sent to Westgate on her behalf by a TET attorney claiming "fraud and misrepresentation" and stating "[m]y clients understand that you have the legal right to foreclose and take back the property and are willing to allow you to do so," Ms. Dupuie testified that she had never heard of or spoken to the attorney, never authorized him or TET to make a claim of fraud or misrepresentation to Westgate about their timeshare, and neither understood nor agreed that Westgate would be foreclosing on their timeshare. *Id.* at 67:20-24, 68:7-23; 69:23-72:17; Ex. 16.

TET's practice of directing and encouraging customers to stop paying Westgate is by itself an unfair and deceptive trade practice, as TET has no valid legal or factual basis to do so. TET makes no effort to ascertain whether any of its customers have any legal justification to stop paying their timeshare contracts with Westgate. *See* Defs.' Ans. to Pls.' 1st Interrogs. (Aug. 9, 2019) (DE 111-2), at 15. Moreover, in an earlier case in this District brought by Westgate against one of TET's contracted attorneys, Mitchell Reed Sussman, Judge Dalton found that Mr. Sussman's practice of directing timeshare owners to stop paying Westgate was "fraudulent and wrongful," and constituted a deceptive trade practice under FDUTPA. *See Westgate Resorts. Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1353, 1364 (M.D. Fla. 2019).[6]

TET's practice of instructing and encouraging its customers to stop paying their timeshare contracts is particularly deceptive when coupled with false statements and misrepresentations like those made to Mr. Tanner and Ms. Dupuie. While TET disingenuously disclaims a formal policy of instructing customers not to pay, its corporate representative testified the company was aware the

---

[6] While not binding on this Court, Westgate notes that summary judgment was denied on a virtually identical FDUPTA claim asserted against Defendants by another timeshare developer in this District. *See Orange Lake v. Reed Hein & Assocs.*, No. 17-cv-1542-Orl-31DCI, (M.D. Fla. October 4, 2019), at DE 420, 31-33.

14

practice occurred, its former marketing director testified stopping payment was recommended to gain leverage to negotiate with timeshare companies, and a former TET employee testified that non-payment was a tool used in TET's presentations to close sales. DE 122, at ¶¶31-34. And because TET's preferred default and foreclosure "exit" has no chance to work otherwise, twenty-one owners stopped making payments to Westgate because TET specifically directed them to stop paying. Those same customers – all Westgate customers first – were first seduced by TET's false advertising promising a safe and legal exit from their timeshares, and then induced to wait out the unexpected and unwanted foreclosure by TET's false assurances that "lawyers" were negotiating their exits with Westgate  In truth, as TET's former COO testified, foreclosure is the only exit option TET can offer to most of these customers due to "the lack of a clear process to truly terminate a mortgage." DE 111-1 at 36:11-19.

Certainly, with respect to these 21 TET customers, there is clear proof, or at least a disputed issue of material fact, that TET's deceptive practices directly caused Westgate's actual damages in the form of lost payments owed under the breached timeshares contracts. With respect to the other TET customers at issue in this case,[7] Westgate has presented evidence of its damages for 621 of them who defaulted on their Westgate timeshares only after hiring TET, supporting an inference that these and other of TET's deceptive acts and practices caused Westgate's damages. *See* Report of Steven Wolf, at DE 111-28, at 8-13 & Exs. H and I; *see Ameritox, Ltd. v. Millennium Labs., Inc.*, 2014 WL 12795383, at *2 (M.D. Fla. May 6, 2014) (sufficiency of circumstantial evidence is solely for the jury). Moreover, Westgate has retained and disclosed expert witness Charles Cowan whose statistical analysis shows that owners defaulted *as a result of TET's instruction to stop pay*ing. DE 122, at 32-33; *see also* DE

---

[7] Since briefing summary judgment, Westgate has conducted dozens of additional depositions and deposition on written questions of timeshare owners and obtained direct evidence from many of them that they stopped paying their timeshare contracts with Westgate because TET instructed them to do so.

141 (Order extending deadline for expert depositions until March 30, 2020). As the Court overlooked as yet unrebutted record evidence of causation, granting summary for lack of evidence was clear error.

Accordingly, Westgate has raised genuine issues of material fact that TET's deceptive acts and practices, including, but not limited to, its advertising, resulted in consumer harm and caused monetary losses to Westgate that are recoverable under FDUTPA – a statute that expressly requires a liberal construction. The Court's singular focus on whether or not TET's advertising statements caused its customers to stop paying Westgate was a clear error of apprehension overlooking the other allegations and evidence showing that TET caused owners to stop paying and supporting Westgate's claim for damages. As such, reconsideration of the Order is warranted, and reversal of summary judgment on Westgate's FDUTPA claims is required.

### 2. Unaddressed Issues of Fact Preclude Summary Judgment on Westgate's on FDUTPA Claim for Injunctive Relief

While the scope of TET's summary judgment argument was strictly limited to FDUTPA's damages remedy, the scope of FDUTPA's injunctive remedy invoked by Westgate is much broader than the damages remedy. *Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990). "The requirement for an entity to show an invasion of legal rights to seek equitable relief under section 501.211(1) is not synonymous with the requirement to show entitlement to actual damages under section 501.211(2)." *Stewart*, 266 So. 3d at 214. Section 501.211(1), Florida Statutes, is broadly worded to authorize declaratory and injunctive relief:

> Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part or to enjoin a person who has violated, is violating or is otherwise likely to violate this part.

