# Exhibit "1"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WESTGATE RESORTS, LTD.,
a Florida limited partnership,
by and through its general partner,
WESTGATE RESORTS, INC.,
a Florida corporation, et al.,

      Plaintiffs,

v.

                                 CASE NO. 6:18-cv-01088-GAP-DCI

REED HEIN & ASSOCIATES, LLC,
d/b/a TIMESHARE EXIT TEAM, et al.,

      Defendants.

_____ /

## EXPERT REPORT OF MICHAEL J. BUCHANAN

      I, Michael Buchanan, have been retained by Defendants in this litigation to provide an

expert rebuttal concerning the report and opinions expressed by Plaintiff's expert, Charles

Cowan, Ph.D.  The following report sets forth the opinions I have reached in this matter.

### I.      Expert Credentials

      I am an applied economist and have significant experience in evaluating statistical and

economic issues in complex litigation matters. A copy of my CV is attached.  I have lectured at

Southern Methodist University ("SMU") on the topics of labor economics and statistics.  I have

served as an expert witness in matters involving economic and statistical issues including

sampling issues as well as economic damage issues.  I received my Bachelor of Science degree

in Economics with Financial Applications from SMU and I received my Master of Arts degree in

Applied Economics from SMU as well.  I currently work as an independent economist focusing

on litigation support.  Previously, I was a Senior Managing Director in the Economic Consulting

("EC") Practice at FTI Consulting ("FTI").  At FTI, I was the product leader of EC's Labor and

Employment practice. My responsibilities at FTI included providing economic, statistical, financial, and damage quantification consulting services to clients. I have significant experience in evaluating economic and statistical issues and I have assisted clients and counsel in various matters pertaining to economic damages and sampling.

I have been retained in many litigation matters to analyze, review and evaluate survey data and economic damage issues using statistical and economic techniques. I have testified as an expert within the preceding four years. A copy of my resume, which summarizes my experience and qualifications, is attached as Exhibit 1 to this declaration.

In performing my analyses and forming my opinions and conclusions, I have considered data and information from various sources, all of which are reasonably relied upon by experts in my field. Exhibit 2 contains a list of all the documents I have considered in this matter. I have also relied upon my professional experience and expertise, gathered over many years as a professional economist.

My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this declaration. This declaration is subject to change or modification should additional relevant information become available which bears on the analysis, opinions, or conclusions contained herein.

## II.    Assignment

I was retained by Reed Hein & Associates, LLC d/b/a Timeshare Exit Team ("Reed Hein" and "TET" respectively) to evaluate economic and statistical issues in this matter. Specifically, I have been asked to review and evaluate Plaintiffs' expert report of Charles Cowan Ph.D. ("Dr. Cowan"), executed on December 16, 2019 ("Cowan Report") and Dr. Cowan's Supplemental Report, dated February 14, 2020.

## III.    Summary of Opinions

Plaintiffs sample of 43 observations results in a margin of error of +/- 31.16% which is

too large a margin of error to yield any statistically meaningful results.

Dr. Cowan does not know if the sample is random, however if the sample is not random you cannot not extrapolate the findings to the entire population with any statistical reliability.

Dr. Cowan has provided no empirical basis for his assumption that the "sample" data is representative of those not included in the sample.

The coding of the depositions by Plaintiffs as "Influenced" or "Not Influenced" contains numerous errors that render the estimate of those "Influenced" erroneous and completely speculative.

Dr. Cowan failed to provide a meaningful extrapolation of alleged damages.

## IV.    Background

It is my understanding that Westgate is in the business of developing, financing, managing, and selling timeshares. In contrast, Timeshare Exit Team, according to its website, assists timeshare owners in ending their timeshare ownership after owners decide that they no longer want their timeshares. Timeshare Exit Team does not buy or sell timeshares. Many of its customers have attempted to exit their timeshare ownership and have been unable to give their timeshare back to Westgate or to sell their timeshare through a listing service.

I understand that Plaintiffs allege among other things that "TET …intentionally interferes with contracts between Westgate and owners of Westgate timeshare interests,…"[1] Furthermore, Plaintiffs claim "Upon information and belief, identifiable Westgate Owners' retainer documents contain provisions that contradict the verbal instructions TET's representatives give to the owners and the "guarantees" emblazoned across TET's website."[2]  In an effort to obtain data from Westgate owners, depositions on written questions were conducted for account holders.

---

[1] Amended Complaint For Damages and Injunctive Relief, Paragraph 48.
[2] Amended Complaint For Damages and Injunctive Relief, Paragraph 88.

V.    **A Review of Dr. Cowan's Expert Reports**

Plaintiffs' expert, Dr. Cowan states that he was retained to (1) assist in picking a random sample of Westgate Owners to depose and (2) to extrapolate the proportion of "Damaged Accounts" to the population:

> "to select a statistically valid random sample from a set of Westgate's accounts … 2) to extrapolate to the Population, the proportion of Damages Accounts and damages associated to those, as estimated by Mr. Wolf, for which the deposition responses indicate the account holder defaulted at the instruction or suggestion of Defendants ("Influenced Accounts").[3]

It is important to note that Plaintiffs' counsel, **NOT Dr. Cowan**, opined on which deponents were allegedly "Influenced" and thus are alleged "Damaged Accounts":

> "For the 23 depositions conducted and for which counsel was able to make a determination, counsel provided a conclusion on whether, based on the account holder testimony, the account should be considered an Influenced account."[4]

It is impossible for me, or anyone else, to review or evaluate how Plaintiffs' counsel coded the deposition testimony since that information has not been provided.  What is clear and discussed later in my report is that there are obvious cases of deposition testimony being miscoded which results in an erroneous and unreliable estimate of those allegedly "influenced" by TET.  First, I will discuss the issues with Dr. Cowan's reports.

