UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WESTGATE RESORTS, LTD.,
a Florida limited partnership,
by and through its general partner,
WESTGATE RESORTS, INC.,
a Florida corporation, et al.,

      Plaintiffs,

v.                                               CASE NO. 6:18-cv-01088-GAP-DCI

TET & ASSOCIATES, LLC,
d/b/a TIMESHARE EXIT TEAM, et al.,

      Defendants.
_____/

**DEFENDANT TET & ASSOCIATES, LLC, BRANDON REED, TREVOR HEIN, AND THOMAS PARENTEAU'S MOTION TO STRIKE THE OPINIONS AND REPORT <u>OF CHARLES COWAN PURSUANT TO *DAUBERT*</u>**

Defendants TET & Associates, LLC d/b/a Timeshare Exit Team, Brandon Reed, Trevor Hein and Thomas Parenteau (collectively, "TET"), respectfully move this Honorable Court for an order striking the opinions of Plaintiff's expert Charles Cowan, Ph.D. pursuant to *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993), and Rules 702 and 403, Fed. R. Evid. The grounds supporting this motion are set forth in the Memorandum, below.

**I.     INTRODUCTION**

Plaintiffs have alleged that TET tortiously interfered with Westgate's contractual relationship with 591 Westgate owners[1], by instructing or suggesting that the owners stop making

---

[1] Plaintiffs' identification of the number of customers at issue with Plaintiffs' tortious interference claim is constantly changing. Dr. Cowan states that he is relying on 843 owner accounts identified by Plaintiff's expert Steven Wolf as giving rise to Plaintiffs' damages (consisting of 621 accounts where the owner defaulted on or after hiring TET and 242 accounts where the owner defaulted before hiring TET). Dr. Cowan was instructed by Plaintiffs' counsel to use a total damage

1

payments on their timeshare mortgages and/or maintenance fees. However, Plaintiffs lack the evidence to prove that TET influenced these 591 customer's decisions to stop making payments to Westgate. In fact, all of the Westgate owners deposed in this action have testified that they made the decision to get out of their Westgate timeshare contract before they hired TET. A majority of the customers deposed have testified that they had several reasons for stopping their Westgate payments – including that they could not afford the payments or that they simply did not want to pay Westgate anymore because they no longer wanted their timeshare.

In an attempt to hold TET liable for each of the 591 defaulted owner accounts without individual proof that TET caused each default, Plaintiffs designated Steven Wolf as a damage expert. Mr. Wolf identified 591 Westgate owners who defaulted on their payments to Westgate at some point on or after hiring TET (he also identified owners who defaulted before hiring TET, as discussed in fn. 1). Plaintiffs attempted to rely on Mr. Wolf's opinion in order to establish, circumstantially, that TET caused the owners to default. However, Westgate was eventually forced to accept that Mr. Wolf's opinion was not sufficient evidence to prove that TET caused the owners to default. Rather, because each owner's circumstance was different, Plaintiff must prove that TET was the cause of each owner's decision to stop making payments to Westgate.

Plaintiffs obtained leave to retain an additional damage expert and subsequently disclosed Charles Cowan, Ph.D. Plaintiffs were also granted leave to take hundreds of depositions upon written questions so that they could obtain evidence that TET caused each of the 591 owners to

---

population of 591. This consists of 843 owners minus 19 accounts not related to Plaintiffs, and minus 37 accounts for owners which had been deposed or depositions had been attempted before Dr. Cowan selected the samples, leaving 787 accounts. Of the 787 accounts, 591 defaulted on or after hiring TET. See Exhibit 1, Cowan First Report at 7-9 ("Description of the Population"). Because this population is the one identified by Dr. Cowan, it is the population that will be used in this motion.

default. From these efforts Plaintiffs were ultimately able to obtain testimony from just 16 owners who may have been influenced by TET to stop paying their Westgate mortgage and/or maintenance fees.[2]

However, Dr. Cowan's opinions on causation are even more attenuated than those of Mr. Wolf. From the 591 owners, Dr. Cowan selected a sample of 100. Dr. Cowan deliberately included almost exclusively Westgate owners who had defaulted on a mortgage, rather than only on maintenance fees. Plaintiffs subpoenaed these 100 owners for deposition upon written question in order to determine if the owners had been influenced by TET to default. Plaintiffs only obtained testimony from 23 of the owners. Plaintiff's counsel then "coded" the 23 depositions into two categories of owners: ones that had been influenced by TET to stop paying Westgate, and ones that had not. Dr. Cowan had *no involvement* in this coding process, did not know what criteria was used by counsel to code the depositions, and did not review the deposition transcripts or summaries of the testimony to verify that the coding had been done correctly.

