UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WESTGATE RESORTS, LTD., a Florida limited partnership, by and through its general partner WESTGATE RESORTS, INC., a Florida corporation, *et al.*,

            Plaintiffs,

vs.

REED HEIN & ASSOCIATES, LLC d/b/a TIMESHARE EXIT TEAM, *et al.*,

            Defendants.

                                               /

CASE NO.: 6:18-cv-01088-GAP-DCI

**PLAINTIFFS' CLOSING BRIEF for**
**AUGUST 13, 2020, EVIDENTIARY HEARING ON *DAUBERT* MOTIONS**

       Pursuant to this Court's Order (DE 197), Plaintiffs Westgate Resorts, Ltd., *et al.* ("Westgate") hereby submit their Closing Brief for the evidentiary hearing on Defendants Reed Hein & Associates, LLC d/b/a Timeshare Exit Team ("TET"), Brandon Reed, Trevor Hein, and Thomas Parenteau's (collectively, "Defendants") Motion to Strike the Opinions and Report of Charles Cowan Pursuant to *Daubert*[1] (DE 162) and Westgate's Motion to Exclude the Expert Report and Testimony of Michael J. Buchanan (DE 161).

**I.    INTRODUCTION**

       The testimony presented to the Court on August 13, 2020, firmly demonstrated that Defendants lack any scientific basis to exclude Dr. Cowan's opinions or testimony under Rule 702 and *Daubert*. Dr. Cowan relied upon his substantial experience and expertise as a statistician and applied widely-accepted methodologies from a learned profession to reach his

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

opinions that Defendants caused Westgate's damages by instructing or suggesting timeshare owners stop paying Westgate. More specifically, through his extrapolation of a random sample of timeshare owners based on their deposition testimony in this case, Dr. Cowan opined that 50% of Westgate's damages for a population of 591 defaulted owners were caused by Defendants' conduct of instructing and encouraging owners to stop paying Westgate. Hrg. Transcr. (Aug. 13, 2020) at 6:3-22 (**Ex. "A"**).

Defendants seek to exclude Dr. Cowan under *Daubert* despite the fact that his qualifications are beyond question, and despite the fact that the methodologies he employed and his underlying mathematical calculations are not challenged by Defendants or their expert, Michael Buchanan. *Id.* at 3:7-10; 91:5-24. Rather, Mr. Buchanan testified that his opinions are limited to "criticizing the points of the margin of error is too wide, the nonresponse issue, the coding issue." *Id*. at 91:10-12. But he could not articulate any scientific basis for his opinion that the margin of error was too wide to be reliable – despite being asked three times by the Court to identify some "scientific literature" or "scientific basis" for his opinion. *Id.* 66:22-69:13. Mr. Buchanan's unfamiliarity with the subject matter of this litigation – he had no idea what TET does to "exit" customers from their timeshares or how much they charge – and with the time constraints and ethical barriers imposed on Dr. Cowan in conducting a survey through depositions on written questions ("DWQs") in litigation, undermines his other criticisms. *Id*. at 87:6-88:12; 103:3-21; 106:2-107:10. At best, his opinions raise issues going to the weight of Dr. Cowan's testimony, not its admissibility, something Mr. Buchanan himself acknowledged:

> A. I think it's up to the trier of fact, and I think it's my role or Dr. Cowan's role to put in front of them, "Here's the journals. Here's what the journals are saying. Here's our expertise from practicing this. Here's what's accepted and common with regards to the margin of error." (*Id.* at 98:20-24)

So Defendants' own expert does not support exclusion of Dr. Cowan under *Daubert*. Rather, his criticisms of Dr. Cowan's margin of error can be addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Maiz v. Virani*, 253 F.3d 641, 666-669 (11th Cir. 2001) (quoting *Daubert*). His uninformed interpretation of evidence relied upon by Dr. Cowan and speculative criticisms of how that evidence was obtained cannot provide a legal basis for exclusion under *Daubert*, which "is not intended to supplant the adversary system or the role of the jury," and a court should not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Defendants' motion must be denied because they failed to raise a valid basis to exclude Dr. Cowan.

