UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WESTGATE RESORTS, LTD.,
a Florida limited partnership,
by and through its general partner,
WESTGATE RESORTS, INC.,
a Florida corporation, et al.,

       Plaintiffs,

v.                                                          CASE NO. 6:18-cv-01088-GAP-DCI

TET & ASSOCIATES, LLC,
d/b/a TIMESHARE EXIT TEAM, et al.,

       Defendants.
_____/

**DEFENDANT TET & ASSOCIATES, LLC, BRANDON REED, TREVOR HEIN, AND THOMAS PARENTEAU'S CLOSING BRIEF CONCERNING THE AUGUST 13, 2020 <u>DAUBERT HEARING</u>**

       Defendants TET & Associates, LLC d/b/a Timeshare Exit Team, Brandon Reed, Trevor Hein and Thomas Parenteau (collectively, "TET"), hereby submit the following closing brief following the August 13, 2020 hearing on the parties' motions to strike Charles Cowan, Ph.D. and Michael Buchanan, pursuant to this Court's September 1, 2020 Order. (D.E. 197)

**I.      PLAINTIFFS HAVE FAILED TO ESTABLISH THAT COWAN'S OPINIONS ARE SUFFICIENTLY RELIABLE OR THAT HIS TESTIMONY WOULD BE HELPFUL TO A JURY**

    **A.  Introduction**

       Plaintiffs have the burden to establish that Dr. Cowan's methodology in this case was reliable and will assist the trier of fact. *City of Tuscaloosa v. Harcros Chems., Inc*., 158 F.3d 548, 562 (11th Cir. 1998); see also *Daubert v. Merrell Dow Pharm. Inc*., 509 U.S. 579 (1993), and Fed. R. Evid. 702.  The factors considered in the Daubert analysis include: (1) whether the expert's

technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.

Dr. Cowan's only "specialized" assistance in this case was to establish a confidence interval around Plaintiffs' counsel's opinion of the number of owners influenced by TET to stop paying Westgate.   D.E. 201-1 at 32.   Yet Plaintiffs have failed to provide the Court with a single industry publication, academic journal, or other scientific source stating that a margin of error greater than 30% is acceptable or common in the scientific community. In fact, Dr. Cowan admits that he has never before relied on a statistical analysis involving a margin of error greater than 20%.  Id. at 29. Dr. Cowan has previously testified that he believes the appropriate margin of error in this context is 5% and a margin above 10% would render the results unacceptable.  See I.B.2., below.

Defendants have offered the testimony of Mr. Buchanan, as well as numerous academic and industry publications, to demonstrate that the acceptable margin of error in the scientific community is less than 10%.  Dr. Cowan's margin of error in this case falls well outside the bounds of what is recognized as acceptable within the scientific community.  His opinions consequently fail to satisfy the admissibility standard established by *Daubert*.  Further, Dr. Cowan's opinions are not helpful to the jury because the margin of error is too wide to provide any meaningful information in this case.

Even setting aside the enormous margin of error, Dr. Cowan's opinions fail to satisfy Rule 702.   Dr. Cowan's opinions are unreliable because he has no knowledge of the data underlying his opinions, he has no idea whether the methodology used to code the transcripts was ever validated, and has no idea how the non response bias affects the randomness of his sample.   Instead of analyzing the significant non response bias in his sample, Dr. Cowan simply assumes that the sample of 43 owners analyzed was random.   D.E. 189-3 at 21:23-22:35 and 189-1 at 8-9. This assumption is particularly concerning in light of recent evidence that Plaintiffs' counsel voluntarily cancelled 110 deposition subpoenas[1] and that Plaintiffs' counsel failed to provide to Dr. Cowan transcripts that had been completed prior to Dr. Cowan's second report.   D.E. 189-7 at ¶ 10; and Ex. 1.

