# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**WESTGATE RESORTS, LTD., et al.,**

      **Plaintiffs,**

v.                                                       Case No:   6:18-cv-1088-Orl-31DCI

**REED HEIN & ASSOCIATES, LLC,**
**et al.,**

      **Defendants.**

## ORDER

This matter is before the Court on Defendants' Motion to Strike the Opinions and Report of Dr. Charles Cowan ("Cowan") (Doc. 162). Plaintiffs oppose the motion (Doc. 170). The Court held an evidentiary hearing on August 13, 2020, at which Cowan and Defendants' expert Michael Buchanan ("Buchanan") each testified. The parties filed post-hearing briefs (Docs. 201 and 202). The matter is ripe for determination, and the Court will grant Defendants' motion.

**I.   Background**

Plaintiffs (collectively, "Westgate" or "Plaintiffs") are developers and owners of timeshare properties. Defendants Reed Hein & Associates, d/b/a Timeshare Exit Team, Brandon Reed, Trevor Hein, and Thomas Parenteau (collectively, "TET") offer timeshare exit services. By their Complaint, Plaintiffs contend that Defendants have used various improper means to cause the owners of Westgate timeshare units to breach their contracts with Westgate. In order to provide Plaintiffs with a reasonable procedure to prove the damages caused by TET's conduct, the Court allowed Plaintiffs to take depositions by written questions. Docs. 55 and 105. The deposition questions were prepared by Plaintiffs' counsel with input from Cowan. The questions were designed

to determine the number of Westgate owners who, as a result of TET's alleged tortious conduct, quit making payments to Westgate after hiring TET for assistance in exiting their timeshare ownership.[1]

## II. Cowan's Report and Defendants' Response

Plaintiffs' counsel retained Cowan, an expert in statistical sampling theory, to: 1) select a valid random sample of TET clients who were Westgate owners to be deposed and 2) extrapolate the proportion of Influenced Accounts and damages to the entire population. Doc. 162-1 at 3.

Dr. Steven Wolf[2] ("Wolf") identified 843 accounts that were allegedly affected by Defendants' interference with their Westgate contracts. At the request of counsel, Cowan excluded 56 accounts from the population.[3] From this subset of 787 accounts, 591 accounts allegedly defaulted On or After TET Hire Date. *Id.* at 9–10.

Cowan designed his study as a simple random sample of 100 accounts to provide a maximum ±10% margin of error at the 95% confidence level. *Id.* at 10. Ninety accounts would be selected from the 591 On or After TET Hire Date group. *Id.* at 11. After two attempts, Plaintiffs' counsel were only successful in conducting 47 depositions. Forty-three of those deponents were identified as having defaulted in their Westgate payments On or After TET Hire Date. Doc. 162-2

---

[1] Owners who quit making payments as a result of TET's alleged conduct are referred to herein as "Influenced Accounts." The period of time after the owner hired TET is referred to herein as On or after TET Hire Date.

[2] Dr. Wolf, a CPA, is Plaintiffs' damages expert. Doc. 130-1.

[3] Nineteen accounts were excluded because they were affiliated with an unnamed plaintiff in this case; 37 accounts were excluded because Plaintiffs' counsel had already conducted or attempted to conduct depositions for these Westgate owners prior to Cowan's study. Doc. 162-1 at 9.

at 6. Out of these 43 depositions, Plaintiffs' counsel determined that 22 of these accounts should be considered "influenced" and provided this information to Cowan.

Cowan then extrapolated these 22 Influenced Accounts to the 591 accounts that defaulted On or After TET Hire Date. Doc. 162-2 at 7. Cowan's extrapolation indicates that an estimate based on dollar damages has an Influenced Account rate of 50%, with a 95% chance that the proportion of Influenced Accounts in the On or After TET Hire Date is between 27.0 – 72.3%. *Id.*, Table 1.[4]

In response, Defendants Buchanan as their own statistical expert. Buchanan does not challenge Cowan's qualifications under *Daubert*. Instead, he criticizes the reliability of Cowan's study primarily due to the large margin of error and the absence of a definition in coding accounts as "influenced." Doc. 161-1.[5]

### III.    The Legal Standard

By their Motion, Defendants contend that Cowan's testimony should be excluded because it does not meet the standard for admission under Federal Rules of Evidence 702, 403 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Under Federal Rule of Evidence 702,

> [e]xpert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

---

[4] Cowan also did an estimate based on the number of accounts, which had an even larger spread. But since the exercise here involves the issue of Plaintiffs' damages, the Court will focus on the dollar damages estimates.

