IN THE UNITED STATES DISTRICT COURT
THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WESTGATE RESORTS, LTD., a Florida
limited partnership, by and through its
general partner WESTGATE RESORTS,
INC., a Florida corporation, et al.,

      Plaintiffs,

v.                            Case No. 6:18-CV-1088-ORL-31-GAP-DCI

REED HEIN & ASSOCIATES, LLC d/b/a
TIMESHARE EXIT TEAM, et al.,

      Defendants.

_____/

**DEFENDANTS' SECOND REVISED MOTION IN LIMINE AND
ALTERNATIVELY, MOTION TO BIFURCATE PUNITIVE DAMAGES
CLAIM (ISSUE NO. 3),
AND SUPPORTING MEMORANDUM**

Defendants Reed Hein & Associates, LLC, Brandon Reed, Trevor Hein, and

Thomas Parenteau (collectively and singularly, "TET" or "Defendants"), by and

through their undersigned counsel, and pursuant to this Court's order dated April

23, 2021 (Doc. 302) respectfully submit their Second Revised Motion in Limine and,

alternatively, motion to bifurcate punitive damages claim (*see* Issue No. 3, *infra*.).

## I.      EVIDENCE DEFENDANTS SEEK TO EXCLUDE

TET respectfully requests that this Honorable Court enter an order

instructing Plaintiffs, their counsel, and witnesses from offering as evidence,

250812625v.1

mentioning, referring to, or otherwise attempting to convey before the jury at any time during these proceedings, the evidence, subject matters, or statements set forth below.

**1.      Any evidence relating to TET's advertisements.**

This Court should exclude any evidence relating to TET's advertisements because the Court previously granted summary judgment on Plaintiffs' Lanham Act claim pertaining to alleged false advertising.  *See* Doc. 143.  In the Court's order, the Court also granted summary judgment in favor of TET on Plaintiffs' FDUTPA claim which was similarly based on TET's allegedly false advertisements.  *See* Doc. 143 at 7.  Westgate filed a Motion for Reconsideration of the Court's Order granting summary judgment as to their FDUTPA claim, arguing that the Court failed to consider TET's ***non-advertising*** conduct and its request for injunctive relief.  *See* Doc. 146 at 1, 5, 7.  The Court granted Westgate's Motion for Reconsideration, but notably, the Motion for Reconsideration was limited to seeking relief based on TET's non-advertising conduct, and did not seek relief from the Court's order pertaining to TET's advertising conduct.  *Id*.

Despite the adverse ruling on their Lanham Act claim, Westgate has listed numerous TET advertisements on its Exhibit List.  *See, e.g,* Doc. 315-1, Westgate Exhibits 2-14, 128, 129.  Since Westgate was unable to succeed on its Lanham Act claim on the theory of false advertising, it necessarily follows that Westgate's

FDUTPA claim, which is based on the same alleged advertisements, also must fail. *See* Doc. 69 at 35; Doc. 143.  As such, any evidence pertaining to TET's advertising should be excluded because Westgate's FDUTPA claim is tied to its Lanham Act claim for false advertising, and this Court has already granted summary judgment in TET's favor on the Lanham Act claim.  *See Compulife Software, Inc. v. Newman,* 2020 U.S. App. LEXIS 16052, at *49, n.18 (11th Cir. May 20, 2020) (noting that the success of state FDUTPA claims is tied to federal Lanham Act claims for false advertising); *see also Sovereign Military Hospitaller v. Fla. Priory of the Knights Hospitallers*, 702 F. 3d 1279, 1296 (11th Cir. 2012) (same); *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F. 3d 1325, 1333 (11th Cir. 2008) (same).  Accordingly, Plaintiffs' claims pertaining to TET's allegedly false advertising are no longer at issue, and Plaintiffs should be precluded from introducing any evidence pertaining to TET's allegedly false advertisements at trial.  Such evidence lacks any relevance and will only serve to confuse the issues and mislead the jury under FRE 403.