Thus, "anyone aggrieved" by a violation of FDUTPA may bring an action to enjoin a person who has violated, is violating, or is otherwise likely to violate the Act, even if they cannot show an actual loss, so long as they show an injury to consumers.  Fla. Stat. § 501.211(1); *see Stewart,* 266 So. 3d at 214; *Wyndham*, 123 So. 3d at 1152. Thus, all an "aggrieved" person must do is demonstrate some specific past, present, or future grievance.  *Ahearn*, 180 So.3d at 173. It is enough that "those remedies would be limited to the protection of consumers who have not yet been harmed by the unlawful trade practice."  *Davis*, 776 So. 2d at 975.

Westgate has pleaded, and as shown, has adduced substantially unrebutted direct evidence to support its claims for equitable relief under FDUTPA in the Amended Complaint. DE 69, at 36-37.  Westgate is an aggrieved party within the meaning of Section 501.211(1): its rights have been, are being, or will be adversely affected by TET's unfair and deceptive acts and practices that are injurious to consumer, necessitating injunctive relief.

There can be no dispute that Westgate's legal rights are adversely affected, for example, when TET lures Westgate's customers with false promises and then tells them to default on their mortgages or other contractual obligations with Westgate. Twenty-one Westgate timeshare owners stopped paying their Westgate timeshare contracts because TET directed or encouraged them to stop paying. That, coupled with the lack of any legal justification for that instruction and the orchestration of a default and unknowing and unwanted foreclosure – remember Westgate often is barred from talking to its customers and telling them they are about to be foreclosed – are unfair and deceptive acts and practices actionable under FDUTPA and injurious to consumers who are foreclosed without their knowledge with Westgate reporting the unpaid debt to the credit bureaus.  Consumers are also duped out of thousands of dollars in fees paid to TET for a "service" for which no one would knowingly pay.  They were deceived and harmed

because that believed that TET offered something real, something "safe", "legal" and "legitimate."

TET interferes and disrupts Westgate's right to talk to its own customers. TET hires lawyers, almost always unknown to the "client", to send boilerplate demand letters to Westgate requiring Westgate to cease communications with its own customers, while at the same time instructing Westgate's customers to cease communications with Westgate. Westgate is obviously aggrieved by these practices. It is denied the right to service its own customers, to collect monies due on unpaid contracts, and if eligible, to assist customers to pursue a valid exit of their timeshares through a Westgate program. Likewise, these practices are injurious to consumers, as the customers are kept in the dark by TET, are unable to use their timeshare to enjoy vacations, and often suffered adverse foreclosure orders and blemished credit.

TET may have denominated its summary judgment motion as one seeking *final* summary judgment on Westgate's FDUTPA claim. But it was not; it was at most one seeking only partial summary judgment on just one component of Westgate's FDUTPA claim. TET's Motion completely failed to challenge or even mention Westgate's FDUTPA claim for injunctive relief. In fact, the only reference to "injunctive relief" in TET's Motion is Defendants' short, conclusory argument that Westgate cannot obtain injunctive relief *under the Lanham Act* because they cannot "establish an irreparable injury." Mot., at 28. They presented no argument or evidence to counter Westgate's claims for injunctive relief under FDUTPA, or contradict record evidence that Westgate is an aggrieved party entitled to injunctive relief.. They ignored Westgate's claim for injunctive relief under FDUTPA, arguing only that Westgate's claim for damages fails for lack of causation. The Court's entry of summary judgment on Westgate FDUTPA claims for lack of causation likewise ignored Westgate's claim for injunctive relief.

The record contains unrebutted evidence supporting Westgate's right to injunctive relief precluding summary judgment and material facts never even disputed by Defendants and not considered by the Court. The Order granting summary judgment on that claim was clear error, warranting reconsideration.

## CONCLUSION

TET's Motion did not seek summary judgment on Westgate's FDUTPA claim for injunctive relief. Final summary judgment on that part of the claim, without argument and in the face of substantial unrebutted record evidence supporting entitlement to injunctive relief was clear error. Westgate asks the Court to reconsider the Order and vacate the final summary judgment on Westgate's FDUTPA claims for damages and injunctive relief, and deny summary judgment on those claims.

Dated: February 28, 2020.            Respectfully submitted,

**GREENSPOON MARDER LLP**

*/s/ Brian R. Cummings*
Richard W. Epstein
Florida Bar No. 229091
Michael E. Marder
Florida Bar No. 251887
Jeffrey A. Backman
Florida Bar No. 662501
Brian R. Cummings
Florida Bar No. 25854
201 East Pine St, Suite 500
Orlando, Florida 32801
Telephone: (407) 425-6559
Facsimile: (407) 209-3152
*Counsel for Plaintiffs*

## GOOD FAITH CONFERENCE CERTIFICATION

Pursuant to Middle District Local Rule 3.01(g), the undersigned counsel certifies that Westgate's counsel conferred by telephone with Defendants' counsel on February 28, 2020,

regarding the subject of this Motion. Counsel for Defendants advised that Defendants are opposed to the relief sought in this motion.

                                                */s/ Brian R. Cummings*
                                                BRIAN R. CUMMINGS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on this February 28, 2020. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing electronically.

                                                */s/ Brian R. Cummings*

                                                BRIAN R. CUMMINGS

**SERVICE LIST**

John Y. Benford (john.benford@wilsonelser.com)
Amy Baker (amy.baker@wilsonelser.com)
**Wilson, Elser, Moskowitz, Edelman & Dicker, LLP**
111 N Orange Avenue, Suite 1200
Orlando, FL 32801-2361
Telephone: (407) 203-7599
Facsimile: (407) 648-1376
*Counsel for Defendant Reed Hein & Associates, LLC,*
*Brandon Reed, Trevor Hein and Thomas Parenteau*