A.  **Small Sample Size Results in Large Margin of Error**

For Dr. Cowan's first task, he advocates a sample size of 100 based on a 95% confidence level with a **maximum margin of error of ±10%**:

> "a simple random sample of 100 accounts, would have a maximum margin of

---

[3] Cowan Report, Paragraph 1.

[4] Cowan Report, Paragraph 33. (emphasis added)

4

error of +/-10% margin of error at the 95% confidence level."[5]

In selecting a sample, Dr. Cowan states that he "stratified the Population into four groups prior to selecting the sample to either provide flexibility to evaluate certain groups separately should a sufficient number of depositions on written questions be completed by the attorneys representing the Plaintiffs."[6]

However, Plaintiffs' first sample consisted of only 23 depositions, 1 of which Dr. Cowan dropped resulting in a sample size of 22, far less than the 100 depositions Dr. Cowan proposed. A sample of 22, using a 95% confidence level yields a margin of error of +/- 36.6%, which is significantly above Dr. Cowan's desired maximum margin of error of ±10%.   A margin of error of +/- 36.6% is much too high a margin of error to yield any statistically meaningful results.

Plaintiffs were provided more time to obtain additional depositions and in Dr. Cowan's supplemental report Plaintiffs reported a sample of 47, but Dr. Cowan based his extrapolation on a sample of 43 Westgate Owners because 4 of the depositions were conducted from the group of "Not On or After TET Hire Date".[7] This is the group that stopped paying their maintenance or their mortgage <u>before</u> the TET hire date.  It is interesting to note that Dr. Cowan actually included the category "Not On or After TET Hire Date" in his sample of 100 but ultimately removes the 4 depositions in this category.

Despite stating his goal of a **maximum margin of error of ±10%**, Dr. Cowan did not report the margin of error for any group or the overall sample in his report.  However, we can find the margin of error in Dr. Cowan's supporting documents.  The actual margin of error for the overall stratified sample of 43 observations is ±31.16% while the margin of error ranges from ±20.21% to ±48.63% for the three groups that comprise the 591 observations that were "On or After TET Hire Date."  Below is a snapshot of Dr. Cowan's supporting documents showing the margin of error for each group along with the overall sample margin of error.[8]

---

[5] Cowan Supplemental Report, Paragraph 3.

[6] Cowan Report, Paragraph 25.

[7] Cowan Report, 2/14/2020, Paragraph 3.

[8] See Dr. Cowan's supporting document:  "Westgate v. TET -- Influenced Account Rate

| Group | N Count | $N Alleged Damages | n Sample | n$ Sample Alleged Damages | Influenced | Influenced $ | 95% LB After FPC | 95% UB After FPC | Exact MOE |
|---|---|---|---|---|---|---|---|---|---|
| On or After TET Hire Date_Both Mortgage and Maintenance | 252 | $ 4,644,225 | 23 | $ 414,720.05 | 13 | $ 197,822.00 | 35.5% | 75.9% | 20.21% |
| On or After TET Hire Date_Mortgage Only | 119 | $ 2,196,501 | 18 | $ 406,421.78 | 10 | $ 217,879.56 | 32.6% | 76.8% | 22.07% |
| On or After TET Hire Date_Maintenance Only | 220 | $ 394,056 | 2 | $ 2,058.40 | 1 | $ 1,155.00 | 1.4% | 98.6% | 48.63% |
|  |  |  |  |  |  |  |  |  |  |
| On or After TET Hire Date (Simple Random Sample) | 591 | $ 7,234,782 | 43 | $ 823,200.23 | 24 | $ 416,856.56 | 40.5% | 70.4% | 14.96% |
|  |  |  |  |  |  |  |  |  |  |
| Group |  |  |  |  |  |  | 95% Lower Bound | 95% Upper Bound | MOE |
| On or After TET Hire Date (Stratified) |  |  |  |  |  |  | 22.2% | 84.5% | 31.16% |

The chart below is Table 1 from Dr. Cowan's supplemental report which depicts the estimate of those allegedly "influenced" along with the upper and lower bounds of the 95% confidence level.

Table 1: Extrapolation of Proportion of On or After TET Hire Date Influenced Accounts

| Type of Estimate | Influenced Account Rate | 95% Lower Bound | 95% Upper Bound |
|---|---|---|---|
| Estimate Based on Number of Accounts | 53.9% | 22.2% | 84.5% |
| Estimate Based on Dollar Damages | 50.0% | 27.0% | 72.3% |

Quoting Dr. Cowan, "The results provided above indicate that there is 95% chance that the proportion of Influenced Accounts in the "On or After TET Hire Date" account population is between the lower bounds and upper bounds."[9]  Simply put, based on a sample of 43, Plaintiffs can say that there is a 95% chance that those allegedly "influenced" is between 22.2% and 84.5%.  Clearly a range from 22.2% to 84.5% is too wide to be useful.  Dr. Cowan's stratified sample yields an "Influenced" rate of 53.9%, setting aside for the moment how this rate was determined by Plaintiffs' counsel, with a margin of error of ±31.16%.

Dr. Cowan set the sample size with a desired goal of having a **<u>maximum</u>** margin of error of +/- 10%.[10]  Plaintiffs failed to achieve this goal and have a margin of error of +/- 31.16%.  A margin of error of +/- 31.16% is much too high a margin of error to yield any statistically reliable

---

Extrapolation" Tab "Calculations". (emphasis added)

[9] Cowan Supplemental Report, Paragraph 4.

[10] Cowan Report, Paragraph 23.  "This estimate, with a simple random sample of 100 accounts, would have a maximum margin of error of +/-10% margin of error at the 95% confidence level.

results.