Based solely on counsel's opinion as to the number of owners had been "influenced" (referred to as the "Influenced Accounts"), Dr. Cowan determined the percentage of Influenced Accounts in the sample and the proportion of damages represented by those Influenced Accounts. He then opined, without any justification for his opinion, that the percentage of influenced owners and damages in the sample could be extrapolated to the entire population of 591 owners for whom Plaintiffs seek damages. In other words, because Dr. Cowan had identified that the influenced account rate was 56.1% in the sample of 23 owners, the influenced account rate would also be 56.1% for the entire population of 591 owners.

---

[2] This includes owners who testified that they may have or did stop paying Westgate, because TET said it was the owner's choice to pay Westgate or not. All of the owners were pre-disposed to breach their Westgate contracts before hiring TET as discussed below.

Plaintiffs subsequently deposed 24 additional owners and counsel again coded the owners according to who counsel believed had been influenced by TET (TET has determined that more than a third of these witnesses expressly said that TET did *not* influence their decision to stop paying Westgate).[3] Dr. Cowan served a supplemental report in which he updated his "opinion" of the percentage of owners who counsel identified as influenced by TET. See Exhibit 2, Second Cowan Report. Based on the newly coded depositions, Dr. Cowan determined that the influenced account rate was 53.9% in the sample of 43 owners[4]. Even though the influenced account rate had changed with the addition of just a few more deposition transcripts, Dr. Cowan opined that the new "reduced" influenced account rate could also be extrapolated to the population of 591.

Dr. Cowan's opinions should be excluded pursuant to Rules 702, 403 and the criteria established by *Daubert* and its progeny because Dr. Cowan's opinion impermissibly serves as a conduit to transform the opinions of Plaintiffs' counsel into evidence. Further, the only opinion actually formulated by Dr. Cowan is that the inaccurate rate of influenced owners in the sample population can be extrapolated to the entire population of 591 owners, but this opinion must be stricken because is speculative, unreliable and therefore unhelpful to a jury. The risk of confusing the jury also substantially outweighs the probative value of Dr. Cowan's opinions, to the extent there is any probative value to be found.

## II.     COWAN'S OPINIONS

Dr. Cowan identified two objectives for his service as an expert in this case, but he accomplished neither. Dr. Cowan was retained to do the following:

> (1) Select a statistically valid random sample from a set of Westgate accounts for which the account holder defaulted on financial obligations to Westgate after hiring TET (as identified by Plaintiffs' expert Steven Wolf) so that the account holders could be

---

[3] See Exhibit 4: Second Report of Loren Naidoo, at 4.
[4] Four of the 47 accounts were excluded from Dr. Cowan's opinion because the owners had defaulted prior to hiring TET. See Ex. 2 at 2.

4

>    deposed in order to determine whether the account holder defaulted at the instruction or suggestion of TET; and
>
> (2) Extrapolate to the entire population of defaulted Westgate account holders identified by Mr. Wolf, "the proportion of damages and damages associated to those, as estimated by Mr. Wolf, for which the deposition responses indicate the account holder defaulted at the instruction or suggestion" of TET (the "Influenced Accounts").

See Ex. 1, Cowan First Report at 2.

As to the first point, Dr. Cowan failed to select a statistically valid random sample of Westgate accounts (owners), as discussed in greater detail in section III.B.3., below. Instead, Dr. Cowan decided to select a sample consisting almost entirely of owners who defaulted on a mortgage obligation, with no objective basis to justify this decision. The sample selected by Dr. Cowan is not statistically representative of the percentage of owners who defaulted on a mortgage balance within the 591 accounts at issue. See Exhibit 3: Report of Michael Buchanan at 10-11. The only possible basis for Dr. Cowan's decision would be to artificially increase the default amounts in the sample group.