Their efforts here exposed the flaws in their own expert's testimony. Mr. Buchanan's opinion should be excluded because he is unqualified to offer opinions on how depositions were coded or conducted, he has not applied any methodology, and his opinions are unreliable.

## II.    BACKGROUND

Dr. Cowan's opinion must be not be considered in a bubble, but rather within the context of other evidence in this case. Westgate was damaged because 621 timeshare owners defaulted on their contracts with Westgate after hiring TET. All of them were current on their mortgage and/or maintenance fee obligations before hiring TET; all hired TET to pursue a promised "safe and legitimate exit" of their timeshares and not to simply breach their contracts with Westgate by not paying obligations they had recognized were valid and enforceable; and all of them then defaulted on their contracts after hiring TET. This sequence of events is not a coincidence. Westgate contends Defendants caused all of these defaults. TET needs Westgate owners to default because Defendants have no means of achieving an exit that does not involve a default,

and its business practices are designed to induce owners to stop paying their timeshare contracts. Westgate has identified multiple acts and practices calculated for this purpose, supported by compelling evidence filed with its pending summary judgment briefs. *See* DE 175, DE 196.

TET's most brazen business practice causing owners to breach their timeshare contracts is directly instructing or suggesting that they stop paying. Westgate has direct evidence to prove this business practice caused its damages for 60 owners, including 41 owners who have been deposed in this case. But Westgate could not depose every one of these 621 owners – although it sought leave to do so. *See* DE 98. Instead, Westgate has presented Dr. Cowan to calculate the percentage of Westgate's damages caused by Defendants' instructions or suggestions to stop paying for the rest of the 621 timeshare owners Westgate could not depose. Dr. Cowan's statistical analysis is just one of several categories of evidence Westgate intends to rely on to prove causation. Defendants' "influence" through instructions or suggestions not to pay must be considered by the trier of fact together with the circumstances of this case in determining whether or not Defendants induced owners to breach their timeshare contracts.

Dr. Cowan relied upon Westgate's counsel to code the deposition testimony as influenced or not because analyzing deposition testimony is what lawyers do and these lawyers, in particular, are intimately familiar with this case. As he testified at the hearing, Dr. Cowan does not claim to be "qualified to make that determination," and in many other cases he has relied upon counsel to summarize evidence he has used in statistical analyses. Ex. A at 20:10-23. Applying the expertise for which was retained, Dr. Cowan conducted a statistical analysis to reach his opinion that 50% of the damages for a population of 591 owners were caused by the Defendants. Like all statistical analyses, Dr. Cowan's opinion is an estimate within a reported margin of error, based upon a principal of statistics holding that the midpoint is the "maximum

4

likelihood estimate." *Id*. at 32:9-16; 52:6-53:3.  Westgate has verified with Dr. Cowan that the total damages for 591 owners in Steven Wolf's Report (Hrg. Ex. 4) is $7,234,782, so the midpoint influenced rate of 50% computes to damages of  $3,617,391, with a margin of error of +/- 22.55% between a lower bound of 27%, which computes to damages of $1,953,391, and an upper bound of 72.30%, which computes to damages of $5,230,747.[2]

### III.  ARGUMENT

#### a. Testimony Further Demonstrated that  Dr. Cowan's Reports and Opinions Satisfy *Daubert*

Dr. Cowan's opinions and his reports are admissible under *Daubert* because he is qualified to testify on the statistical analysis he conducted, the methodology he used is reliable as determined by the sort of inquiry required under *Daubert*, and his testimony will assist the trier of fact, through the application of his expertise, to understand the evidence or determine a fact in issue.  *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1998). His opinions and reports are based upon mathematics, and accurately present relevant and reliable evidence that the Court, as the evidentiary gatekeeper under *Daubert*, must allow to be weighed by the trier of fact.  *U.S. v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004). And, importantly, Defendants do not contest that a statistical analysis such as Dr. Cowan has performed can be used to prove the causation element of Westgate's claims.