Dr. Cowan's opinions in this case serve merely as a conduit for the opinions of Plaintiffs' counsel, with no controls, validation or oversight of any kind.   This is a sham inconsistent with the requirements set forth in Rule 702.   Additionally, Plaintiffs offer Dr. Cowan's testimony in an attempt to prove causation for the alleged breaches of 591 Westgate owners (despite claiming to only have evidence that 26 owners[2] were influenced).   However, Dr. Cowan admits that he has not undertaken any analysis to determine if the sample of 43 owners is representative of the population of 591 as to whether the owners were likely to be influenced by TET to stop paying.   Dr. Cowan's

---

[1] This decision by Plaintiffs' counsel is contrary to Plaintiffs' position that the small sample size forced Plaintiffs to accept a higher margin of error than accepted in the scientific community.   If Plaintiffs' counsel had obtained only half of the depositions that they cancelled after service, Plaintiffs would have achieved the sample of approximately 100 that Dr. Cowan identified as necessary to obtain his maximum margin of error of 10%.   It is clear from the affidavit of Ms. Simpson that the insufficient data underlying Dr. Cowan's opinion was caused solely by Plaintiffs' own conduct.

[2] As Defendants' pointed out in their motion to strike Dr. Cowan's testimony, the deposition testimony itself does not support a conclusion that 26 owners were influenced by TET to stop paying Westgate.   See D.E. 162 at FN 2; see also Exhibit 2.

attempt to extrapolate counsel's opinion of the rate of influenced accounts to the entire population of owners is entirely lacking in any semblance of reliable methodology and fails to satisfy Rule 702(c) and (d).  In fact, Dr. Cowan's attempt to extrapolate in this manner has been precluded by other courts.  *See Homeward Residential, Inc. v. Sand Canyon Corp*., 2017 U.S. Dist. LEXIS 187265 (SDNY Nov. 13, 2017). Consequently, Dr. Cowan's opinions in this case are not sufficiently reliable to satisfy *Daubert* or Rule 702, are not helpful to the jury, and should be stricken.

### B.  Cowan's Margin Of Error Warrants Exclusion His Opinions

#### 1.  The Scientific Literature Provides A Margin Of Error Of 5% Or Less

Dr. Cowan proposes to use a margin of error that is three times what The American Statistical Association has characterized as considerably uncertain.  See Stokes, L and T. Belin (2004). "What is a Margin of Error?" What is a survey?" Survey Research Methods Section, American Statistical Association. p. 63 – 78.  Stokes and Belin discourage the use of a margin of error greater than 10% due to the ***considerable uncertainty*** that arises from a "swing" greater than 20%.   The remaining publications provided to the Court through Mr. Buchanan's report demonstrate that 5% is the acceptable and common margin of error in the scientific community. See Bartlett, J., J. Kotrlick, and C. Higgins (2001) "Organizational Research: Determining Appropriate Sample Size in Survey Research." Information Technology, Learning, and Performance Journal 19, p. 45 ("For categorical data, 5% margin of error is acceptable, and, for continuous data, 3% margin of error is acceptable.")

Even Dr. Cowan, who has been publishing statistical analyses for over 40 years, could not cite a single instance in which he used a margin of error greater than 10%.  D.E. 201-1 at 29.  It is clear that Dr. Cowan's opinions are not consistent with the standards generally accepted in the

scientific community and his opinions should be stricken on that basis. *Daubert*, 509 U.S. at 593-94.

### 2.  A Margin of Error Above 10% Is Not Appropriate In Litigation

Dr. Cowan clearly determined that 10% was the maximum margin of error that he determined would be acceptable in this case.  D.E. 201-1 at 54. In his subsequent effort to justify using a margin of error greater than 30%, Dr. Cowan has vaguely alluded to his involvement in prior litigation involving mortgage backed securities.  However, in those cases Dr. Cowan utilized a maximum margin of error of 5%, and has testified that 5% is the standard margin of error in litigation:

> [Q]  Now, the second question in your analysis plan was how accurate do my results have to be. In this case what level of accuracy did you use?
>
> [A]  I use a high standard. It's 95% confidence with a +/- 5% margin of error…
>
> …
>
> By the Court: The 5% that you talked about, is that a standard amount, or is it a high amount, or is it a low amount?
>
> [A]  I consider it the standard amount, it's the standard that I see frequently in litigation cases. … To give you other examples, Countrywide in their quality control has a standard of 95% but it's +/- 2%, but that's for quality control purposes, that's a different purpose…The standard we use for the DOJ is 99%, +/- 0.5%.  It's a much tighter standard but again that's for quality control purposes.

*MBIA Ins. Corp. v. Countrywide et al.*, Index. No. 602825/2008, Supreme Court, New York County, September 27, 2010 Testimony of Charles Cowan, Ph.D, attached as Ex. 3.