[5] Buchanan also questions whether Cowan's sample was random or representative of the population. The Court finds no merit to this argument.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1998). Under this standard, the Court acts as the evidentiary gatekeeper. *See Daubert*, 509 U.S. at 592-93; *see generally Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). In performing the gatekeeping function, district courts "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation expert testimony." *Superior Consulting Servs. v. Shaklee Corp.*, No. 6:16-cv-2001-Orl-31GJK, 2018 WL 2323433 at *4 (M.D. Fla. May 22, 2018) (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005)) (internal quotation marks omitted).

To guide district courts' assessments of the reliability of an expert's testimony, the Supreme Court has identified four factors that district courts should consider: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. *See Daubert*, 509 U.S. at 593–94. This test is flexible, and these factors are neither necessary nor exhaustive in the Court exercising its discretion. *See Kumho Tire*, 526 U.S. at 141.

**IV.    Analysis**

In performing its gatekeeping function, the Court first acknowledges that the *Daubert* standard is broad and seeks "to strike a balance between a liberal admissibility standard for relevant evidence on one hand and the need to exclude misleading junk science on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009). Further, "'shaky but admissible' evidence is ordinarily opposed through cross-examination and the presentation of

contrary evidence." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 237 F. Supp. 3d 1230, 1240 (M.D. Fla. 2017) (quoting *Daubert,* 509 U.S. at 595–96).

Under *Daubert*, Cowan is clearly a qualified statistician, his methodology was statistically sound, and, if reliable, his opinion would be useful to the jury in assessing Plaintiffs' damages. The issue boils down to whether his opinion provides a *reliable* estimate of Plaintiffs' damages. And whether that estimate is *reliable* under *Daubert* depends upon whether Cowan's margin of error is legally acceptable.[6]

Defendants take issue with Cowan's designed margin of error and the actual margin of error after deviation from the sample design. Cowan's initial design recommended a simple random sample of 100 accounts that would ensure a ±10% margin of error at the 95% confidence level, which Cowan asserts is "well supported in statistics" and has been used in many of his prior studies. Doc. 162-1 at 10.[7] In response, Buchanan claims that a ±10% margin of error is much too high to produce a reliable result and cites authorities claiming ±3-5% is a more appropriate margin. Doc. 162-3 at 7.

---

[6] The margin of error is a common summary of sampling error which quantifies uncertainty about a survey result (*See* Doc. 202 at 4 (citing Lynne Stokes & Tom Belin, "What is a Margin of Error" in *What is a Survey* 63–67 (Fritz Scheuren, ed. 2004)). Cowan explained that it is the range of outcomes around the midpoint where all possible outcomes would fall (Doc. 194 at 49).

[7] For example, in *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 989 F. Supp. 2d 165 (D. Mass. 2013), Cowan proposed a 96 loan sample which would achieve a 95% confidence with a maximum margin of error of ±10%. He concluded that a larger sample size would decrease the margin of error to ±5%, but that the proposed sample, "strikes the correct balance between cost and accuracy." *See also In re Countrywide Fin. Corp. Mortg.-Backed Secs. Litig.*, 984 F. Supp. 2d 1021, 1030 (C.D. Cal. 2013) (Cowan's sample of 100 loans would yield a margin of error of ±10% with 95% confidence). Cowan has also used a margin of error of ±5% with a 95% confidence level. *See Homeward Residential, Inc. v. Sand Canyon Corp.,* No. 12 CIV. 5067 (JFK), 2017 WL 5256760 (S.D.N.Y. Nov. 13, 2017).

Cowan did not get his intended sample of 100. Instead, his sample size was only 43 accounts that defaulted after the TET hire date. Doc. 162-2. Of these 43 accounts, 22 were coded as "influenced," producing an Influenced Account rate of 50% based on dollar damages. Using Wolf's total of $7,234,782, the 50% midpoint would amount to a damages estimate of $3,617,391[8]. But the lower sample number increased the margin of error for dollar damages to ±22%, producing a boundary range between 27% - 72.3%. Doc. 162-2 at 7. Thus, in terms of dollars, the jury would be asked to choose a number between $1,953,391 and $5,230,747. *See* Doc. 194 at 56:8-25; *see also* Doc. 201 at 6-7.