This Court has indicated that certain aspects of TET's advertisements may be relevant if one of the 86 owners at issue has *testified* to seeing a specific advertisement.  *See* Doc. 258-1 at 24:3-11.  However, only a handful of owners were questioned at their depositions regarding specific advertisements.  In particular, Westgate generally asked the owners regarding one specific advertisement from

TET's Website.[1]  Even then, many of these owners testified that they did not recall or could not remember seeing the website advertisement.  *See* Doc. 112-25 at 38:19-39:6; Doc. 151-8 at 31:3-17.  For example, Westgate owner Marlene Thorne was questioned regarding a TET advertisement at her deposition, but she testified that she did not recall seeing that "particular one" and recalled seeing similar information elsewhere.  *See* Doc. 112-14 at 69:14-17.  Importantly, she did not testify that this advertisement caused her to stop paying her timeshare.  *See generally id.*  Additionally, while many Westgate owners testified to hearing a TET radio advertisement generally, they could not recall the specifics of the advertisement.  *See* Doc. 151-8 at 28:1-19.  Thus, most of the testimony from Westgate owners indicates that they only generally remember TET's advertisements and no specific advertisement or advertising language has ever been identified.  Such evidence must be excluded because the jury cannot be left to speculate regarding what specific advertisements Westgate owners saw, if any, and the resulting impact of the advertisement.  Therefore, any advertisement on Westgate's Exhibit List which a Westgate owner did not testify to specifically should be excluded.

---

[1] *See* Doc. 151-16 at 34:24-35:14, Exhibit 9 (Boring Depo.); Doc. 112-16 at 52:2-24, Exhibit 14 (Bak Depo.); Doc. 112-25 at 38:12-39:6, Exhibit 11 (Porter Depo.); Doc. 151-8 at 31:3-17, Exhibit 6 (Bland Depo); Doc. 112-12 at 41:14-42:18, Exhibit 3 (Patton Depo.); Doc. 112-13 at 52:22-53:9, Exhibit 29 (Arguello Depo).

**2.      Any evidence relating to Westgate owners who have not actually testified.**

The Court has made clear that Westgate's damages are limited to the 86 owners who have provided deposition testimony.   On November 5, 2020, the Court explained: "I thought it was clear that … Plaintiffs' damages have to be proven through direct testimony of Westgate owners who quit paying as a result of the defendants' alleged tortious conduct.  So what's unclear about that?"  Doc. 223 at 4:5-9.  Regardless, Plaintiffs still attempted to claim damages based upon the remaining 535 owners (out of original 621) who did not testify in their Statement of Case section of the Joint Pretrial Statement.  *See* Doc. 230 at 2-10. Shortly thereafter, at the December 15, 2020 pretrial conference, this Court was again unnecessarily required to clarify its ruling to Westgate:

> On the one hand, we have a trial, and the issues presented to that jury will be a claim for tortious interference, as well as a claim under FDUTPA, for damages as a result of the alleged conduct of the defendant that caused harm to the plaintiff. And based on my prior orders, the evidence with respect to those damages will be limited to those Westgate customers who testify during the trial that they stopped paying Westgate because of the defendants' conduct.  Apparently, the plaintiff still doesn't understand that ruling.

Doc. 258-1 at 4:17-25 (emphasis added).

However, Westgate continued to ignore the Court's rulings by attempting to introduce owner-related evidence pertaining to the remaining 535 owners who

have never testified, including rank hearsay communications to and from these owners who have never testified.  *See* Westgate's Exhibit List and TET's objections, attached hereto; Doc. 274 at 6-10; Doc. 261 at 9.  Accordingly, on April 21, 2021 the Court was required to entered an order to show cause against Westgate.  *See* Doc. 295.  In the order, the Court noted:

> This Court has clearly and consistently ruled that Plaintiffs' damages in this case (whether based on tortious interference or FDUTPA) will be limited to Westgate owners who testify (whether live or through deposition) that they stopped paying Westgate because of Defendants' tortious or deceptive conduct. See, e.g., Doc. 223 at 4:6-8 ("Plaintiffs' damages have to be proven through direct testimony of Westgate owners who quit paying as a result of the defendants' alleged tortious conduct."); Doc 255 at 4:21-24 ("the evidence with respect to those damages will be limited to those Westgate customers who testify during the trial that they stopped paying Westgate because of the defendants' conduct.

Doc. 294 at 1.