While there is no single, universally acknowledged margin of error appropriate for all purposes, the generally accepted margins of error cited in the scientific statistics community range from ±3% to ±5%, not ±10%.  This is reflected in the academic statistical literature.  Note that the first example is from an agency in the Department of Education:

- "Select the margin of error; the margin of error estimates the precision or accuracy of the statistics obtained from a survey sample. **A 5 percent margin of error is the most common**; it adds 5 percentage points of uncertainty around the sample statistic (statistic plus or minus 5 percent). Smaller margins of error may be chosen for a critical policy decision that requires precise estimates."[11]

- In their guide to conducting and designing survey research, Louis Rea and Richard Parker, each Professors in the School of Public Administration and Urban Studies at San Diego State University, state that the typical margin of error is usually set between ±3% and ±5%.[12]

- In setting forth guidelines for sample size determination in organizational research, Bartlett, Kotrlik, and Higgins (2001) states: "For categorical data, 5% margin of error is acceptable, and, for continuous data, 3% margin of error is acceptable."[13]

- In a paper presented at the survey methods section of the 2004 annual American Statistical Association meeting, the world's largest community of statisticians, Stokes and Berlin (2004) discourages a margin of error of ±10% due to the "considerable uncertainty" associated with such a wide margin of error, guiding readers instead to a ±3% margin of error.[14]

The above examples illustrate that the generally agreed-upon margins of error espoused

---

[11]Survey methods for educators: Selecting samples and administering surveys (part 2 of 3), Angela M. Pazzaglia, Erin T. Stafford, Sheila M. Rodriguez. Education Development Center, Inc., U.S. Department of Education, Institute of Education Sciences (Emphasis added)

[12]Rea, L. and R. Parker (2014). Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition, San Francisco: John Wiley & Sons, p. 165.

[13]Categorical data include variables such as gender, educational level, and other discrete variables, while continuous data include variables such as weight, time worked, and other variables which can theoretically take infinitely many values. Bartlett, J., J. Kotrlik, and C. Higgins (2001). "Organizational Research: Determining Appropriate Sample Size in Survey Research." Information Technology, Learning, and Performance Journal 19, p. 45.

[14]Stokes, L. and T. Belin (2004). "What is a Margin of Error?" (PDF). *What is a Survey?* Survey Research Methods Section, American Statistical Association. pp. 63 – 67.

in the academic statistics literature range from ±3% to ±5% not ±10%. The reason that surveys generally use margins of error of ±5% or lower is because otherwise such sample surveys have little to no practical value.  Regardless of ±5% or ±10% margin of error, Plaintiffs failed to achieve their desired margin of error, and it is my opinion that a margin of error of +/- 31.2% is too large to yield any meaningful results.

## B. Dr. Cowan Failed to Show Deposition Respondents are Representative of the Population

### 1. Dr. Cowan had to *ASSUME* that the sample is random

The Court should *not* rely on Dr. Cowan's results because Dr. Cowan failed to show that the deposition respondents are representative of the population whose experiences they purportedly reflect.  The representativeness of Dr. Cowan's deposition respondents is a foundational issue in this litigation because he states that he intends to extrapolate the results to the population.[15]  Dr. Cowan admits that he assumed the sample was random, thus there is no empirical evidence that the sample was a proper random sample.

> "For the purpose of extrapolation, **I have to further assume** that the 22 depositions conducted were a random subset of the 90 depositions I suggested as the set for which depositions should be conducted for this set."[16]

Dr. Cowan's Supplemental Report also fails to provide any evidence that the depositions were conducted randomly.  Thus, it appears that Dr. Cowan has no evidence that the sample of 43 was conducted randomly. Probability sampling (*e.g.*, random sampling) is widely recognized as a best practice in statistical science:

> "Probability samples are the standard by which other samples are judged. They are routinely used by almost all government statistical agencies when data are used to provide important information for policy makers. They are used for surveys used in litigation. They are used for

---

[15] Cowan Supplemental Report, paragraph 1.

[16] Cowan Report, Paragraph 34. (emphasis added)

8

measurement of media audience sizes, which in turn determine advertising
rates. In short, whenever large stakes ride on the value of a sample,
probability sampling is generally used."[17]

The second and third editions of *The Reference Manual on Scientific Evidence* state that

**probability sampling "maximizes both the representativeness of the survey results and the**

**ability to assess the accuracy of estimates obtained from the survey**."[18] The third edition of

*The Reference Manual on Scientific Evidence* also states that probability sampling "ensures that

within the limits of chance…, the sample will be representative of the sampling frame."[19]

A Department of Education agency published, *Survey methods for educators: Selecting*

*samples and administering surveys (part 2 of 3)*which states **"If survey results are to be**

**generalized from a sample to a target population, a probability sampling design must be**

**used."**[20]

Dr. Cowan failed to ensure a random or probability sample was taken of accounts and,

thus, failed to maximize both the representativeness of the results and the ability to assess the

accuracy of estimates obtained from the depositions, according to *The Reference Manual on*

*Scientific Evidence*. By failing to take or confirm a probability sample of accounts, Dr. Cowan

ignored a widely recognized best practice in statistical science.  In addition, Dr. Cowan cannot be

---

[17]   Groves, R.M., et al. (2009). *Survey Methodology*(2nd ed.), p. 6. Hoboken, NJ: John Wiley &
Sons, Inc.

[18]   Diamond, S(2000) "Reference Guide on Survey Research," in *Reference Manual on
Scientific Evidence* (2nd ed.), p. 242. Washington, D.C.: National Academies Press; Diamond, S.
(2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (3rd
ed.), p. 380. Washington, D.C.: National Academies Press. (emphasis added)

[19]   Kaye, D. and Freedman, D. (2011). "Reference Guide on Statistics," in *Reference Manual on
Scientific Evidence: Third Edition*, The National Academies Press, p. 226.