Additionally, Dr. Cowan determined that he needed a sample size of *at least 90 in order to achieve a maximum margin of error of ± 10%* with a confidence interval of 95%. See Ex. 1 at 9. However, Dr. Cowan's sample size after two rounds of depositions was only 43, which resulted in an error rate of *± 31%,* far too large to determine any useful data from the sample. Ex. 3 at 5-6. To illustrate the uselessness of this data, Dr. Cowan was only able to say with 95% certainty that *the number of influenced accounts in the sample was **somewhere between 22.2% and 84.5%**.*[5]

In addition to failing to select a statistically valid random sample, Dr. Cowan did not determine whether any of the account holders defaulted at the instruction or suggestion of TET

---

[5] Dr. Cowan did not offer any confidence intervals other than 95%. Thus, the range of 22.2% to 84.5% would be the only range that he could offer to a jury to explain the number of accounts that were likely influenced.

(this was left entirely to the discretion of counsel). Thus, he did not accomplish any portion of the first objective for which he was retained.

Dr. Cowan likewise did not accomplish the second objective of his retention because although he opined that the percentage of Influenced Accounts in the sample could be extrapolated to the entire population, as could the percentage of damages attributed to the Influenced Accounts, he failed to perform an extrapolation or to describe how the extrapolation could be performed, i.e. whether it should be done based on the percentage of owners who were influenced or the percentage of damages represented by the influenced accounts.

More importantly, Dr. Cowan failed to provide any rationale for his opinion that the influenced accounts could even be extrapolated from the sample in the first place. Dr. Cowan was unable to explain how the testimony of 26 owners (the number incorrectly determined by Plaintiff's counsel to have been influenced) would apply in any way to the experiences of 565 other owners who all had a different circumstance and individual conversations with TET. In fact, the only materials reviewed by Dr. Cowan in forming his opinions were: 1) the complaint; 2) Mr. Wolf's spreadsheets identifying the default information for each owner; and 3) the list of "influenced" accounts created by Plaintiffs' counsel. There is no possibility that Dr. Cowan could possess the requisite foundation to explain how the experience of 26 owners might relate to the remaining owners of the defaulted accounts because Dr. Cowan lacks any information on that subject.

### III. ARGUMENT

#### A. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue, a

6

> witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Court serves as a gatekeeper to determine when expert testimony is permitted, and must consider whether (i) an expert is qualified to testify regarding the matters he intends to address, (ii) the expert's methodology is sufficiently reliable under *Daubert*; and (iii) the expert's testimony assists the trier of fact to understand the evidence or to determine a fact in issue. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003). "*Daubert* sets forth a non-exclusive checklist for use in evaluating the reliability of scientific expert testimony. The factors include: (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." *Daubert*, 509 U.S. at 593-94.

In pertinent part, Rule 403 permits exclusion of an expert's opinion if the probative value of the opinion is substantially outweighed by the danger of confusing the issues or misleading the jury. "Because of the powerful and potentially misleading effect of expert evidence, see *Daubert*, 509 U.S. at 595, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the

probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).

### B. COWAN'S METHODOLOGY AND RESULTS ARE NOT RELIABLE BY HIS OWN STANDARDS OR BY INDUSTRY STANDARDS AND DO NOT SATISFY RULES 702, 403 OR *DAUBERT*

#### 1. Cowan's Opinions Are Essentially A Conduit To Present The Opinions Of Plaintiffs' Counsel As Evidence To The Jury

Dr. Cowan did not perform any analysis other than to determine the weighted percentage of owners that Plaintiffs' counsel believes were "influenced" by TET to stop paying Westgate. Dr. Cowan has no idea how Plaintiffs' counsel determined which owners were influenced by TET. Dr. Cowan did not read any of the deposition transcripts of the Westgate owners, or read summaries of the transcripts, or otherwise attempt to verify that the customers identified by Plaintiff's counsel as "influenced" had been identified through the use of any type of uniform criteria. Ex. 5: Cowan Transcript at 15:16-18, 15:19-21. Thus, Dr. Cowan's opinions are based entirely on data selected with no known controls or methodology.[6]

Not only is Dr. Cowan relying on data collected with no known methodology or controls, for which Dr. Cowan lacked any oversight over the collection, but the data is also incorrect. While Plaintiff's counsel identified 26 customers (of 47 deposed) as "influenced" by TET to stop making payments to Westgate, Defendant's experts demonstrated that 10 of those 26 actually provided reasons for defaulting on their payments other than an instruction or suggestion from TET. (See Exhibit 4, Naidoo Report at 4: "Of the 26 individuals initially coded as "influenced" I identified

---

[6] It is worth noting that the depositions contained over 100 questions, many of which were interrelated and as explained by Dr. Naidoo, often contained conflicting responses for a given witness. Ex. 4 at 13-14. A copy of a sample deposition question sheet is included as Exhibit 5.