Dr. Cowan undoubtedly satisfies *Daubert's* qualification requirement, with a doctoral degree in mathematical statistics and almost 50 years of wide-ranging experience, including extensive background in the federal government designing and conducting surveys impacting

---

[2] At the hearing, the Court requested that Dr. Cowan provide these calculations for the ranges of damages.  Ex. A at 56:8-16.  Defendants can verify these computations in the "Data" worksheet of the "Westgate v. TET – Influenced Account Rate Extrapolation" spreadsheet produced with the back-up materials for Dr. Cowan's reports reflecting the total damages from the 591 owners.

how millions of dollars of taxpayers funds are allocated. Ex. A at 5:18-21; 9:9-10:17. He is extensively published and credentialed, and has conducted an estimated 1,400 statistical analyses in his career, compared to Mr. Buchanan who is not a statistician and who estimated he has conducted 50 plus statistical analyses, less than four for every one hundred statistical analyses Dr. Cowan has performed. *Id.* at 10:19-22; 12:6-8; Ex. 1; 60:13-17; 86:10-22. There is likewise no dispute that the methodology Dr. Cowan used in this case enjoys "general acceptance" within the "relevant scientific community." Sampling theory is a scientifically-accepted assumption that a measured rate in a randomly-selected sample will be equal to the rate of the population, within a margin of error, and its methodology is subject to peer review and publication. *Id*. at 10:23-12:5. It consists of mathematics – the results of which are irrefutable. Dr. Cowan's has provided through counsel all of the calculations used in his reports to Mr. Buchanan, who confirmed their validity. *Id*. at 91:8-24.

Dr. Cowan applied the same methodology in his statistical analysis for this case as he employed in some 1,400 sample surveys over his career, including hundreds of litigation matters. In this case, his extrapolation of influenced accounts will substantially assist the trier of fact both to understand the evidence and to determine an element of Westgate's claims. His testimony is necessary for the jury to understand the statistical analysis he conducted, which is "beyond the understanding and experience of the average citizen." *U.S. v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985). Additionally, his testimony is necessary for the jury to determine damages caused by Defendants' instructions or suggestions to stop paying Westgate made to those owners who cannot be deposed in this case. Specifically, Dr. Cowan's opinions will provide the trier of fact with a simple formula for calculating Westgate's damages arising from those owners, with a midpoint influenced rate of 50% computing to damages of $3,617,390.85, or a range of

6

outcomes between the lower and upper bounds from $1,953,391 to $5,230,747. As Dr. Cowan testified, "the information that I'm producing to the trier of fact gives not only the midpoint but the range of possible outcomes and how likely the different outcomes are. And it's up to the trier of fact to make a choice as to what they like or don't like." Ex. A at 56:3-7.

### b. Defendants' Criticisms of Dr. Cowan at Best Raise Issues Going to the Weight of the Evidence

#### 1. Defendants Provide no Scientific Basis to Exclude Dr. Cowan's Opinion and Reports Based upon his Reported Margins of Error

Defendants' criticism of the margin of error reported by Dr. Cowan is not based on any scientific standard. Rather, they try to capitalize on the fact that the sample of 43 owners obtained from DWQs for his analysis was smaller than the sample of 100 originally proposed – based on the allotment of DWQs to Westgate. As Dr. Cowan testified, a smaller sample size will result in a higher margin of error but has no impact on the rate being measured – the midpoint, which statisticians refer to as the "maximum likelihood estimate." *Id*. at 52:6-53:3. While a higher margin of error reflects a wider range of estimates of the rate being measured, Dr. Cowan testified that his analysis is statistically valid and reliable based on his sample, with a resulting margin of error of +/-22.5%. *Id*. at 53:10-24. As he explained, the outcomes within a margin of error are distributed like a bell curve, with the most likely outcome in the middle and the ends representing remote-probability outcomes. *Id.* at 31:24-32:8. In reply to the Court's inquiry on his scientific basis for this conclusion, Dr. Cowan testified that he was relying upon a "basic principle of statistics called the central limit theorem." *Id*. at 32:9-16.