Dr. Cowan later testified that that that he considered a margin of error of 10% to be the maximum that he would consider to be acceptable in a litigation context:

[Q]     So with there being no standard margin of error, how did you
        determine to use the +/- 10% maximum margin of error in
        these cases?

[A]     Well, what I did was, I actually calculated the sample size
        for several different margins of error, so 5%, 6%, all the way
        up to 10%. And I provided those to counsel, and I said any
        of these are the range that I would find acceptable.

*Mass Mut. Life Ins. Co. v. Residential Funding Co., LLC et al.*, 11-30035-PBS et al., Dist. Mass.,

October 18, 2013, Daubert Hearing before the Honorable Patti Saris, 72:11-20, attached as Ex. 4.

    Dr. Cowan went on to testify in the same hearing that by using a margin of error greater

than 10%, he would be taking a risk that a small sample size would result in a margin of error that

was ***unacceptable***.  Id. at 74:17-75:17.   Dr. Cowan has conceded in this case that he has never

offered opinions utilizing a margin of error greater than 20%.[3]  D.E. 201-1 at 29.

    Mr. Buchanan has likewise testified that he has never used a margin of error greater than

10% in the course of his work as an expert witness.  D.E. 201-1 at 65. Mr. Buchanan further

testified that he has never seen a margin of error of 31% in any litigation matter in his whole career.

D.E. 201-1 at 66.

    The excessive margin of error is significant in this case.  The considerable uncertainty that

comes with a margin of error above 10% (as described by Stokes and Belin) is illustrated by the

significant change in the midpoint of Dr. Cowan's calculations between the first sample discussed

in Dr. Cowan's first report and the second sample included in the supplemental report.  Dr. Cowan

has characterized the midpoint of his calculated range as the "most likely" result.  However, his

first sample had a midpoint of 63% owners influenced and his second sample had a midpoint of

---

[3] There is no evidence that Dr. Cowan has ever relied on a margin of error greater than 10%, but
at the August 10, 2020 Daubert hearing, counsel phrased the question as 20% or greater.

approximately 40% influenced, despite the samples being approximately the same size.  As Mr. Buchanan explained, "That's a big difference. Your best estimate is moving all over the board." D.E. 201-1 at 73.  Thus, Dr. Cowan's excessive margin of error renders his statistical analysis meaningless because it is too large to be useful to the jury[4].

## C. Cowan's Opinions Are Unreliable Because He Ignored The Significant Non Response Bias

Dr. Cowan admits that his work is only reliable if the sample is random.  D.E. 201-1 at 33.  He also admits that he failed to analyze the randomness of the sample, and merely assumed that it was random.  D.E. 189-3 at 21:23-22:35 and 189-1 at 8-9.

The sample of 43 owners was clearly not random.  As Mr. Buchanan has noted, several owners who actually testified and whose transcripts were prepared in advance of Dr. Cowan's February 14, 2020 supplemental report were nevertheless not provided to Dr. Cowan or included in his calculations.  For example, owners Robin Futrell, Chris Newbern and Rhonda Schiestel were deposed upon written question and testified that they were not influenced by TET to stop paying Westgate.  Their depositions were taken on November 22, 2019, January 31, 2020 and November 22, 2019, respectively, well before the date of Dr. Cowan's final report.  See Ex. 1.

Plaintiffs' counsel submitted an affidavit by Moneka Simpson after the close of expert discovery, which does nothing to remedy Dr. Cowan's complete inability to explain why so many owners were excluded from the sample of 43.  According to the affidavit, which is vague at best and lacks any supporting documentation, 53 owners were served with a deposition subpoena but failed to appear for their scheduled depositions. D.E. 189-7 at ¶ 11. The potential bias associated with this large subset of owners, which outnumber the actual sample considered by Dr. Cowan, is

---

[4] In addition to finding the margin of error of 31% to render the results meaningless, Mr. Buchanan testified that a margin of error above 20% was also too large to be useful. D.E. 201-1 at 94.

entirely unknown.  D.E. 201-1 at 110. Additionally, it is significant that 110 depositions were **_cancelled by Plaintiffs' counsel_** after the owners had been served with a deposition subpoena, apparently discussed the depositions with counsel, and apparently indicated that the depositions would be inconvenient.  D.E. 189-7 at ¶ 10. This subset of owners is more than double the sample size and could significantly affect Dr. Cowan's results.  D.E. 201-1 at 110.  Yet Dr. Cowan has neglected to perform any analysis whatsoever to determine the effect of these cancellations on the non response bias.