There appears to be no recognized limit to an acceptable margin of error. In his report, Buchanan said that "[w]hile there is no single, universally acknowledged margin of error appropriate for all purposes, the generally accepted margin of error cited in the scientific community ranges from ±3-5%, not ±10%." Doc. 161-1 at 8. Cowan claims that a margin of error of ±10% is acceptable[9], but opines that an acceptable margin of error "depends on the question that's being raised." Doc. 194 at 51. So from the evidence presented here, it appears that the generally accepted margin of error is between ±3-5%, perhaps as high as ±10% in some circumstances. *See* Stokes & Belin, *supra,* at 64. But ±22%? Cowan makes no real effort to support this margin of error in the context of this case, so the Court must look to the circumstances surrounding the survey and the goal of conducting it.

---

[8] According to Cowan, the midpoint produces the most likely estimate. Doc. 194 at 32:9-16, 52:6-53.

[9] Within the past ten years, Cowan has not published anything within a scientific peer-reviewed journal where he utilized a maximum margin of error greater than ±10%. *See* Doc. 194 at 29:9-13.

The circumstances here were difficult. Plaintiffs' counsel had to rely on the seldom-used and imprecise process of depositions by written questions. *See* Docs. 55 and 105. Although Cowan had some input, the questions used in these depositions were prepared by counsel, who are not experts in sampling theory, and the questions produced answers that were nuanced and often inconsistent. And to compound this already troubling procedure, Plaintiffs' counsel made the coding decisions as to which accounts were "influenced." It seems self-evident that coding of survey responses should be done by disinterested persons, not the lawyers who have an obvious bias to achieve a favorable result for their clients. This is especially problematic here because Plaintiffs provide no express definition of "influenced." Furthermore, the Court examined the depositions and found that two were erroneously coded[10] and that two are questionable.[11]

With the survey's difficult and troubling circumstances in mind, the Court turns to the purpose of the survey itself. With the Wolf damages report as its foundation, the survey was designed to ascertain a reasonably accurate estimate of Plaintiffs' damages. *See* Doc. 162-1 at 10. While proof of economic damages need not yield a result that is precise to the penny, there must "be a reasonable basis of computation [of damages] although the result may be only approximate." *McCall v. Sherbill*, 68 So. 2d 362, 364 (Fla. 1953). A range of uncertainty between $1,953,391 and $5,230,747 for a total spread of $3,277,356 is simply too great to satisfy this legal requirement that there be a reasonable basis to compute economic damages.

---

[10] The Court found the following depositions erroneously coded as "Influenced." *See* Cochran Depo. (Doc. 151-1 at 9:4–14, 10:2–17; 13:12–22; 14:4–15:6; 23:8–12; 24:23–25); Gaugh Depo. (Doc. 151-17 at 10:3–16; 19:3–17; 28:23–29:15).

[11] The Court found the following depositions were borderline as to being coded "influenced" – again exposing the problematic nature of failing to define "influenced." *See* Kincaid Depo. (Doc. 175-4 at 6:5–14; 11:1–14; 13:15–14:6; 21:23–22:14); Nicholas Depo. (Doc. 128-10 at 6:15–18; 13:3–11; 20:18–21).

Plaintiffs counter with the argument that this range of uncertainty merely goes to the weight of Cowan's testimony, which they contend is for the jury to decide. As expressed by Cowan, "…the information that I'm producing to the trier of fact gives not only the midpoint but the range of possible outcomes and how likely the different outcomes are. And it's up to the trier of fact to make a choice as to what they like or don't like." Doc. 194 at 56:3-7. But how is the jury supposed to weigh this evidence and pick a number they like? There is no standard of measurement to guide the jury except the range itself, and a verdict anywhere within this range would be pure guesswork and unsustainable from an evidentiary standpoint. In essence, once Cowan's survey design of 100 responses was reduced to a sample of only 22 out of 43, his only contribution to a damages calculation is to put a ±22% margin of error around the 50% midpoint produced by the coding decisions of Plaintiffs' counsel. Asking a jury to just pick a number they "like," within the boundary range produced by a ±22% margin of error, is not sound statistical support for an estimate of Plaintiffs' damages and cannot be allowed under the Court's *Daubert* gatekeeping responsibility.[12]

---

[12] Because the Court strikes Cowan's report, it need not reach whether Cowan's report should be excluded under Federal Rule of Evidence 403.

## V. Conclusion

For the foregoing reasons, the Defendants' Motion to Strike the Opinions and Report of Dr. Charles Cowan (Doc. 162) is **GRANTED**[13].

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 16, 2020.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[13] This Motion includes both Cowan's original report (Doc. 162-1) and supplement (Doc. 162-2).