Yet despite the Court's clear rulings, Westgate now maintains it is entitled to prove alleged damages from 45 owners without the owners' testimony, and who were not among the 86 deposed in this case.[2]  This includes $420,207.00 in damages relating to approximately 31 owners who did not testify and $197,898.16 in damages for 14 owners who did not testify.  *See* Doc. 315 at 22.  In an attempt to prove these unauthorized damages, Westgate has listed numerous documents on

---

[2] Westgate admits that only three of these 45 owners gave their depositions (therefore among the 86 who gave their depositions).  *See* Doc. 315 at 22.  However, Westgate has not included these three owners in the 44 owners upon which it is claiming damages.  Moreover, these three owners did not testify as to the documents Westgate is now seeking to introduce.  Accordingly, there is no way a jury can fairly assess how these documents would have influenced the decisions of these three owners to stop payment.

its Exhibit List (Doc. 315-1) pertaining to these 45 owners who have not given testimony in this matter.

First, as forth above, the Court has made it clear that Westgate's damages are limited to the approximately 86 owners who testified (approximately 44 of whom Westgate now seeks to offer)[3].  *See* Doc. 291 at 1.  Thus, any evidence, in particular documentary evidence, relating to owners who have not testified is irrelevant and prejudicial because it is outside the scope of damages.  *See, e.g., Dover v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-11531(SAS), 2014 U.S. Dist. LEXIS 133181, *4-6 (M.D. Fla. Sep. 19, 2014).

Second, assuming Westgate's damages are not limited to the approximately 86 owners who testified (despite this Court's clear rulings), evidence relating to the other 535 owners who did not testify would be prejudicial and misleading under FRE 403.  In the present case, Westgate is attempting to offer approximately 538 trial exhibits into evidence.  *See* Doc. 315-1 (Plaintiffs' Exhibit List).  Many of these documents include documents relating to the approximately 535 owners who did not testify, including, but not limited to:

---

[3] There were originally a total of 621 owners which Westgate claimed TET caused to default.  86 of these owners gave their depositions, leaving 535 who never testified.  Of the 86 that testified, Westgate contends that approximately 41 testified that TET advised them not to pay their timeshares.  TET, on the other hand, contends that only approximately 34 testified that TET advised them not to make payment, and, also testified as to numerous other reasons as to why they stopped paying their timeshare.  *See* Doc. 163 at 5-7; Doc. 190 at 3-91; Doc. 190-13, 190-14.

7

- Communications from TET to owners who never testified.  *See, e.g.,* Westgate Exhibits 37-39, 46, 48-52, 96, 407-424, 471, 474, 476, 480, 481.

- Communications from TET vendors to owners who never testified.  *See, e.g.,* Westgate Exhibits 61, 97, 98, 99, 100.

- Exit Agreements (service agreements) and other sales related documents between TET and owners who never testified.  *See, e.g.,* Westgate Exhibits 26, 28, 30, 33, 35.

- Various TET advertisements which the 86 owners did not provide testimony regarding or did not recall.  *See, e.g.,* Westgate Exhibits 2-14, 128, 129.

- Contract documents with Westgate and owners who never testified.  *See, e.g.,* Westgate Exhibits 355-401, 469, 470, 472, 473.

- Recordings of telephone calls between TET representatives and owners who never testified. *See, e.g.,* Westgate Exhibits 450-465.

Without testimony from the owners pertaining to these communications, it is impossible for a jury to assess what impact, if any, TET's advice had on the owner, and whether any such advice actually caused a default.  Indeed, the inclusion of these documents would require the jury to speculate as to the circumstances surrounding each owner, which will only serve to confuse the issues and mislead the jury.  *See* Doc. 163 at 21-22 (discussing how courts are reluctant to find tortious interference with a contract where the party to plaintiff's

contract has not testified); Doc. 190 at 10; Doc. 203 at 3, 5.  Indeed, in *Westgate v. Sussman*, Judge Dalton recognized the speculation problem surrounding tortious interference claims where an owner has not provided direct testimony.  *See Westgate v. Sussman*, Doc. 266 at 3-4; Doc. 163 at 22-23; Doc. 190 at 10.  Aside from the obvious hearsay issues raised by these communications, the documents would additionally be highly prejudicial to TET because TET would not have the benefit of the owner's testimony to indicate whether TET was the cause of any purported breach of the timeshare contract.  Similarly, correspondence between TET vendors (for example, SGB) and non-testifying owners is equally problematic.