[20]Survey methods for educators: Selecting samples and administering surveys (part 2 of 3),
Angela M. Pazzaglia, Erin T. Stafford, Sheila M. Rodriguez. Education Development Center,
Inc., U.S. Department of Education, Institute of Education Sciences (emphasis added)

sure that the margin of error he calculated is statistically valid since had to ASSUME that the sample was random.

Plaintiffs' sample lacks any level of confidence or margin of error since proper sampling techniques were not followed (i.e. it was not selected randomly). However, even if a sample of 43 was selected randomly, it is doubtful most statisticians or econometricians would rely on estimates with this level of error tolerance to draw any meaningful conclusions.

### 2. Sample is Not Representative of the Population

Dr. Cowan failed to show that the sample of 43 deponents is representative of the population. Dr. Cowan's first report describes how he selected the sample of 100 based on the amount of damages in each of his categories. He states:

> "I further divided the group by the type of default they incurred and **used the proportion of total damages**, as computed by Mr. Wolf, that each group contributed to the total for the "On or After TET Hire Date" group of accounts **to determine the number of accounts to propose to be deposed on written questions from each sub-group**.[21]

I have calculated the sample proportion and compared that to the proportion of total damages as alleged by Mr. Wolf. The sample of 47, adjusted to 43, to replicate Dr. Cowan omitting 4 observations indicates that the sample of 43 under-sampled "Mortgage and Maintenance" by 13.81% and over sampled "Mortgage only" by 19.01%. For example, Alleged Damages for Mortgage and Maintenance is 64.19% of Total Alleged Damages, but the Sample Damages are only 50.38% of the Alleged Sample Damages for a difference of 13.81%.

---

[21] Cowan Report, Paragraph 27. (emphasis added)

**Sample Weight compared to Population Weight by Alleged Damages**

| | Population | Alleged Damages | Sample | Sample Alleged Damages | Weight [On or After Stratified] | Sample Weight | Difference |
|---|---|---|---|---|---|---|---|
| On or After TET Hire Date_Both Mortgage and Maintenance | 252 | $ 4,644,225 | 23 | $414,720.05 | 64.19% | 50.38% | -13.81% |
| On or After TET Hire Date_Mortgage Only | 119 | $ 2,196,501 | 18 | $ 406,421.78 | 30.36% | 49.37% | 19.01% |
| On or After TET Hire Date_Maintenance Only | 220 | $ 394,056 | 2 | $ 2,058.40 | 5.45% | 0.25% | -5.20% |
| **Total used by Dr. Cowan** | **591** | **$ 7,234,782** | **43** | **$823,200.23** | **100.00%** | **100.00%** | |

The table below indicates that the sample of 43 is not representative based on the population count. Below are the three groups Dr. Cowan created followed by the population count and percentage of total population ("Weighted [On or After Stratified]") along with the sample count and percentage of sample for each group.

**Sample Weight compared to Population Weight by Count**

| | Population | Alleged Damages | Sample | Sample Alleged Damages | Weight [On or After Stratified] | Sample Weight | Difference |
|---|---|---|---|---|---|---|---|
| On or After TET Hire Date_Both Mortgage and Maintenance | 252 | $ 4,644,225 | 23 | $414,720.05 | 42.64% | 53.49% | 10.85% |
| On or After TET Hire Date_Mortgage Only | 119 | $ 2,196,501 | 18 | $406,421.78 | 20.14% | 41.86% | 21.73% |
| On or After TET Hire Date_Maintenance Only | 220 | $ 394,056 | 2 | $ 2,058.40 | 37.23% | 4.65% | -32.57% |
| **Total used by Dr. Cowan** | **591** | **$ 7,234,782** | **43** | **$823,200.23** | **100.00%** | **100.00%** | |

There is a difference of at least 10 percentage points between Population weight and Sample weight indicating that the sample is not representative of the population. Numerically, there are 220 accounts in the category "On or After TET Hire Date – Maintenance Only" and only 2 accounts are included in Plaintiffs sample. In fact, there were only 2 sampled in the first report, so no one was sampled in this group since the first report. It appears that the "Maintenance Only" group, which accounts for 37%[22] of the population, was ignored or skipped in the 2nd sample collection. Ignoring a category in the 2nd sample collection phase further calls into question if the sample was chosen randomly. Below is a comparison of the first sample versus the final sample where I derive how many observations were added in the 2nd sampling attempt and how many were attempted to be deposed in the 2nd sampling attempt.

---

[22] Sample of 220 / 591 Population = 37%

11

|  | Initial Sample | Initial Sample Max # | Final Sample | Phase 2 Sample Max # | Added to Sample in Phase 2 | Attempted to Sample in Phase 2 |
|---|---|---|---|---|---|---|
| On or After TET Hire Date_Both Mortgage and Maintenance | 12 | 68 | 23 | 135 | 11 | 67 |
| On or After TET Hire Date_Mortgage Only | 8 | 32 | 18 | 54 | 10 | 22 |
| On or After TET Hire Date_Maintenance Only | 2 | 7 | 2 | 7 | 0 | 0 |
| **Total used by Dr. Cowan** | **22** | **107** | **43** | **196** | **21** | **89** |
|  |  |  |  |  |  |  |
| Not on Or After TET Hire Date | 1 | 8 | 4 | 27 | 3 | 19 |
|  |  |  |  |  |  |  |
| **Total** | **23** | **115** | **47** | **223** | **24** | **108** |

\* Using the "count" maximum number in Dr. Cowan's sample file.