8

10 that were clearly erroneous" and generally at 19-29 for a specific discussion of the testimony that is contrary to counsel's coding.)

Another 6 of the 26 customers provided deposition testimony that was ambiguous as to whether the owners stopped paying because TET told them to, or for another reason. (Id.) Thus, *the data relied upon by Dr. Cowan may have only included 10 "influenced" owners out of 43, rather than 26 out of 43*. In addition to the inaccurate coding of whether the owners were influenced, several depositions upon written question taken at Dr. Cowan's direction were simply excluded from Dr. Cowan's consideration without any rationale provided. The excluded transcripts are mostly favorable to TET as to whether the owner was "influenced" to stop paying Westgate. Ex. 3 at 22-23. Dr. Cowan's inclusion of incorrectly coded Influenced Accounts and exclusion of testimony that would have been coded as not influenced skews the influence rate of the sample in Westgate's favor. See Ex. 3 at 21-22.

The problematic nature of Dr. Cowan's blind reliance on clearly miscoded Influenced Accounts is made exponentially worse by Dr. Cowan's willingness to extrapolate the influenced account rate to the entire population of 591 defaulted owners. Dr. Cowan fails to provide any analysis or methodology to support his opinion that it is appropriate to extrapolate from the sample to the entire population (discussed further at III.B.3). Dr. Cowan's services as an expert thus seem to serve the sole purpose of adopting the opinions of Plaintiffs' counsel, and magnifying the effect of the opinions by extrapolating them and presenting that information to the jury as evidence of the damages caused by TET.

Dr. Cowan's opinions should be stricken because they are not based on sufficient facts or data (Dr. Cowan has never even seen the data underlying the opinions that he is offering), and his testimony is not the result of reliable principles and methods. *See Quiet Tech. DC-8, Inc.*, 326

9

F.3d 1333, 1340-41. Dr. Cowan's opinion that extrapolation is appropriate is a subjective, conclusory opinion because Dr. Cowan does not know whether that data was collected in an appropriate or generally accepted way, or whether there were any standard or controls established to guide Plaintiff's counsel and whether Plaintiff's counsel followed them, if so. *See Daubert*, 509 U.S. at 593-94.

Furthermore, expert testimony generally will not assist the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing motions. *Frazier*, 387 F.3d 1244, 1262; citing 4 Weinstein's Federal Evidence § 702.03[2][a]. *See also Bowers v. Norfolk S. Corp.*, 537 F. Supp.2d 1343 (M.D. Ga. 2007) (excluding expert's opinions based on *Frazier* where the plaintiff's lawyers were equally able to argue that vibration from a seat caused Plaintiff's injuries, because that is what Plaintiff said caused them, without the aid of the expert's testimony. The district court found that the expert had "merely adopted Plaintiff's history to help Plaintiff with his lawsuit. His opinions, therefore, add nothing to Plaintiff's case apart from what Plaintiff's lawyers can already argue to the jury.") Here, counsel can make the argument to the jury that the 26 owners were influenced after introducing the transcripts; an expert is not needed for that. This is especially true because Dr. Cowan did not review the transcripts or verify counsel's methodology or results. Dr. Cowan adds nothing to the analysis of whether a certain percentage of the sample population was influenced by TET.

Furthermore, it would be improper to allow Dr. Cowan to testify that extrapolation of Plaintiffs' miscoded data is appropriate because this testimony is likely to confuse of mislead the jury. "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take great care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier,* 387 F.3d 1244, 1263. Here, there is a very

real possibility that a jury will be confused into believing that counsel's coding constitutes evidence of some kind and should therefore be afforded some weight by the jury. Furthermore, a jury is likely to lend some weight to Dr. Cowan's opinion that he can extrapolate the percentage of influenced accounts from the sample to the entire population simply by virtue of Dr. Cowan testifying as an expert that it is appropriate for him to do so. *See Hull v. Merck & Co., Inc.*, 758 F.3d 1474, 1477 (11th Cir. 1985) (finding that admission of speculative and potentially confusing expert testimony is at odds with the purpose of expert testimony as envisioned by Rule 702).