In contrast, Mr. Buchanan, who is not a statistician, could not identify any scientific basis to explain why he did not "believe" Dr. Cowan's margin of error was "acceptable" or "useful." *Id.* at 65:22-66:14. Indeed, the Court directly asked him three times to identify "scientific

7

literature" or a "scientific basis" supporting his conclusory criticisms that the Court could rely upon:

> THE COURT: Is there some scientific literature I can look at to say -- that says, "This is simply unreliable from an economic or statistical standpoint, and, therefore, would not be reliable to present to a jury"? That's my predicament. That's what I've got to decide.
>
> THE WITNESS: I don't know of a journal that says specifically anything over 30 percent is not reliable. I think what you will find is all the journals talk about what's acceptable and common as plus or minus five percent or less. If you're going to go above that, you need to give justification as to why you're doing that.
>
> THE COURT: Well, Dr. Cowan has a justification, it's the best he could do based on the sample and the limitations that are presented by trying to do a survey during the course of litigation using depositions on written questions. And I've been doing this work now for over 50 years, and I can tell you I've never done, I've never seen anyone use, a deposition on written questions. It's not a typical way to get information. It's hardly ever used in the legal process. I understand that the lawyers here were handicapped. And I think Dr. Cowan's opinion is, "Well, under the circumstances, that's the best I could do." So given those circumstances, is there some scientific basis for me to say that range is simply too big for a jury to consider? That's my problem.
>
> THE WITNESS: I understand. I don't know of a scientific journal that will say that.
>
> …
>
> [THE COURT] So my personal experience is that, you know, if I were given a 30 percent margin of error, I wouldn't pay much attention to it. But I'm not a scientist. I need some scientific basis to determine whether this margin of error is too high or not.
>
> THE WITNESS: I understand your predicament, and I feel for you. But the reason it's not out there is because people don't do that in scientific journals.  (*Id.* at 67:5-69:2)

And "people don't do that" because there is no scientifically-accepted margin of error for all purposes, and a larger or smaller margin of error may be warranted depending on the facts of

8

a particular case, as Mr. Buchanan later conceded. *Id.* at 85:21-86:9. In fact, the four cherry-picked examples of literature he relied on for his opinion do not set forth any standard for a margin of error, or conclude that a high margin of error renders a survey unreliable. *Id*. That was simply his belief. Yet he also agreed that a margin of error of +/-22% "might" provide useful information depending on the facts of a particular case. *Id*. at 94:9-16. And most tellingly, Mr. Buchanan agreed that such a determination should be "up to the trier of fact." *Id*. at 94:17-24. Dr. Cowan similarly testified that the jury can weigh the margin of error but the midpoint represents the "maximum likelihood estimate." *Id*. at 52:6-53:3.

The data is the data – it is undisputed that the margin of error reported by Dr. Cowan and all of the calculations in his report are accurately stated. *Id*. at 91:13-24. The fact is that Dr. Cowan applied a generally accepted methodology reliably to the facts of the case, and testified he has offered opinions based upon statistical analyses in litigation and wide variety of other applications with margins of error at the rates reported here. In other litigation matters, Dr. Cowan testified that "[t]he argument is always that the margin of error is too high," but he has never been excluded from offering expert testimony for that reason. *Id*. at 54:3-11. In those cases, the argument was always rejected as going to the weight of the evidence, and the Court should do the same with the argument in this case.

### 2. Defendants' Scatter-Shot Attack on the Randomness of Dr. Cowan's Sample is Based on Uninformed Conjecture and Erroneous Assumptions

Defendants' arguments that Dr. Cowan's sample was not random is based upon a series of unfounded assumptions and self-serving conjecture, most of which was refuted in the Declaration of Moneka Simpson admitted into evidence at the hearing as Exhibit 7. This declaration dispelled any suggestion raised by Mr. Buchanan in his Report that Westgate's

counsel may not have followed Dr. Cowan's random sampling plan (Hrg. Ex. 5 at 13), and refuted his unfounded assumptions that DWQs of owners from the maintenance-only account group "appeared" to have been intentionally excluded (*Id.* at 11-12) or that deposition transcripts simply not received by Dr. Cowan in time to use in his reports were intentionally omitted (*Id.* at 22-25). The declaration also provided a full accounting for non-participation in DWQs by owners in Dr. Cowan's sample due to bad addresses, non-service of subpoenas and non-appearances.