At the time Dr. Cowan issued his final report, he had no idea that Plaintiffs' counsel had intentionally withdrawn owners from the sample after those owners had been validly served with a deposition subpoena.  During his deposition, Dr. Cowan admitted that he did not know why there was such a high non response bias.  Even after Plaintiffs' ex post facto affidavit from Moneka Simpson, attempting to explain the basis for not deposing hundreds of owners, Dr. Cowan has not performed any analysis of the non response bias.  Thus, we are left without an explanation of how the absence of these 163 owners from the pool identified by Dr. Cowan might affect his conclusions.  His opinions are therefore unreliable.

### D.  Cowan's Opinions Should Be Excluded Because He Did Not Validate The Coding

Plaintiffs cannot establish that a reliable methodology was used to code the deposition testimony.  Dr. Cowan had no idea how the coding was accomplished, he did not make any effort to validate the coding, and no evidence of any such effort has been submitted by Plaintiffs.  D.E. 201-1 at 24. Thus, Plaintiffs have not met their burden to show that Dr. Cowan's opinions are reliable.

Dr. Cowan's failure to validate the coding or perform any kind of scientific oversight or analysis clearly demonstrates that Dr. Cowan is being used simply as a conduit for counsel's

opinions.  As the Court has pointed out, Dr. Cowan's only role here was to put a confidence interval around the results determined by Plaintiff's counsel.  D.E. 201-1 at 32.  Thus, Dr. Cowan's opinions are a far cry from the scientific principals and methods required to permit an expert's opinions to satisfy the threshold for admissibility.  *See Quiet Tech. DC-8, Inc*., 326 F.3d 1333, 1340-41.

Furthermore, expert testimony generally will not assist the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing motions.  *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004); citing 4 Weinstein's Federal Evidence § 702.03[2][a].  See also *Bowers v. Norfolk S. Corp*., 537 F. Supp.2d 1343 (M.D. Ga. 2007) (excluding expert's opinions based on Frazier where the plaintiff's lawyers were equally able to argue that vibration from a seat caused Plaintiff's injuries, because that is what Plaintiff said caused them, without the aid of the expert's testimony.  The district court found that the expert had "merely adopted Plaintiff's history to help Plaintiff with his lawsuit.  His opinions, therefore, add nothing to Plaintiff's case apart from what Plaintiff's lawyers can already argue to the jury.")  Here, counsel can make the argument to the jury that the 26 owners were influenced after introducing the transcripts; an expert is not needed for that.  Additionally, Dr. Cowan's opinions fail to satisfy Rule 702(c) because there is no way to determine whether reliable principals or methods were used to code the transcripts.

There is also clear evidence that the coding is incorrect.  Defendants have previously demonstrated that the 24 owners identified by Plaintiffs' counsel as "influenced" by TET had other reasons to stop paying Westgate.  See Ex. 2.

**E.  Dr. Cowan Has Not Performed Any Statistical Analysis To Confirm That The Sample Is Representative Of The Population**

Dr. Cowan admits that he has not performed any statistical analysis of the reasons why the owners stopped paying Westgate.  D.E. 201-1 at 27.  In fact, Dr. Cowan has failed to offer any justification for his determination that he can extrapolate the sample to the entire population, with no regard for the individual circumstances of each owner or the multitude of reasons why owners decided to stop paying Westgate. See generally D.E. 162 at 12-18.