In addition, communications between specific TET representatives and owners (neither of whom have testified) constitutes hearsay.  *See Martinez v. Rabbit Tanaka Corp.*, 2006 U.S. Dist. LEXIS 97084, at *17-19 (S.D. Fla. Jan. 5, 2006) (holding that communications regarding customers' interest in purchasing products from plaintiffs were inadmissible hearsay where plaintiffs failed to provide any first hand testimonial support from the customers to corroborate their account); *In re Lynch*, 755 Fed. Appx. 920, 925 (11th Cir. 2018) (communications offered to prove the truth of the matter therein constitute hearsay).

**3.    Any evidence relating to alleged punitive damages.  In the *alternative*, TET moves to bifurcate Westgate's punitive damages claim at trial.**

There is no basis for Westgate to claim punitive damages under either its tortious interference or FDUTPA claims.  Where a plaintiff's request for punitive

damages is based on state law claims, as is the case here, Florida law controls the request. *See McCarthy v. Barnett Bank*, 750 F. Supp. 1119, 1127 (M.D. Fla. 1990); *Lancer Arabians, Inc. v. Beech Aircraft Corp.*, 723 F. Supp. 1444, 1446-1447 (M.D. Fla. 1989). Florida's punitive damages statute creates a "substantive legal right not to be subject to a punitive damages claim" until the trial court rules that there is a reasonable evidentiary basis for one. *See Holmes v. Bridgestone/Firestone, Inc.*, 891 So. 2d 1188, 1191 (Fla. 4th DCA 2005). A punitive damages claim is not "permitted unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages." Fla. Stat. § 768.72(1). Plaintiffs have failed to offer any evidence or make any showing on the record which supports their claim for punitive damages.

For a defendant to be held liable for punitive damages, Florida law requires a finding, by clear and convincing evidence, that "the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.725. Intentional misconduct is defined as "[having] actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursu[ing] that course of conduct, resulting in injury or damage." *Id*. at § 768.72(2)(a). Gross negligence is defined as conduct that is "so reckless or wanting in care that it

250812625v.1

constitute[s] a conscious disregard or indifference to the life, safety or rights of persons exposed to such conduct." *Id.* at § 768.72(2)(b).

Plaintiffs cannot make such a showing here because the record evidence establishes that out of the approximately 1,386 Westgate owners who hired TET, Westgate has only located approximately 34 who testified that TET advised them not to make payment. *See* Doc. 163 at 5-7; Doc. 190 at 3-9l Doc. 190-13, 190-14. However, these 34 owners also testified as to numerous other reasons in which a reasonable jury could conclude they stop making payment, including financial hardships, and inability to use their timeshares, among other reasons. *See* Doc. 190-1; Doc. 190-2. These owners also testified that the "other conduct" Westgate relies on, *i.e.*, TET misleads its customers into believing it is a law firm, did not cause them to stop paying. *See* Doc. 190-9; Doc. 190-10. Accordingly, Plaintiffs cannot prove that TET engaged in any conduct which could support a claim for punitive damages.

Furthermore, as discussed above, TET's advertisements are no longer at issue, but even if they were, no owners testified that they were deceived by any of TET's advertisements. Consequently, Plaintiffs have failed to establish their entitlement to punitive damages, and cannot demonstrate by clear and convincing evidence that TET was engaged in intentional misconduct or reckless behavior to support a claim for punitive damages. Any evidence pertaining to punitive

damages (including the compensation of Brandon Reed and Trevor Hein) will only confuse and mislead the jury and thus should be excluded under FRE 403.

In the alternative, TET would respectfully request that the Court bifurcate the trial so that a jury would first determine liability (and the Plaintiffs' entitlement to punitive damages) and then, in a second phase – and only if necessary – quantify the amount of those punitive damages.  *See Estate of Miller v. Ford Motor Co.*, No. 2:01-cv-545-FTM-29DNF, 2004 U.S. Dist. LEXIS 30809, at *2-4 (M.D. Fla. July 22, 2004); *W.R. Grace & Co.-Conn. v. Waters*, 638 So. 2d 502, 506 (Fla. 1994).  Otherwise, it is likely that the jury will hear, among other things, highly prejudicial evidence relating to Defendants Brandon Reed and Trevor Hein's personal compensation from TET (described below) which, other than for punitive damages, is not remotely relevant.  As this Court has explained, when presented with a timely Federal Rule of Civil Procedure 42(b) request to bifurcate, the trial court should bifurcate the determination of the amount of punitive damages from the remaining issues at trial, explaining:

> At the first stage of a trial in which punitive damages are an issue, the jury should hear evidence regarding liability for actual damages, the amount of actual damages, and liability for punitive damages, and should make determinations on those issues.  If, at the first stage, the jury determines that punitive damages are warranted, the same jury should then hear evidence relevant to the amount of punitive damages and should determine the amount for which the defendant is liable.