Comparing the initial sample of 22 to Dr. Cowan's final sample of 43 by group indicates that the "Maintenance Only" was not sampled during the 2nd sampling phase. However, in the category "Not on Or After TET Hire Date", which Dr. Cowan does not use in his analysis, there were 19 attempts to depose owners and Plaintiffs added 3 more sample observations, which Dr. Cowan ultimately ignores.

The representativeness of the deponents is a foundational issue in this litigation because Dr. Cowan purports to extrapolate the results of those determined to be "influenced" to the entire population.

> "The purpose of these additional 10 accounts was to allow me to estimate the proportion of Influenced Accounts at the aggregate level – that is for the Population of 787 accounts by combining the results together with those obtained from the other 90 accounts, if requested."[23]

Dr. Cowan omitted all 4 sample observations from the "Not on or After TET Hire date" category from his analysis which prevents him extrapolating the proportion to the population of 787. Furthermore, the chart above indicates that someone made the choice in the 2nd phase of sampling to NOT sample "Maintenance Only" accounts.

---

[23] Cowan Report, Paragraph 28.

| | Population | Initial Sample | Final Sample | Dr. Cowan Proposed Sample Size |
|---|---|---|---|---|
| On or After TET Hire Date_Both Mortgage and Maintenance | 252 | 12 | 23 | 58 |
| On or After TET Hire Date_Mortgage Only | 119 | 8 | 18 | 27 |
| On or After TET Hire Date_Maintenance Only | 220 | 2 | 2 | 5 |
| **Total used by Dr. Cowan** | **591** | **22** | **43** | **90** |
| | | | | |
| Not on Or After TET Hire Date | 196 | 1 | 4 | 10 |
| | | | | |
| **Total** | **787** | **23** | **47** | **100** |

In his initial report Dr. Cowan stated, "I provided counsel with instructions for selecting supplements to ensure that the randomness of the samples was maintained."[24] Neither Dr. Cowan, nor counsel, has provided the instructions for making selections.  There is no evidence or data showing that Dr. Cowan's instructions were followed or the reason why many accounts were skipped.  However, when the initial sample failed to achieve Dr. Cowan's desired number of observations per group a second round of sampling was allowed.   Since Dr. Cowan's desired number of observations per group was not met in the initial sample selection there is no reason why all groups should not have continued to be randomly sampled in the 2nd phase.  Below is a comparison of the population count with the sample counts for the initial sample and the final sample along with Dr. Cowan's desired sample size.

The failure to attempt to sample "Maintenance Only" accounts in the 2nd sampling phase makes it clear that the 2nd phase of sampling is not consistent with the initial sample selection nor was the 2nd phase random.  Again, if the sample is not random or chosen to be representative of the whole population, errors beyond the margin of error may occur.

---

[24] Cowan Report, paragraph 30. (emphasis added)

### C. Non-Response Bias

*The Reference Manual on Scientific Evidence* states:

"…[T]he difficult question to address is the extent to which nonresponse has biased the pattern of responses by undermining the representativeness of the sample and, if it has, the direction of that bias. **It is incumbent on the expert presenting the survey results to analyze the level and sources of nonresponse, and to assess how that nonresponse is likely to have affected the results**."[25]

Dr. Cowan failed to analyze the level and sources of non-response, and to assess how that non-response is likely to have affected the results. Dr. Cowan needed to compare the experiences of the 43 deposition respondents to the experiences of the non-respondent to assess how non-response is likely to have affected his results. Dr. Cowan did *nothing* to learn about the experiences of non-respondents.

Dr. Cowan failed to provide any information or data in this litigation that suggest that it is likely that the deposition respondents are similar to the non-respondents. Below is a chart that depicts the population along with Dr. Cowan's sample of 43 coupled with the maximum number in each group that tell us, at a minimum, how many accounts Plaintiffs had to attempt to depose to get a sample of 43.

---

[25]   Diamond, S. (2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (3rd ed.), p. 383. Washington, D.C.: National Academies Press. (emphasis added)

I understand that the questions in this matter are not from a survey but are deposition questions. Other than testifying under oath, deposition questions and information obtained from the deposition testimony is very similar to the way researchers obtain information from survey data. In fact, it appears that the deposition questions varied little across the deponents, much like a survey.

|  | Population | Final Sample | Phase 2 Sample Max # | Skipped but No Reason Provided |
|---|---|---|---|---|
| On or After TET Hire Date_Both Mortgage and Maintenance | 252 | 23 | 135 | 112 |
| On or After TET Hire Date_Mortgage Only | 119 | 18 | 54 | 36 |
| On or After TET Hire Date_Maintenance Only | 220 | 2 | 7 | 5 |
| **Total used by Dr. Cowan** | **591** | **43** | **196** | **153** |
|  |  |  |  |  |
| Not on Or After TET Hire Date | 196 | 4 | 27 | 23 |
|  |  |  |  |  |
| **Total** | **787** | **47** | **223** | **176** |

 * Using the "count" maximum number in Dr. Cowan's sample file.

There are at least 176 account owners that were allegedly to be deposed, assuming Dr. Cowan's random order was followed by Plaintiffs' counsel, but for some reason they were not deposed and Plaintiffs did not provide a reason why.  Dr. Cowan reports *nothing* about why they were skipped or the experiences of the non-respondents and, as a result, does not know whether the low response rate impacts the representativeness of his results, or, if so, the direction of any non-response bias.

In the end, Dr. Cowan was left with a non-random sample of 43 accounts. If the sample was selected non-randomly, then it is inappropriate to assume that non-responses are distributed randomly in a way that does not bias the survey results.