### 2. The Margin Of Error Is Enormous And Renders Cowan's Opinions Useless

Dr. Cowan created an initial sample of 100 owners in order to obtain a margin of error of ± 10%, which he identified as the maximum margin of error used in most of his professional work. Ex. 1 at 9. The acceptable industry margin of error in sampling such as that done by Dr. Cowan is between 3% and 5%.[7] A margin of error of 10% is high enough that data have no practical value.[8]

However, the data collected by Plaintiffs' counsel and used by Dr. Cowan ultimately had a margin of error of 31.16%, well beyond Dr. Cowan's allowable maximum of ± 10%, because Plaintiff was only able to obtain deposition testimony from 47 owners (only 43 of which were included in Cowan's opinions) rather than the target sample size of 100. (Ex. 3 at 5) The final margin of error was so high that Dr. Cowan did not even include the margin of error in his initial or supplemental report. The margin was calculated by Defendant's expert Dr. Buchanan based on

---

[7] Bartlett, J., J. Kotrlick, and C. Higgins (2001) "Organizational Research: Determining Appropriate Sample Size in Survey Research." Information Technology, Learning, and Performance Journal 19, p. 45 ("For categorical data, 5% margin of error is acceptable, and, for continuous data, 3% margin of error is acceptable.") (As discussed in Ex. 3 at 7)

[8] Stokes, L and T. Belin (2004). "What is a Margin of Error?" What is a survey? Survey Research Methods Section, American Statistical Association. Pp. 63 – 78 (As discussed in Ex. 3 at 7)

the supporting documents to Dr. Cowan's report. (Id. at 5-6) The final margin of error as high as 30% is unacceptable by the standards stated in Dr. Cowan's report and by industry standards, and renders the data useless.

The absurdity of the high margin of error is highlighted by the wide range of the rate of influenced accounts that fall within Dr. Cowan's confidence interval. Although Dr. Cowan opines that the rate of accounts influenced by TET was 53.9% (based *entirely* on the opinion of Plaintiffs' counsel), the range of potential influence rates within Dr. Cowan's 95% confidence interval are between 22.2% and 85.4%. In other words, Dr. Cowan intends to opine that there is a 95% chance that between 22.2% and 85.4% of owners were influenced by TET to stop paying their financial obligations to Westgate. This is a huge range that renders the "influenced account rate" entirely meaningless because a margin of error of 31% is "much too high a margin of error to yield any statically reliable results." (Ex. 3 at 6)

Additionally, Dr. Cowan's error rate is likely further increased by the inaccurate coding upon which Dr. Cowan relies. As Dr. Naidoo explained:

> As the validity of Dr. Cowan's conclusions are wholly dependent on the validity and reliability of the data he analyzes, and as Dr. Cowan apparently played no role in designing the data collection or data coding procedures, nor in evaluating those procedures to ensure their reliability and validity, and given the evidence that there were significant problems with these data collection and coding procedures which call into question the validity and reliability of the data Dr. Cowan analyzed, there is no reason to believe that Dr. Cowan's conclusions have any validity.

Ex. 4 at 4.

### 3. The Sample Is Not Random Or Representative of the Population of Owners for Which Cowan Intends to Extrapolate And Cowan Admittedly Has No Justification for Extrapolating

Dr. Cowen's methodology for selecting the sample of 100 owners was unjustified and inconsistent, but it was not random. Instead of drawing 100 randomly selected owners from the

population of 561 owners for which Westgate is seeking damages, Dr. Cowan decided to select a sample consisting of 85 owners that had defaulted on a mortgage obligation to Westgate, 5 owners that had defaulted only on a payment of maintenance fees, and 10 owners who defaulted on an obligation to Westgate before hiring TET (although the last group was excluded from Dr. Cowan's ultimate opinions). Ex. 1 at 9-11. Thus, Dr. Cowen's sample deliberately consisted of 94.4% mortgage defaults and only 5.6% maintenance only defaults. Dr. Cowan considers his sample to be "random" because he randomly selected 85 owners who had defaulted on a mortgage from the total population of owners who had defaulted on a mortgage, and randomly selected 5 owners who had defaulted only on their maintenance fee from the total pool of such owners.