Thus, by the time of the hearing, Mr. Buchanan abandoned many of these nit-picking arguments and limited his criticism of the randomness of Dr. Cowan's sample to what he termed "the nonresponse issue." Ex. A at 91:10-12. He agreed Dr. Cowan created a valid random sampling plan. *Id.* at 101:21-25. He also agreed that bad addresses and other reasons for non-participation cited in Ms. Simpson's declaration, such as an owner who died, were unrelated to the subject matter being surveyed and thus did not impact the randomness of the sample. *Id.* at 104:8-14. But he criticized Dr. Cowan for not analyzing the "characteristics" of people who could not be served or failed to appear for DWQs to verify the sample he obtained remained random. *Id.* at 75:12-24. Mr. Buchanan pointed to the 49 subpoenas that had been withdrawn, complaining "I don't know who the 49 people are" and protesting that he was unable to answer questions he says could measure non-response bias:

> why were they withdrawn? Were they all from one
> particular location? Were they all from one particular strata?
> Were they all maintenance only? Were they all from Gatlinburg,
> Tennessee? We don't know. (*Id.* at 75:4-7)

Mr. Buchanan's criticism was shown, on cross examination, to be entirely unfounded. Mr. Buchanan could have easily answered all of these questions himself, but never bothered to investigate. *Id.* at 103:15-21; 106:22-107:6. He was unaware Defendants' counsel received

notice of service, or withdrawal of every person subpoenaed for DWQs, which would have enabled him to investigate the mentioned characteristics using the back-up materials from Dr. Cowan's reports, claiming "[t]hat information wasn't provided to me" but later admitting "I could have obtained that." *Id*. at 84:20-24, 103:15-21.  His criticisms conveniently ignore time constraints on Dr. Cowan in obtaining DWQs and issuing his reports.  They also overlook the ethical barriers erected by Defendants preventing Dr. Cowan and Westgate from directly contacting owners, and disclose his unfamiliarity with this case, including being unaware which timeshare owners were served or deposed, or even who conducted the DWQs. *Id*. at 91:2-4.

Mr. Buchanan's speculation that Dr. Cowan's sample might not be random has no basis in fact, and his opinion should be disregarded. As Dr. Cowan testified at the hearing, he was simply hampered by the discovery deadlines in this case, and the ethical barriers to contacting timeshare owners directly, from conducting an extensive investigation of the reasons for the non-participation in the DWQs by timeshare owners. *Id*. at 19:23-20:3; 21:8-12; 50:7-18.  However, he also testified that "a low response rate also isn't that unusual in surveys and statistics," and "there is no indication that I have that it's anything other than random factors that kept people from being either contacted or responding when they were contacted." *Id*. at 19:9-21; 53:17-20.  Mr. Buchanan's assumptions about what might have been revealed by an investigation he chose not to conduct are unreliable under Mr. Buchanan's own standards and so cannot provide grounds to exclude Dr. Cowan's under *Daubert*.  This is, at most, another issue for cross examination.

### 3. Mr. Buchanan Is not Qualified to Offer Opinions on the Content of Deposition Testimony, and his Lack of Familiarity with this Case Would Only Confuse the Jury about the Evidence

Defendants' criticism that Dr. Cowan relied on counsel's coding of testimony, and their attempt to use Mr. Buchanan – an applied economist – to interpret deposition testimony that is

11

completely outside his area of expertise, is both not a valid ground to exclude Dr. Cowan and warrants excluding Mr. Buchanan. First, Defendants could have replicated the coding of the DWQ deposition testimony – all transcripts were available to them – but they did not. Absent that, they cannot quarrel with the results of the coding, as they have no alternative analysis with which to refute the coding that was done. Cherry-picking snippets of testimony, out of context, which is what Defendants did, is not the same. Second, as this Court noted in *Superior Consulting Services Inc. v. Shaklee Corp.*, cited in the recent Order excluding Defendants' expert Steven Marshall (DE 177), expert testimony based on information not independently verified by the expert is routinely allowed in the Eleventh Circuit so long as it is reliable. Third, Defendants' attorneys and experts just disagree with Westgate about what the evidence shows. But neither they nor Westgate are the triers of fact, to whom this task is given. This goes to the weight of Dr. Cowan's expert testimony rather than its admissibility and such arguments are not a legal basis for exclusion. *See Quiet Tech.*, 326 F.3d at 1341. As the 11th Circuit held in *United States v. 0.161 Acres of Land*, so long as the expert relies upon record evidence and identifies the facts on which he relies – which Dr. Cowan has done in this case – "it is for opposing counsel to inquire into the expert's factual basis," and the jury is completely free to accept or reject an expert's testimony. 837 F.2d 1036, 1040-41 (11th Cir. 1988).