Dr. Cowan has been precluded from offering a similar analysis by another court.  *See Homeward Residential, Inc*., 2017 U.S. Dist. LEXIS 187265.  In that case, Dr. Cowan proposed to use a statistical analysis to calculate the probability that a loan within a pool had been breached by: (1) taking a random sample of representative loans from the population; (2) determining the proportion of loans that had been breached within the sample; and (3) extrapolating the proportion of breached to the entire population.  Dr. Cowan testified in that matter that his methodology would allow him to *calculate the probability that a loan had been breached even though he could not determine which specific loans in the population had been breached* because he did not have data on all of the specific loans.  Similar to this case, Dr. Cowan intended to offer an opinion on the rate of breach and extrapolate that opinion to the entire population.  However, in the case at hand, there is a further layer of specific intent and individual circumstances concerning each of the owners that has not been analyzed at all.  In *Homeward Residential*, the court precluded Dr. Cowan from offering the proposed testimony because the statistical sampling methodology was not admissible or helpful to the jury.  Defendants respectfully submit that this opinion is analogous to the situation at hand and should be instructive.  Additionally, Dr. Cowan's opinions regarding extrapolation should be precluded because there is simply "too great of an analytical gap" between

the data and the opinion proffered. *See Bailey v. Allgas, Inc.*, 148 F. Supp.2d 1222 (N.D. A.L 2000) (citing *General Electric v. Joiner*, 522 U.S. 136, 146 (1997)).

## II.   PLAINTIFFS HAVE NOT PRESENTED ANY COLORABLE CHALLENGE TO MR. BUCHANAN'S OPINIONS

Mr. Buchanan has been offered as a rebuttal expert to Dr. Cowan.  While Plaintiffs initially filed a Daubert challenge attempting to argue that Mr. Buchanan was not qualified to opine on statistical analysis, Plaintiffs' counsel later conceded at the September 10 hearing that Plaintiffs do not challenge Mr. Buchanan's expertise as it relates to statistical analysis of survey results. D.E. 201-1 at 63.  The only challenge mounted to Mr. Buchanan during the hearing was whether he was qualified to opinion on the coding of deposition testimony.  However, as Mr. Buchanan explained at the hearing, he has been analyzing and interpreting deposition testimony for more than 20 years in the course of his work as an expert.  D.E. 201-1 at 108.  Additionally, Mr. Buchanan explained that depositions are similar to open-ended survey questions, which Mr. Buchanan has been coding for decades. Mr. Buchanan's significant experience in performing statistical analysis was previously addressed in Defendant's opposition to Plaintiffs' motion to strike. D.E. 171, Sections I. and II.D.  Thus, there is no question that Mr. Buchanan satisfies is sufficiently qualified to analyze and rebut Dr. Cowan's opinions. *See City of Tuscaloosa*, 158 F.3d 548, 562 (11th Cir. 1998).

In the event that Dr. Cowan's testimony is permitted at trial, it will be essential for the jury to understand the significant shortcomings and errors in Dr. Cowan's analysis.  While the Court is ordinarily the gatekeeper for the admissibility of expert testimony, the jury will need to be equipped to address the issues raised in Section I., above, if Dr. Cowan's testimony is not stricken. Thus, Mr. Buchanan's testimony, as further described in D.E. 162, is clearly helpful to the jury. *Id.*

## III.     CONCLUSION

Dr. Cowan's opinions do not satisfy the criteria for admissibility of expert opinions because they are unreliable and not helpful to the jury in this case.  Thus, Defendants respectfully request that the Court strike Dr. Cowan's opinions and preclude him from testifying at the trial of this matter.

In the event that Dr. Cowan is permitted to offer his opinions to the jury, it is imperative that the jury be assisted by Mr. Buchanan's explanation of the significant flaws in Dr. Cowan's analysis.  Mr. Buchanan has been clearly established as qualified to opinion on the statistical analysis and coding and his opinion will be helpful to the jury.

Respectfully submitted this 15th day of September, 2020.

/s/   Amy L. Baker
John Y. Benford, Esquire
Florida Bar No. 51950
E-mail: john.benford@wilsonelser.com
E-mail: alyssa.heitman@wilsonelser.com
Amy L. Baker, Esquire
Florida Bar No. 86912
E-mail: amy.baker@wilsonelser.com
E-mail: cristina.popan@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker
111 North Orange Avenue, Suite 1200
Orlando, Florida 32801
Telephone: (407) 203-7599
Facsimile: (407) 648-1376
Attorneys for Defendants
TET & Associates, LLC,
Brandon Reed, Trevor Hein,
and Thomas Parenteau

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 15, 2020, the foregoing document was filed with the Clerk of Court using the CM/ECF system and that all counsel of record received an electronic copy.

/s/ Amy L. Baker
Amy L. Baker, Esquire