*Estate of Miller,* 2004 U.S. Dist. LEXIS 30809, at \*3 (citing *W.R. Grace & Co,* 638 So. 2d at 505 (Fla. 1994)) (granting motion to bifurcate trial for punitive damages to be determined after a jury makes a determination on liability).[4]  Accordingly, should this Court allow Westgate to proceed with its punitive damages claim, TET requests that the Court bifurcate the trial so the jury would first determine liability, and then, if a finding is made for punitive damages, it would determine the amount of punitive damages in a second phase.

Other than possible relevance in determining the amount of punitive damages (assuming a jury were to find Westgate is entitled to such damages), the compensation of Mr. Reed and Mr. Hein should be excluded because it is not relevant to the issues in the action.  *See Kinsey v. Cendant Corp.,* 588 F. Supp. 2d 516, 518 (S.D.N.Y. Nov. 24, 2008) (the court excluded evidence related to negotiations and compensation packages with Bluegreen on the basis such evidence has limited relevance that is outweighed by unfair prejudice); *Industrial Hard Chromse, Ltd. v. Hetran, Inc.,* 92 F. Supp. 2d 786, 790 (N.D. Ill. Apr. 18, 2000) (the court excluded evidence relating to wages and salaries as irrelevant and prejudicial); *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC,* 2017 U.S. Dist. LEXIS 52886, \*6 (W.D. Ark. Apr.

---

[4] *Salinero v. John & Johnson,* 2019 U.S. Dist. LEXIS 196600 (S.D. Fla. Oct. 25, 2019) (same); *Cross v. Wyeth Pharms., Inc.,* 2011 U.S. Dist. LEXIS 67348, at \*12-14 (M.D. Fla. June 23, 2011) (granting motion to bifurcate determination of amount of punitive damages from liability portion of trial under Rule 42(b)).

6, 2017) (the court held salaries and/or commission paid by the parties to their individual employees were not relevant and should be excluded under Rule 403).

During their depositions, Westgate asked Mr. Reed and Mr. Hein various questions regarding their compensation. *See, e.g., Westgate* (Reed Depo), at 23:14-17, 49:22-25; *Westgate* (Hein Depo), at 32:3-25, 33:1-4, 48:9-13.   TET's damages expert, Robert Morrison, has testified that the compensation of these two officers/owners has no relevancy to damages. *See* Doc. 347-4.[5]

In *Orange Lake*, TET filed a similar motion in limine requesting that the plaintiffs be precluded from offering any evidence regarding Mr. Reed and Mr. Hein's compensation, which the court granted. *See Orange Lake*, Doc. 448 at 8. Accordingly, information relating to the salaries, distributions or other compensation of Mr. Reed or Mr. Hein is irrelevant and will only prejudice the jury.

**4.    The depositions by written question of Edgar Annett, Shawna Cochran, Anthony Kincaid, and Arnold Mullins should be excluded because TET's properly submitted cross questions were not asked during the depositions.**

---

[5] Partner/owner distributions do not affect expenses (which are central to Lanham Act damages) because they are recorded as a reduction to the partner's capital accounts, and not deducted as expenses. *Id.* W-2 wages and guaranteed payments are deducted as expenses. *Id.* From 2013 through 2017, the W-2 wages and guaranteed payments combined represented 4.0% of TET's earned revenue and 1.3% of its earned revenue plus unearned revenue. *Id.* Mr. Morrison opines that these percentages are well within the norm. *Id.* Further, Plaintiffs' damages expert, Mr. Wolf, does not offer any testimony with respect to the compensation of Reed or Hein, further underscoring the lack of relevance.