Dr. Cowan ultimately failed to analyze the level and sources of non-response, and to assess how that non-response is likely to have affected the results, an analysis that Dr. Cowan is required to perform, according to *The Reference Manual on Scientific Evidence*. By failing to undertake such an analysis, Dr. Cowan ignored a widely-recognized best practice in statistical science.

**D.  Dr. Cowan Provided No Empirical Basis for Extrapolation**

As discussed above, Dr. Cowan has provided no empirical basis for his assumption that the "sample" data is representative of those not included in the sample.  Dr. Cowan does not know if the sample is random, however, if the sample is not random you cannot not extrapolate the findings to the entire population with any statistical reliability.  Regardless if the sample was random or not, we know the sample estimate has no statistically meaningful or practical use with a margin of error of +/- 31%.

**E.  Dr. Cowan Failed to Extrapolate to the Population**

Dr. Cowan states he was "to extrapolate to the Population, the proportion of Damages Accounts and damages associated to those, as estimated by Mr. Wolf, for which the deposition responses indicate the account holder defaulted at the instruction or suggestion of Defendants ("Influenced Accounts")."  Remember, Dr. Cowan defines "Influenced Accounts" as those "that Defendants instructed them to default."[26]

Dr. Cowan presents an estimate of 53.9% of the sample data were "Influenced.  However, as Dr. Cowan stated, he did not perform the analysis to determine if any accounts in the sample were influenced.  Instead, he is relying on the Plaintiffs' attorneys to make that determination.

> "For the 23 depositions conducted and for which counsel was able to make
> a determination, counsel provided a conclusion on whether, based on the account holder
> testimony, the account should be considered an Influenced account."[27]
> ......
> "**The conclusions from counsel** were provided to me as a document with two lists of
> names (names for account holders that stated they were influenced and names for account
> holders that did not state they were influenced)."[28]

Dr. Cowan, with apparently no knowledge of how deponents were coded, accepted Plaintiffs' assertion that 53.9% of those sampled were "influenced".  Even if all of Plaintiffs'

---

[26] Cowan Report, paragraph 23.

[27] Cowan Report, paragraph 32.

[28] Cowan Supplemental Report, Footnote 3, page 2. (emphasis added)

deposition coding were correct, which I don't believe it is, Dr. Cowan did not extrapolate or

identify which accounts in the population were "influenced" versus those that were not based on

the sample data.  Nor did he extrapolate the amount of alleged damages.  Dr. Cowan simply

reiterates the estimate provided by Plaintiffs' counsel and then provides the resulting Lower and

Upper Bounds at a 95% confidence level.  Dr. Cowan provided two estimates in Table 1 of his

supplemental report.  The first is the estimate based on the "number of accounts" that were

allegedly influenced.  The second is an estimate based on the "dollar damages".  Dr. Cowan does

not specify which estimate or range he will apply, if any, to extrapolate alleged damages to the

population.

**Table 1: Extrapolation of Proportion of On or After TET Hire Date Influenced Accounts**

| Type of Estimate | Influenced Account Rate | 95% Lower Bound | 95% Upper Bound |
|---|---|---|---|
| Estimate Based on Number of Accounts | 53.9% | 22.2% | 84.5% |
| Estimate Based on Dollar Damages | 50.0% | 27.0% | 72.3% |

Thus, we are left to our own imagination as to how and which estimate or range of

estimates Plaintiffs' or Dr. Cowan will extrapolate to determine alleged damages.  Again, Dr.

Cowan states his second task was to"

> "to extrapolate to the Population, the proportion of Damages Accounts and
> damages associated to those, as estimated by Mr. Wolf, for which the deposition
> responses indicate the account holder defaulted at the instruction or suggestion of
> Defendants ("Influenced Accounts)."

Dr. Cowan has failed to provide the court with any useful extrapolated information based

on the sample data.  We do not know what accounts he believes are "influenced" and the

resulting alleged damages from the alleged influence.  In short, there was never a useful

extrapolation.

### F. Errors in Coding Deposition Testimony

I have reviewed several depositions in this matter and it is my opinion that Plaintiffs have erroneously miscoded several accounts as "influenced" when their testimony would indicate otherwise. Thus, Dr. Cowan's reporting of the estimate of those allegedly influenced is overstated, erroneous and unreliable. Below are examples, but not an exhaustive review, of testimony from several account holders that Plaintiffs erroneously coded as "Influenced".

Plaintiffs categorized Glen Edward Gaugh as "influenced" but he testified that he was not current on his mortgage or tax payments BEFORE he hired Timeshare Exit Team:

> Q. Were you current on the mortgage payments when you decided to hire Timeshare Exit Team?
>
> A. No.
>
> Q. Were you current on the maintenance and tax payments when you decided to hire Timeshare Exit Team?
>
> A. No.[29]
>
> …………………..
>
> Q. Did you stop paying your maintenance and tax fees for your timeshare after you retained Timeshare Exit Team?
>
> A. Well, I was already unable to pay so I had already not been paying my maintenance and tax fees, so yes.[30]

Plaintiffs categorized Shawna Cochran as "influenced" but she repeatedly testified that it was her choice to stop paying before she hired Timeshare Exit Team:

> Q. Okay. What did the Timeshare Exit Team representative tell you about the company, and what it could do for you?

---

[29] Deposition of Glen Edward Gaugh, page 10.

[30] Deposition of Glen Edward Gaugh, page 29.

A. I believe his name was Nathan, and he basically had talked to me about the fact
that I **-- they did not make me not pay my mortgage**, but they felt that at this
point, you know, **it was my decision whether or not I wanted to continue to
pay** it or not, but if I retained them for their services to exit, that was **my decision**
to make whether or not I wanted to continue to make payments or not, but that
oftentimes, because I was still making payments, it would sometimes delay the
exit going through quickly.