Dr. Cowan has not provided any rationale for devising a sample consisting of 94.4% mortgage owners, other than that he wanted to "provide flexibility to evaluate certain groups separately should a sufficient number of depositions upon written questions be completed." Ex. 1 at 9. In contrast to Dr. Cowan's sample composition, the percentage of owners defaulting on mortgages in the total population of 591 owners consists of 62.8% and the percentage of owners defaulting on a maintenance fee only obligation was 37.2%.[9]

The application of Dr. Cowan's methodology is also inconsistent. The first 100 depositions on written question returned a dismal total of 27 deposition transcripts, which was deemed insufficient by Plaintiffs. But rather than applying the same methodology to select a second sample group of 100, a sample which did not include *any* maintenance fee only defaults was selected. (B at 13) Thus, the presence of maintenance fee only defaults went from severely underrepresented in Dr. Cowan's first sample to non-existent in the second sample. There is no apparent basis for

---

[9] Westgate has identified 591 defaulted owners for whom they are seeking damages. Of those, 252 defaulted on both maintenance and mortgage obligations, 119 defaulted only on a mortgage obligation, and 220 defaulted only on a maintenance obligation. Ex. 1 at 7.

this sampling method other than to intentionally create a sample pool with the highest damages possible.

The owners who actually appeared for deposition in response to Westgate's subpoena were not a random sample of the owners that were selected for deposition.  Dr. Cowan admits that he simply assumed that the sample response was random but he has no evidence to support that opinion.  Ex. 5 at 21:23 - 22:25; see also Ex. 3 at 8-9.  This is significant because in failing to assess the reasons that owners did not appear for deposition, including comparing the circumstances of the owners who did appear with the owners who did not, Dr. Cowan failed to assess the non-response bias (or in other words, the way in which the bias of the owners who did appear for deposition might affect the testimony obtained).

As discussed in greater detail by Dr. Buchanan, industry standards require an expert to analyze the level and sources of nonresponse and how the nonresponse likely affected the results in order to determine whether the sample is representative of the population.[10] (Ex. 3 at 14) Instead of conducting any analysis of the nonresponse bias, Dr. Cowan simply makes an assumption that the sample is representative of the entire population of 591 owners, which is inappropriate.

Finally, Dr. Cowan's report is devoid of *any rationale* to support extrapolating the influence rate in the sample to the entire population at issue.   He simply announces that the data can be extrapolated and there is no further discussion.  Dr. Cowan's testimony did not shed any further light on his thought process.  Dr. Cowan initially testified that any randomly selected sample will be representative of the population (although Dr. Cowan's sample was not random, as discussed above).  But then Dr. Cowan backtracked and testified that it is *not* important for a

---

[10] This is supported by the Reference Manual on Scientific Evidence, which provides that "the difficult question to address is the extent to which nonresponse has biased the pattern of responses by undermining the representatives of the sample, and if it has, the direction of bias.

sample to be representative of the entire population in order for extrapolation to be appropriate. Ex. 5 at 21:2-6. Dr. Cowan testified that:

> [T]here's no real concept of 'representative' outside of the law. We don't use that term in statistics. The only thing I'm concerned about is whether or not the reason for not responding to the survey is correlated with the thing that is being measured which is influenced accounts. If there is no correlation between those, then **I don't have any reason to believe I can't extrapolate to the population**.

Ex. 5 at 21:2-18. Dr. Cowan then admitted that he did not know the reasons why the remaining 153 owners that he had selected for his samples did not show up for deposition. Id at 21:23-22:25. Thus, Dr. Cowan has no explanation for his determination that extrapolation is appropriate.

### C. COWAN'S OPINIONS ARE MISLEADING AND LIKELY TO CONFUSE THE JURY

#### 1. Cowan's Opinions Are Not A Proper Consideration In Determining Plaintiff's Damages And Are Not Helpful to the Jury

Dr. Cowan's opinions do not establish that TET caused the 591 owners, or any percentage of them, to default on their payments to Westgate. There is no evidentiary value to Dr. Cowan's opinion that the weighted percentage of owners in the sample that were influenced by TET can be extrapolated to the total 591 owners. This is true even *aside* from the fact that Dr. Cowan did not conduct any analysis to determine which owners in the sample were influenced, the fact that the number of owners identified as influenced by counsel is clearly wrong, and the fact that Dr. Cowan cannot show that the sample is representative of the entire population of owners for which Westgate seeks damages.