Dr. Cowan testified that he relied upon Westgate's counsel to conduct, summarize, and annotate testimony that is admissible as evidence in this case – something lawyers do every day – because he is "not qualified to make that determination." Ex. 1 at 20:10-16. Likewise, Mr. Buchanan, who is not a lawyer or an expert on reading and summarizing depositions, is not qualified to opine on the coding of the DWQs. Defendants' counsel are far more competent to

12

inquire into the factual basis of evidence relied upon by Dr. Cowan than Mr. Buchanan,[3] who fails to offer anything "beyond the understanding and experience of the average citizen." *Rouco*, 765 F.2d at 995. Thus, Mr. Buchanan's opinions as an applied economist will not assist the trier of fact in weighing deposition testimony and determining whether Defendants influenced a particular timeshare owner's decision to stop making payments to Westgate.

As Mr. Buchanan admitted in his deposition and at the hearing, there is no standard to apply or expertise needed to code deposition testimony. Ex. A at 108:5-12; Ex. 2 at 160:6-14. He testified he is qualified to analyze and interpret deposition testimony in this case because: (1) he has "coded many depositions" and "coded many surveys" in his career, and (2) "I have an understanding of the issues in this matter specifically." *Id.* at 81:22-82:5; 108:17-23. His first basis is dubious at best, as he estimated that he only coded *survey data* on those 50-plus occasions, and to the extent those involved depositions, the majority of recent litigation experience has involved labor and employment matters unrelated to issues in this case. *Id*. at 77:9-14, 86:23-87. His second basis is refuted by his own testimony showing he has a very limited understanding of the issues in this matter. He has no prior experience or knowledge relating to the timeshare industry, and only a "layman's understanding" of TET's business. *Id*. at 87:6-88:2. He has no idea what TET actually does to help customers get rid of their timeshares. *Id.* at 88:3-5. He could not recall, even generally, how much TET charges customers for these purported services, although this same question was asked of every owner whose deposition transcript he allegedly reviewed. *Id.* at 88:6-21. Other than deposition testimony, he has not reviewed any of the evidence supporting Westgate's allegations in this case.

---

[3] This is underscored by the fact that Defendants' counsel fed Mr. Buchanan the coding examples to illustrate in his report. *See* Hrg. Ex. 6 at 170:25 – 171:4.

13

Thus, Mr. Buchanan proposes to re-interpret deposition testimony of timeshare owners to measure Defendants' "influence" on customers' decisions to stop paying Westgate in a vacuum, ignoring other evidence of TET's many other business practices calculated to induce customers to breach their timeshare contracts – and without any relevant expertise. In his report, he refers to several owners – pointed out to him by Defendants' counsel – whose testimony he claimed was "erroneously miscoded."[4] Ex. 5 at 18. But like Defendants' prior "coding" expert, Dr. Loren Naidoo, Mr. Buchanan pointed only to testimony he believed supported his argument, often ignoring other uncited testimony showing – as Westgate's coding reflected – that TET influenced owners to stop paying. For instance, he claims owner Shawna Cochran was miscoded because she testified TET told her not paying was her choice. *Id*. at 18-19. But he omitted her testimony that TET "encouraged" her to stop paying Westgate. *See* DE 128-5 at 17:24-18:2. And he overlooked testimony that he included in his excerpt showing TET told her that paying Westgate would *delay the exit process* – a process for which she had just paid up to $5,000 to a company that holds itself out as a timeshare exit "expert." Ex. 5 at 19; DE 128-5 at 26:10-14.