250812625v.1

Westgate has included in its designated transcripts the transcripts of witnesses deposed under Rule 31 in which the reporter did not read TET's timely served cross-questions: Edgar Annett, Shawna Cochran, Anthony Kincaid, and Arnold Mullins. *See* Kroll Declaration, Doc. 274-3. Rule 31 provides the specific practices and procedures for taking depositions upon written questions, and requires that written questions from a party directed to a deponent must be served on all parties and allow fourteen days, from the date of service, for the other parties to serve cross-questions. *See* Fed. R. Civ. Proc. R. 3(a)1(5), *In re: Clerici*, 481 F.3d 1324, 1336 (11th Cir. 2007) (recognizing written deposition requirements set forth in Fed. R. Civ. P. 31). However, the court reporters who conducted the depositions of the Subject Witnesses read only Westgate's questions, and failed[6] to read TET's timely served cross-questions. *See* Kroll Declaration, at Exhibit "1".

Testimony obtained from these four witnesses should be excluded. The transcripts of the four witnesses are incomplete and prejudicial to TET because they do not contain responses to TET's cross-questions. The failure to conduct the

---

[6] In the case of Annett, Cochran and Kinkaid, the reasons for the court reporters' respective failures to read TET's cross-questions is entirely unknown. In the case of Mullins, the court reporter determined not to read TET's cross-questions on the basis that the caption misidentified the deponents as Mullins' spouse. TET denies that examination of Mullins (albeit misidentified) would have resulted in inadmissible testimony. At any rate, the court reporter should have read TET's cross-questions; if so, the court could have later excluded the cross-examination if requested and warranted.

depositions of the four witnesses as required under the Rule 31 is not a mere technicality, but rather a matter of due process.

It is indisputable that the ability to cross-examine witnesses is fundamental to due process.  *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses").  Here, because the transcripts were incomplete, TET was not afforded "an effective opportunity to defend" as required by *Kelly*.  *Id*. at 268; *see also Greene v. McElroy,* 360 U.S. 474, 497 (1959) (internal citations and quotation marks omitted); *Marin v. Comm'r of Soc. Sec.*, 535 F. Supp. 2d 1263, 1265 (M.D. Fla. 2008).  Moreover, when TET learned of this deficiency, TET attempted, but was unable, to cure it prior to the February 7, 2020, discovery cut-off because it was either unable to reach the four witnesses or the witnesses were adverse to being deposed a second time.

5. **Any evidence relating to the BBB, including communications from the BBB, reports, complaints, etc.**

At the status hearing on April 23, 2021, this Court stated:

[T]he issue with respect to the jury trial is rather simple, and that is whether the conduct of TET caused these testifying Westgate owners to default on their obligation or obligations to Westgate.  That's the issue.  The issue is not all the bad things that TET has done throughout the universe of their operations.  It's not about *Better Business Bureau complaints* or advertising or holding themselves out as a law firm or not honoring their 100 percent guarantee or things like that unless -- unless such issues specifically relate to one of the Westgate testifying owners.

Transcript of April 23, 2021 status hearing (Doc. 309), at 7 (emphasis added).

Regardless, Plaintiffs have included documents pertaining to communications and reports from the Better Business Bureau ("BBB") on their exhibit list as well as designated deposition testimony from various witnesses relating to the BBB.  *See* Plaintiffs' Exhibit List, Doc. 315-1, Exhibits 7, 8, 110, 111. This evidence should be excluded because Plaintiffs have failed to offer any witness which has personal knowledge of the matters set forth therein.  Plaintiffs have attempted to offer similar evidence at the depositions of Brandon Reed, Scott Loughran, Chastity Porter, and Thomas Parenteau.   For example, Plaintiffs questioned Scott Loughran at his deposition regarding the BBB's Standard Investigation Summary on TET, and introduced the document as an exhibit.  *See* Loughran Depo at Ex. 7.  Plaintiffs have further listed this document on their Exhibit List.  *See* Doc. 315-1 at Exhibit 108.  Additionally, Westgate lists other documents from the BBB on its exhibit list, including TET's Profile with the BBB and correspondence from the BBB.  *Id.* at Exhibits 7, 8, 110, 111.  Westgate lists the sponsoring witnesses for these documents as Brandon Reed, Thomas Parenteau, Chastity Porter, Scott Loughran, and "TET Representative," but none of these witnesses have personal knowledge of the matters set forth in the BBB documents because they all work for TET and were not involved in the creation of these BBB documents.  As a result, they have no personal knowledge of any BBB customer

17

reviews, and the only persons with personal knowledge of those reviews would be the customers themselves.  Under FRE 602, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Here, Westgate has not offered any witness from the BBB which has personal knowledge of the BBB documents. Consequently, documents pertaining to the BBB should be excluded.