Q. Okay.

A. So **I did chose to not continue to pay my mortgage amount and fee**, quite
frankly, because I felt that Westgate was also taking my money, and not providing
the service I was paying for.[31]

…………………………………

A. They did not tell me to stop paying. They told me it was my choice to stop
paying, and so I chose to.[32]

Plaintiffs categorized Emeka Nicholas as "influenced" but her deposition makes it clear

that it was her choice to stop paying and she states several times she was not influenced.

Q. Did the representative instruct you to stop paying your mortgage or
maintenance and tax obligations for your time share?

A. **No.**

Q. Did the representative suggest or imply that you should stop paying your
mortgage or maintenance and tax obligations for your timeshare?

A. I'll say yes.

Q. What exactly did he or she say?

A. It was scenarios as to say that, If I were you, I would not do this, but not
directly to tell me not to -- not to pay it. **They said it was my choice.[33]**

…………….

---

[31] Deposition of Shawna Cochran, page 14. (emphasis added)

[32] Deposition of Shawna Cochran, page 27.

[33] Deposition of Emeka Nicholas, pages 12-13. (emphasis added)

19

Q. Did you stop paying your mortgage for your timeshare after you retained
Timeshare Exit Team?

A. Yes.

Q. Did you continue not paying your mortgage because Timeshare Exit Team had
told you to stop paying?

A. **No.**

Q. Did you stop paying your maintenance and tax fees for your timeshare after
you retained Timeshare Exit Team?

A. Yes.

Q. Did you continue not paying your maintenance and tax fees because Timeshare
Exit Team had told you to stop paying?

A. I don't remember. I don't remember if they said not to or not.[34]

Plaintiffs categorized Edgar Raymond Arnett as "influenced" but his deposition indicates

that he would have stopped paying regardless of hiring Timeshare Exit Team.

THE NOTARY: Did you stop paying your mortgage for your timeshare after you
retained Timeshare Exit Team?

THE WITNESS: Yes.

THE NOTARY: Did you continue not paying your mortgage because Timeshare
Exit Team had told you to stop paying?

THE WITNESS: Yes. **I wasn't going to pay them anyhow because I couldn't
use it, so it didn't make any difference**. I may have even stopped before I
acquired them.[35]

Plaintiffs categorized Susan Harding [Robinson] as "influenced" but her deposition

testimony indicates that she stopped because she couldn't afford it.

Q. Did you continue not paying your maintenance and tax fees because the
Timeshare Exit Team had told you to stop 18 paying?

---

[34] Deposition of Emeka Nicholas, pages 20-21. (emphasis added)

[35] Deposition of Edgar Raymond Arnett, page 23. (emphasis added)

A. **I stopped paying because I couldn't afford it**.[36]

Plaintiffs categorized Anthony Kincaid as "influenced" but like others, it's not a clear line.  He testified multiple times that Timeshare Exit Team "recommended" they not pay implying that this is his choice.  At the very least is the coding is questionable.  It is subjective for Plaintiffs to indicate this as a clearly influenced account.

> Q. Did the representative instruct you to stop paying your mortgage or maintenance and tax obligations for your timeshare?
>
> A. Yes.
>
> Q. What exactly did he or she say?
>
> A. **They recommended that we don't pay them** any of the maintenance fees or mortgage fees while the legal proceedings pay [sic] out because we would likely not get that money back if successful or not of exiting.
>
> Q. Did the representative suggest or imply that you should stop paying your mortgage or maintenance and tax obligations for your timeshare?
>
> A. **No. They recommended.**
>
> Q. What exactly did he or she say?
>
> A. Again**, they recommended that we not pay** while they process of exiting was going on.[37]

Adjusting Dr. Cowan's Table 1 just for the miscoded depositions present above results in a decrease of the estimate of those allegedly influenced to 19 allegedly influenced accounts or 44% of the overall sample.  Using Dr. Cowan's supporting documents, I updated Table 1 of his supplemental report to reflect the revised Influenced Rate (which is weighted) based on just these coding corrections.

---

[36] Deposition of Susan Harding [Robinson], page 27. (emphasis added)

[37] Deposition of Anthony Kincaid, pages 13-14.

| Type of Estimate | Influenced Account Rate | 95% Lower Bound | 95% Upper Bound |
|---|---|---|---|
| Estimate Based on Number of Accounts | 46.1% | 15.5% | 77.8% |
| Estimate Based on Dollar Damages | 37.3% | 16.9% | 60.8% |

Based on a limited review of the depositions, the alleged Influenced Rate is 46.1% with a Lower and Upper Bound between 15.5% and 77.8%, which is much too wide a margin of error to be useful. You will also notice that the Influenced Rate for Estimated Damages is 37.3% which is much lower than the percentage of alleged damages Dr. Cowan presents. The Upper and Lower Bounds of the Dollar Damage is also too wide to be useful.

The numbers above are a demonstration that Plaintiffs coding is erroneous and not reliable. It is not meant to be a complete and exhaustive review of those deposed or even a comment on if the questions were appropriate. It is simply meant to show that even if you ignore the non-random sample issue, the small sample size and the wide margin of error, it is clear that Plaintiffs estimate of those "influenced" is erroneous and completely unreliable.

**G. Omitting Deposition Testimony**

Dr. Cowan's sampling plan of 100 observations includes 10 observations from the category "Not on Or After TET Hire Date", but Dr. Cowan's footnote 6 in his first report indicates that he omits any depositions in the sample taken from this category, yet he provides no reason. In addition, Dr. Cowan or Plaintiffs' attorneys have conducted several depositions and inexplicitly excluded them from the sample. Below are a few examples of deposition that were completed but omitted.