Dr. Cowan's opinions ultimately hold no evidentiary value because Plaintiff cannot prove its damages arising from 591 separate alleged acts of interference by generalizing TET's actions toward, *and the effect of those actions upon* each owner. Each of the 591 owners had separate

15

and private communications with TET concerning their individual circumstances. The communications at issue spanned a period of years. There is no evidence to suggest that TET acted in a particular way, or influenced owners to do a particular thing, a certain percentage the time. In fact, the deposition testimony of the owners considered by Dr. Cowan (indirectly, since he never reviewed the testimony) described a variety of individual owner circumstances that affected the owner's decision to stop paying Westgate. Arguably, only 16 of the 43 customer depositions on written question suggested that TET may have influenced an owner to stop paying Westgate, and 6 of those were described as ambiguous as to the owner's motivation to stop paying. Thus, there is no basis to extrapolate the specific circumstances of any customer interaction to any other customer interaction with any degree of certainty.

The Plaintiff must prove defendant interfered with a contract by "influencing, inducing, or coercing one of the parties to ... breach the contract, thereby causing injury to the other party. *See Kennedy v. Deschenes*, 2017 U.S. Dist. LEXIS 76501, (S.D. Fla. May 19, 2017) citing *Farah v. Canada*, 740 So.2d 560 (Fla. 5th DCA 1999) (noting that Black's Law Dictionary defines "induced" as "to bring on or about, to affect, cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on"). Similarly, a defendant does not tortiously interfere with a contract if that defendant merely assists someone who decides to breach the contract. *See Winmark Corp. v. Hill*, 2009 U.S. Dist. LEXIS 29687, at *4 (D. Minn. 2009).

Accordingly, under Florida law, a party's "predisposition to breach" precludes any finding that it was induced to breach by a third party. *See Ingenuity, Inc. v. Linshell Innovations, Ltd.*, 644 Fed. Appx. 913, 916 (11th Cir. 2016); *Chi. Title Ins., Co. v. Alday-Donalson Title Co. of Fla.*, 832 So.2d 810, 814 (Fla. 2d DCA 2002); *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.,* 361 So.2d 769, 772 (Fla. 4th DCA 1978).

As discussed in TET's MSJ filed concurrently with this motion, the record evidence shows that TET did not cause the owners to breach their contracts with Plaintiffs, but was assisting these owners in obtaining a termination of their unwanted contracts and in most cases hiring attorneys to accomplish that end. The testimony of these owners supports this.

As discussed in TET's MSJ, Westgate is aware of the difficulty in establishing causation though the testimony of exemplar owners or otherwise attempting to "generalize" the damages in tortious interference, given that the court in *Westgate v Sussman*, 17-cv-1467-RBD-DCI held that Westgate could not rely on exemplar owners and the defendant's actions and conduct to determine damages, and they instead needed to directly call each owner for whom they sought damages. See Sussman, Doc. 254 at 8. The court held that the testimony of five exemplar owners, Mr. Sussman, Steven Wolf's expert report, and the record evidence was insufficient to establish damages on 175 separate owners. Upon Plaintiffs' motion for reconsideration, Judge Dalton found:

> This is not a run-of-the-mill tortious interference case, like the ones Plaintiffs rely on, where a discrete set of circumstances surrounds the breach of one contract and there's enough evidence of the parties' relationships to allow circumstantial evidence to carry the day… So, yeah, as the Court said before, those cases are inapposite to this large-scale tortious interference case, where the exact evidence missing is the circumstances surrounding these 175 owners' nonpayments…. Plaintiffs missed the boat on establishing causation for the 175 outstanding owners by presenting statistical information, and their remaining evidence doesn't speak to these owners' circumstances surrounding their nonpayments, all that's left to prove up their claim is direct evidence from the owners. (Doc. 254) We're at this point because of how Plaintiffs pled, approached, and litigated this case. Their strategy.

Sussman, Doc. 266 at 4-6.