The other testimony excerpted by Mr. Buchanan contains similar omissions and oversights. He claims owners Emeka Nicholas and Anthony Kincaid were miscoded as influenced because each testified being told by TET that non-payment was a choice. Ex. 5 at 19-21. But Ms. Nicholas also testified that the representative of TET – the company presenting itself as an expert in timeshare exit to whom she had just paid a large fee – told her "If I were you, I would not do this [pay]." *Id.* at 19. And Mr. Kincaid testified that TET urged him and directly instructed him to stop paying (DE 175-4 at 13:15-18; 11:11-13), which Mr. Buchanan omitted, and that "they recommended that we not pay while the process of exiting was going

---

[4] Presumably, Mr. Buchanan meant "erroneously coded" or "miscoded."

14

on." Ex. 5 at 21. Clearly, the trier of fact could reasonably find that they these owners and others like them, whose testimony has been selectively excerpted by Mr. Buchanan, were influenced to stop paying Westgate by TET's instructions, suggestions, urgings, and encouragement to stop paying, and its admonishment that paying Westgate would delay the result that each of them had paid just thousands of dollar to obtain. Even more clearly, Mr. Buchanan's "coding" opinion and testimony offer nothing more than what Defendants' lawyers can argue at trial. They must be excluded to avoid misleading the jury by masquerading advocacy on behalf of Defendants – their lawyers' role – as a "scientific" expert opinion.

### c. Mr. Buchanan's Opinions and Testimony Must Be Excluded

Westgate's *Daubert* motion directed to Mr. Buchanan should be granted. His opinion that Dr. Cowan's margin of error is too wide lacks any scientific basis, and his opinion that Dr. Cowan's sample was not random is based on rank speculation and erroneous assumptions. Mr. Buchanan is not qualified to offer opinions interpreting deposition testimony, which is outside the scope of his expertise as an applied economist, offers nothing beyond the understanding of a layperson, and would only serve to confuse the jury by couching argument of counsel as expert opinion. As such, his opinions should be excluded as not reliable or helpful to the factfinder.

### CONCLUSION

Westgate has met its burdens of establishing the admissibility of Dr. Cowan's opinions and testimony under *Daubert* by a preponderance of the evidence, and of demonstrating the unreliability of Mr. Buchanan's opinions. Defendants' motion to exclude Dr. Cowan should be denied and Westgate's motion to exclude Mr. Buchanan should be granted.

DATED: September 15, 2020                              Respectfully submitted,

                                                 By:   *Brian R. Cummings*
                                                        RICHARD W. EPSTEIN

(Trial Counsel)
Florida Bar No. 229091
MICHAEL E. MARDER
Florida Bar No. 251887
JEFFREY BACKMAN
Florida Bar No. 662501
BRIAN R. CUMMINGS
Florida Bar No. 25854
**GREENSPOON MARDER LLP**
201 East Pine St, Suite 500
Orlando, Florida 32801
Telephone: (407) 425-6559
Facsimile:  (407) 209-3152

and

200 East Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 491-1120
Facsimile: (954) 213-0140

and

401 E. Jackson Street, Suite 1825
Tampa, FL 33602
Telephone: (813) 769-7020
Facsimile: (813) 426-8582

Jeffrey.Backman@gmlaw.com
Khia.Joseph@gmlaw.com
Richard.Epstein@gmlaw.com
Maria.Salgado@gmlaw.com
Michael.Marder@gmlaw.com
Trisha.Snyder@gmlaw.com
Brian.Cummings@gmlaw.com
Moneka.Simpson@gmlaw.com

**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on this 15th day of September, 2020.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below in the manner specified, either via transmission of Notices of

16

Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing electronically.

*/s/ Brian R. Cummings*

**SERVICE LIST**

John Y. Benford (john.benford@wilsonelser.com)
Amy Baker (amy.baker@wilsonelser.com)
**Wilson, Elser, Moskowitz, Edelman & Dicker, LLP**
111 N Orange Avenue, Suite 1200
Orlando, FL 32801-2361
Telephone: (407) 203-7599
Facsimile:  (407) 648-1376
*Counsel for Defendant Reed Hein & Associates, LLC,
Brandon Reed, Trevor Hein and Thomas Parenteau*

45030511