Furthermore, the BBB documents themselves constitute hearsay under FRE 802.  "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *United States v. Perl*, 492 F. App'x 37, 40 (11th Cir. 2012) (quoting Fed. R. Evid. 801(c)).  Plaintiffs have failed to take the depositions of any BBB representatives regarding the communications, reports, and other writings listed on their exhibit witness list.  Accordingly, offering these documents at trial constitutes hearsay because Plaintiffs are offering the documents containing out of court statements to prove the truth of the matters asserted therein, and TET would have no opportunity to cross-examine the declarants. Even if Plaintiffs offered testimony of a BBB witness to support the documents at issue, the witnesses' testimony would still constitute hearsay especially as it pertained to any consumer complaints or communications not made by the witness because any testimony regarding such documents would not be based on his or her own personal

knowledge.   Thus, Plaintiffs cannot offer any witness which has personal knowledge of the matters set forth in the BBB documents, and any testimony pertaining to the documents would constitute hearsay.

Finally, any evidence from the BBB is irrelevant unless it pertains to one of the approximately 44 owners who testified which Plaintiffs claim TET caused to default and were among those owners for which Plaintiffs are seeking damages. Outside of this narrow subset of BBB documents which may be relevant, the remainder of the BBB documents should be excluded on relevancy grounds because the documents are not of consequence in determining the claims at issue, yet would be highly prejudicial.

**6.    The comparison of hire dates and default dates used by Plaintiffs' expert Steven Wolf in his report should be excluded to the extent that it does not relate to one of the approximately 41 owners who testified that TET advised them not to pay their timeshares.**

On October 19, 2020, several days following this Court's order striking Dr. Cowan's opinions as to causation by extrapolation, the Court entered an order denying TET's Motion to Strike Plaintiffs' expert on damages, Steve Wolf.  *See* Doc. 211.  Importantly, in the order, the Court ruled that "[b]y Order dated October 16, 2020, the Court struck Cowan's report and testimony.   (Doc. 208).  Thus, Wolf's report is *moot* with respect to Plaintiffs' effort to extrapolate damages based on Cowan's survey.  However, Wolf's report may be relevant to the extent Plaintiffs produce *direct evidence* of causation at trial."  Doc. 211 at 1-2 (emphasis added).  As

19

set forth above, this Court has also made clear that "Plaintiffs' damages must be proven through direct testimony of Westgate owners who quit paying as a result of Defendants' alleged tortious conduct."   Doc. 228 at 4, 13-14 (transcript of November 5, 2020 hearing).

Accordingly, it is TET's position that Mr. Wolf's hire date/default date analysis in his expert report may only be used with respect to any owners who provided direct testimony at trial.  Like the barrage of other evidence Westgate seeks to introduce at trial pertaining to the 535 owners who have not testified, Mr. Wolf's hire date-default date comparison regarding these owners is prejudicial because nothing is known as to why they stopped paying Westgate – speculation problems discussed at length in TET's Motion to Strike Cowan and MPSJ on Damages.  *See* Docs. 162, Doc. 163.  It is especially prejudicial given that Mr. Wolf is an expert witness.

## II.     EVIDENCE DEFENDANTS SEEK TO ADMIT

Defendants respectfully request that this Honorable Court enter an order ruling that the following evidence is admissible at trial:

**1.     TET's Fact Pattern Sheets.**

As set forth above, an owner's decision to exit their timeshare before even learning of TET, which made many of these owners seek out TET, is highly relevant to almost every issue in this case, including, but not limited to, causation

and predisposition a breach under tortious interference and FDUTPA.   The relevancy of owner dissatisfaction with their timeshares was a central issue in TET's motion to strike Dr. Cowan under *Daubert* as well as its motion for partial summary judgment.   *See, e.g.*, Doc. 162, Doc. 163; Doc. 190.   In addition, other courts in similar cases brought by timeshare companies against exit companies and attorneys have also noted the relevancy of such information.   *See* Orange Lake, Doc. 448 at 3.   In addition, to the extent Westgate is allowed to introduce evidence relating to TET's advertisements, these complaints are also relevant to the alleged falsity and/or misleading nature of TET's advertising.   In its Amended Complaint, Westgate alleges that TET falsely publishes negative comments regarding the timeshare industry as a whole, for example, TET purposefully inserts itself into the same marketplace in which Plaintiffs operate and direct false advertising to Plaintiffs' existing client base and to prospective owners.   *See, e.g.*, Amended Complaint, 156.   These comments are some of the most common complaints by timeshare owners as to why they want to get rid of their timeshare contracts, many of which have been echoed in the testimony of former TET customers/third-party witnesses.   *See* Doc. 190 at 4; Doc. 190-1; Doc. 190-2.