Account Holder Francelonne C. Jones was deposed February 7, 2020, but her deposition was not included in the list of accounts that were coded by Plaintiffs' counsel in the document "OUTLINE OF TESTIMONY FROM 47 DWQS FOR CHUCK COWAN" by Plaintiffs'

counsel.[38]  Her deposition testimony indicates that she was not "influenced" as alleged by

Plaintiffs.

> Q. Did the representative instruct you to stop paying your mortgage or
> maintenance and tax obligations for your timeshare?
>
> THE WITNESS: No.
>
> Q. Did the representative suggest or imply that you should stop paying your
> mortgage or maintenance and tax obligations for your timeshare?\
>
> THE WITNESS: No, I stopped because I couldn't afford it.[39]

Christopher Newbern was deposed January 31, 2020, but his deposition was not included

in Dr. Cowan's list of depositions to consider I referenced above.  His deposition testimony

indicates that he was not influenced as well.

> Q. Did the representative instruct you to stop paying your mortgage or
> maintenance and tax obligations for your timeshare?
>
> A. No.
>
> Q. Did the representative suggest or imply that you should stop paying your
> mortgage or maintenance and tax obligations for your timeshare?
>
> A.  No.[40]

Rhonda Schiestel was deposed November 22, 2019 and her deposition was not included

in Dr. Cowan's list of depositions to consider I referenced above.  Her deposition testimony

indicates that she was not influenced as well.

> Q. Did the representative instruct you to stop paying your mortgage or
> maintenance and tax obligations for your timeshare?
>
> A. No.

---

[38] See MS Word Document:  SUPPLEMENTAL OUTLINE OF TESTIMONY FROM DWQS
FOR CHUCK COWAN (3)

[39] Deposition of Francelonne C. Jones, page 16.

[40] Deposition of Christopher Newbern, pages 9-10.

Q.. Did the representative suggest or imply that you should stop paying your
mortgage or maintenance and tax obligations for your timeshare?

A No, you just asked me that.[41]


Christopher Eugene Walworth was deposed November 8, 2019, but his deposition was

not included in Dr. Cowan's list of depositions to consider I referenced above.  His deposition

testimony vacillates as to if he was influenced or not.

Q. Did you continue not paying your mortgage because Timeshare Exit Team had
told you to stop paying?

A. Oh. You know what? I just saw that too.  Okay. I had emailed them and asked
them if it -- because they were -- Westgate was currently taking an automatic
payment out of my bank account every month and I ask her if I should continue
that or not. She said "It's your choice whether you want to keep paying it or not. If
you want to stop, then yes, you need to contact them and tell them you want to
stop automatic payments and start manual payments with paper billing.  Do not
tell them you are going to pay any more – you aren't going to pay any more."

Q. Okay. So -- so did you continue not paying your mortgage because Timeshare
Exit Team had told you to stop paying?

A. She said that's up to me. It's -- she said it's my choice. And we couldn't afford
to pay it.[42]

…………………..

Q. Did you continue not paying your maintenance and tax fees because Timeshare
Exit Team told – had told you to stop paying?

A.  No.[43]

………………

Q.  Did the representative instruct you to stop paying your mortgage or
maintenance and tax obligations of your timeshare?

A.  The maintenance, no, but the mortgage, yes.

---

[41] Deposition of Rhonda Schiestel, page 14.

[42] Deposition of Christopher Eugene Walworth, pages 33-34.

[43] Deposition of Christopher Eugene Walworth, page 34.

24

> Q. Did the representative suggest or imply that you should stop paying your mortgage or maintenance and tax obligations for your timeshare?
>
> A. Yes. To my recollection, yes.[44]

Based on Dr. Cowan's initial report and supplemental reports, it appears that Plaintiffs' counsel is making the choice as to which depositions Dr. Cowan is to include in the overall sample as well as if they are deemed "influenced." Cherry picking observations to include or exclude in a sample is not statistically appropriate.

## VI.    CONCLUSION

Dr. Cowan was asked to perform two separate tasks for Plaintiffs in this matter. The first was to select a random sample for Plaintiffs to conduct depositions of Westgate Owners and the second task was to extrapolate the findings to the population. Neither task was completed.

Dr. Cowan opined that a sample of 100 would have a maximum margin of error of ±10 using a 95% confidence interval. Dr. Cowan provided Plaintiffs with a list of 300 randomly ordered deponents in order to accomplish the goal of obtaining 100 observations. Plaintiffs only obtained 43 that were useful and Dr. Cowan failed to verify that the sample was randomly selected. With a sample of only 43 and a margin of error of +/- 31.1%, Plaintiffs failed to meet their own expert's desired margin of error.

Depositions were completed and then were omitted from the sample by Plaintiffs for no apparent reason. In addition, Dr. Cowan doesn't know if the sample was chosen randomly or not. Thus, he is assuming that the probabilities of a random sample while the information in this matter indicates the sample was not random. Therefore, Dr. Cowan cannot extrapolate any findings with any level of statistical confidence.

Even if one were to ignore that the sample is a non-random sample, Dr. Cowan cannot extrapolate any findings with any reasonable statistical meaning. Plaintiffs' sample was too small resulting in the margin of error being too large to be useful. Therefore, Dr. Cowan cannot

---

[44] Deposition of Christopher Eugene Walworth, page 23.

complete his second task with any reasonable level of statistical certainty.

Dr. Cowan's failed to provide a meaningful extrapolation of alleged damages or the alleged number of accounts that were influenced.

Plaintiffs have miscoded the number of accounts that were deemed "influenced". As a result, the estimates reported by Dr. Cowan are erroneous and unreliable.

_Mike Buchanan_
_____

Michael J. Buchanan

3/16/2020