Indeed, during the trial of *Diamond Resorts v. Aronson,* Case No. 6:17-cv-1394-RBD-DCI, Mr. Wolf provided a substantially similar analysis in attempting to support Diamond Resort's

17

claim that the defendant tortiously interfered with the contracts between Diamond Resorts and its owners. Like the present case, Plaintiffs attempted to show causation via Mr. Wolf's testimony by having him compare the dates the owners hired TET and the dates they defaulted on their timeshare contracts. During the Court's questioning of Diamond Resorts (outside the presence of the jury) as to Mr. Wolf's testimony, the Court commented on the speculative nature of causation Diamond Resorts as attempting to establish via Mr. Wolf:

> MS. VIEIRA (COUNSEL FOR PLAINTIFF): Well, *we don't have proof of a lot of things*.
>
> COURT: That is *true*. That what you just said right there is *very true*. So I just want to tell you that *I'm really struggling with this*. I mean, I've *never seen a case with a bigger overreach in terms of damages in my time on the court*. I have no idea how you think you're going to associate conduct that occurred before Mr. Aaronson was even hired with what Mr. Aaronson allegedly did that you think was tortious or a violation of the Lanham Act. * * * [Y]ou've got a … a steep hill to climb to let that information go to the jury, because I see *absolutely no way to connect it* with the conduct of Mr. Aaronson. * * * I don't see how in the world you're going to connect the B and C categories with conduct of Mr. Aaronson. So just be advised.

Excerpt from transcript of *Diamond Resorts v. Aronson* trial, at 63-64 (emphasis added). Similar to the use of Mr. Wolf's testimony in Diamond Resorts and the instant case, Dr. Cowan's opinions are mere generalizations that cannot establish causation for all of the 591 owners, or an extrapolated percentage of them.

### 2. Cowan's Opinions Are Likely To Confuse the Jury And Are More Prejudicial Than Probative

The application of Rule 403 to exclude the opinions of an expert is appropriate when the opinions offered by the expert are less probative then prejudicial or confusing. *Starter Corp v. Converse, Inc.,* 170 F.3d 286, 297 (2nd Cir. 1999). As an initial point, Dr. Cowan has no support or methodology to support his opinions. Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data

only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *Allison v. McGhan Med. Corp.,* 184 F.3d 1300 (11th Cir. 1999).

But the major deficiency with Dr. Cowan's opinions is similar to the problem that Plaintiff has encountered with Mr. Wolf's opinions. Ultimately, aside from the serious deficiencies in Dr. Cowan's opinions and his entire lack of any methodology in arriving at his opinions, Plaintiff cannot establish the causation for tortious interference by generalizing (or "extrapolating") the cause of the damages. Thus, Dr. Cowan's opinions are of no probative value to the jury and should be excluded due to the likelihood that the jury will give some credence to his opinions about the influence rate and that it can be extrapolated, simply because Dr. Cowan is presented as an expert.

## IV. CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court exclude the opinions of Plaintiffs' damage expert Dr. Cowan because Dr. Cowan's entire opinions run afowl of Rules 702, 403 and *Daubert*. Dr. Cowan should not be permitted to present the jury with an inaccurate "influence rate" determined entirely by Plaintiffs' counsel and then extrapolate that rate to the entire population of Westgate owners for whom Plaintiffs seek damages.

Respectfully submitted this 15th day of May, 2020.

/s/ _Amy L. Baker
John Y. Benford, Esquire
Florida Bar No. 51950
E-mail: john.benford@wilsonelser.com
E-mail: alyssa.heitman@wilsonelser.com
Amy L. Baker, Esquire

>Florida Bar No. 86912
>E-mail: amy.baker@wilsonelser.com
>E-mail: cristina.popan@wilsonelser.com
>Wilson Elser Moskowitz Edelman & Dicker
>111 North Orange Avenue, Suite 1200
>Orlando, Florida 32801
>Telephone: (407) 203-7599
>Facsimile: (407) 648-1376
>Attorneys for Defendants
>TET & Associates, LLC,
>Brandon Reed, Trevor Hein,
>and Thomas Parenteau

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 15, 2020, the foregoing document was filed with the Clerk of Court using the CM/ECF system and that all counsel of record received an electronic copy.

>/s/ Amy L. Baker
>Amy L. Baker, Esquire