Importantly, the Fact Pattern Sheets constitute business records under federal Rule of Evidence 803(6), which is an exception to hearsay.   TET's Fact Pattern Sheets are comprised of customer intake information in which TET is

21

asking its customers to provide various information regarding their timeshares. Information is provided by the customers at the time they are hiring TET or shortly thereafter.  TET intends to offer the Fact Pattern Sheets as business records at trial pursuant to FRE 803(6).  In doing so, TET intends offer the testimony of the appropriate records custodians who will be able to lay the foundation of these Fact Pattern Sheets as business records pursuant to FRE 803(6).  The Fact Pattern Sheets are highly relevant because, among other things, they contain compelling information as to why the owners are motivated to get rid of their timeshares and establish predisposition to breach.

Under FRE 803(6), courts have admitted numerous types of statements made by third parties as business records.  Customer information is admissible as business records pursuant to FRE 803(6).  *See, e.g., Cent. States, Southeast & Southwest Areas Pension Fund v. U.S. Truck Co. Holdings, Inc.*, 341 B.R. 596, at *613 (E.D. Mich. March 31, 2006).  A qualified witness need "not be the author of the document but must have personal knowledge of the procedure used to create and maintain the document."  *United States v. Reese*, 666 F.3d 1007, 1017 (7th Cir. Jan. 13, 2012).

In *Central States*, the court held that customer surveys were admissible as business records under FRE 803(6).  *See Cent. States, Southeast & Southwest Areas Pension Fund v. U.S. Truck Co. Holdings, Inc.*, 341 B.R. 596, at *613 (E.D. Mich. March

250812625v.1

31, 2006).   Similarly, court have held that applications for employment were admissible as business records under FRE 803(6).   *See Tift v. Hubbell Power Sys.*, 2013 U.S. Dist. LEXIS 111034, at * 3 (N.D. Ala. Aug. 7, 2013); *Marchioli v. Pre-Employ.com, Inc.*, 2017 U.S. Dist. LEXIS 217648, at *29 (C.D. Cal. June 30, 2017).   In admitting these applications, the courts have also admitted statements made by the applicants.   *See, e.g., Doali-Millerv. SuperValu, Inc.*, 855 F. Supp. 2d 510, 513-515 (D. Md. 2012) (finding a plaintiff's statements contained within a report were admissible because they fell under hearsay exception). In *Savanna Group*, defendants challenged an expert report on the basis it was based upon fax transmission logs he had obtained from a hard-drive.   *See Savanna Group, Inc. v. Trynex, Inc.*, 2013 U.S. Dist. LEXIS 1277, at *24-26 (N.D. Ill. Jan. 4, 2013).

Finally, in *Orange Lake*, the plaintiffs attempted to exclude the same documents in their motion in limine.   In its order on plaintiffs' motion, the court found such documents were admissible.   *See Orange Lake*, Doc. 391 at 11-14; Doc. 448 at 3.

Respectfully submitted this 4th day of June, 2021.

/s/ John Y. Benford
John Y. Benford, Esquire
Florida Bar No. 51950
E-mail:  john.benford@wilsonelser.com
E-mail:  alyssa.heitman@wilsonelser.com

23

Amy L. Baker, Esquire
Florida Bar No. 86912
E-mail:  amy.baker@wilsonelser.com
E-mail:  alyssa.heitman@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker
111 North Orange Avenue, Suite 1200
Orlando, Florida 32801
Telephone:  (407) 203-7599
Facsimile:  (407) 648-1376
Attorneys for Defendants

## LOCAL RULE 3.01(G) CERTIFICATION

The undersigned certifies that, pursuant to Local Rule 3.01(g), the parties

have conferred, and were unable to reach an agreement on the issues raised in this

motion.

/s/ John Y. Benford
John Y. Benford, Esquire

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of June, 2021, the foregoing

document was filed with the Clerk of Court using the CM/ECF system and that

all counsel of record received an electronic copy.

/s/ John Y. Benford
John Y. Benford, Esquire

24

250812625v.1