# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

WESTGATE RESORTS, LTD., a Florida
limited partnership, by and through its
general partner WESTGATE RESORTS,
INC., a Florida corporation, *et al.*,

       Plaintiffs,

vs.                              **Case No. 6:18-cv-01088-GAP-DCI**

REED HEIN & ASSOCIATES, LLC d/b/a
TIMESHARE EXIT TEAM, *et al.*,

       Defendants.

_____/

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' SECOND REVISED MOTION IN LIMINE AND ALTERNATIVE MOTION TO BIFURCATE PUNITIVE DAMAGES CLAIM

Plaintiffs Westgate Resorts, Ltd., et al. ("Westgate") file their opposition to the Second Revised Motion in Limine and Alternatively Motion to Bifurcate Punitive Damages Claims (DE 319) (the "Motion") filed by Defendants Reed Hein & Associates, LLC d/b/a Timeshare Exit Team, Brandon Reed, Trevor Hein, Thomas Parenteau ( collectively "TET").

## INTRODUCTION

TET's Motion largely re-asserts arguments in the motion it amends, except to narrow the scope of its argument seeking to exclude all evidence relating to timeshare owners who did not testify. This is a crucial distinction because

1

Westgate is not submitting a correlation analysis to extrapolate claims unrelated to the circumstances of a timeshare owner's non-payment.  Now, TET's argument targets just 45 non-testifying owners for whom Westgate seeks damages based on TET's own business records showing these specific owners stopped paying Westgate at TET's behest.  TET offers no valid basis for excluding this evidence.

Rather, TET's argument and prior iterations of this argument rely upon Judge Dalton's rulings on the use of circumstantial evidence to prove tortious interference causation and damages in an earlier case[1] where there was no specific evidence of owners' circumstances surrounding their non-payments.  *Sussman* at DE 266, p 5. But Judge Dalton never said that only witness testimony could prove causation.  He only questioned not using any, and relying only on a correlation analysis to prove causation of damages for owners without their testimony or other direct evidence specific to those owners.  In this case, Westgate previously offered a correlation analysis with the timeline report of CPA expert Steve Wolf, but also has substantial direct evidence specific to owners in the form of testimony, documentary evidence, and, most recently, audio recording belated produced by TET.  Westgate previously offered a third kind of evidence of causation: expert opinion using an extrapolation analysis, but that failed, not because the method was questioned, but because the execution was faulty.  But this expert's reliance only on witness testimony – not TET

---

[1] *Westgate Resorts, Ltd. v. Mitchell Reed Sussman*, No. 6:17-cv-1467 (M.D. Fla.) ("*Sussman*")

documents or (then unknown) audio recordings – for his testing sample seems to have given rise to confusion that testimony is the only evidence Westgate can use to prove causation, and the existence of other direct evidence has been overlooked.

While the Court has enunciated its view several times that the only admissible direct evidence of causation and damages for these claims is the testimony of owners, the Court also acknowledged at the December 15, 2020, Pretrial Conference that direct evidence other than the testimony of owners would likewise be sufficient.[2] Westgate does not believe that the Court intended to pre-emptively exclude other forms of direct evidence (including party admissions) that would prove Westgate's claims for damages related to 45 specific timeshare owners.  This is what TET asks the Court to do in Section 2 of its Motion (which Westgate addresses here in Section 1).

TET's arguments to exclude five other categories of evidence, and to obtain an advance ruling that its "fact pattern sheets" are admissible despite substantial evidentiary defects, are largely verbatim re-assertions of prior argument. Westgate's responds to and refutes those arguments as before, except to streamline some arguments to the narrowed scope of the jury trial and to withdraw evidence related to the Better Business Bureau in Section 5 of the Motion.

---

[2] *See* Hrg. Transcr. (DE 306-1) at 16:19-17:11)

1.     **Westgate Is Entitled To Offer Owner-Specific Evidence From TET's Own Documents and Audio Recordings to Prove its Claims for Damages for 89 Identified Owners**

Westgate offers to prove its claims for tortious interference and FDUTPA through direct evidence that shows 89 identified timeshare owners each defaulted on his or her timeshare contract because TET instructed, suggested, or directly influenced him or her to stop paying, as follows:

1.  Category 1 - Deposition Testimony: 44 owners testified they stopped paying their timeshare contracts at the instruction, suggestion, and/or influence of TET, which caused them to default on their timeshare contracts.

2.  Category 2 - TET Documentary Evidence: 31 owners (1 of whom was deposed but is not included in Category 1) stopped paying Westgate at the instruction of TET as shown in TET emails to owners expressly instructing them to stop paying, and also shown in TET forms and CRM entries in which TET admits the owners were in default because TET instructed them to stop paying.

3.  Category 3 - TET Call Recordings: 14 owners (2 of whom were deposed but are not included in Categories 1 or 2) unambiguously stated in telephone calls with TET's authorized representatives which were recorded by TET, and produced by TET on March 15, 2021, that they stopped paying Westgate at the instruction of TET.

All of the owner-related exhibits and deposition designations offered by Westgate pertain to these 89 owners.  Although TET falsely portrays Westgate's exhibits as relating to "the approximately 535 owners who did not testify,"[3] their argument is really directed at excluding evidence in Categories 2 and 3 that Westgate offers for 45 owners.  This evidence is highly relevant and admissible to prove

---

[3] Mot. 7-8. This is simply wrong, as the exhibits cited by Defendants in making this argument are contracts, emails, call recordings and other documents relating only to the specific 89 owners for whom Westgate seeks damages.  *See* **Ex. 1** (Summary of Exhibits Cited in Motion).

Westgate's claims, and TET does not offer a valid basis for excluding them.  The non-testimonial evidence comes directly from TET's own business records about these specific owners.    As Westgate will show, TET's own words in its emails and CRM and its own words in recorded conversations with these customers are not hearsay at all; they are statements  of a party opponent under Rule 801(d)(2)(D).

This evidence includes audio recordings of calls with TET *in real time* telling TET agents they stopped paying Westgate *because* TET told them to stop.[4]  Owner Kristina Bezmen, outraged that she was being foreclosed and demanding a refund, stated "I never missed a payment until you told me to stop," and "I was never told in the middle of it or at any other time to resume paying," which TET's agent acknowledged (yet refused a refund): "I know you were told not to make your payment."[5]  When TET called to ask owner Michelle Jordan if she was current on her mortgage and maintenance payments to Westgate, she replied: "No. We stopped paying once we signed on with you as we were told."[6]  Owner Joann Lee told a TET agent that she stopped paying her Westgate mortgage because someone at TET she believed was a lawyer "told me to stop paying."[7]  Owner Paul McComb told TET he stopped paying because he had "assurances" from TET that "[y]ou won't

---

[4] This is a whole other form of direct evidence from TET's own records never considered by Judge Dalton in *Sussman*, or this Court in enunciating its rulings on the pretrial motions.

[5] Transcr. of Call (Sept. 5, 2018) (**Ex. "2"**) at 5:13-17; 8:2-5.

[6] Transcr. of Call (Sept. 1, 2018) (**Ex. "3"**) at 3:14-19.

[7] Transcr. of Call (July 18, 2018) (**Ex. "4"**) at 4:3-23

have to pay anything else" when he hired the company.[8]   Owner Danielle

Romero reported the same thing, which TET's agent acknowledged:

> DANIELLE ROMERO:  And the reason why I didn't
> pay is because I was told not to.  Like no, don't worry
> about it.  They sent me the letters.  I'm like wow, now
> it's costing me a lot more.
>
> BEA:  Right.  And when you first signed up
> that's how the process was.[9]

Likewise, owner Steven Mueller explained that he understood that stopping

payment to Westgate was part of the "deal" he reached with TET:

> Have you been able to
> keep current with that?
> MR. MUELLER:  No.  I never paid them.  I never
> paid them.  I stopped paying them when I hired you
> guys.
> DANIEL WEBSTER: Okay.  And same thing with --
> Same thing with the maintenance fees?
> MR. MUELLER:  Right.  I stopped paying them.
> DANIEL WEBSTER: Um-hmm.  Okay.  And have you
> received --
> MR. MUELLER:  I wasn't going to pay you guys
> 500 a month, 500 a month up to $10,000, and pay
> them at the same time.  That wasn't part of the
> deal.  You guys said you can get me out.
> DANIEL WEBSTER: Well, yes.  We can get you
> out, but it is mentioned -- it is stated in the
> exit agreement you signed that until you are out
> basically you are the legal owner and responsible
> for maintenance fees, loan fees, things like that.
> MR. MUELLER:  That's not what they told me
> when I signed it.
> DANIEL WEBSTER: Okay.[10]

---

[8] Transcr. of Call (April 30, 2018) (**Ex. "5"**) at 3:11-4:3.

[9] Transcr. of Call (June 4, 2018) (**Ex. "6"**) at 10:1-6.

[10] Transcr. of Call (**Ex. "7"**) at 6:22-7:18.

These and similar statements in these belatedly produced audio recordings are condemning party admissions as to the essential issues in the upcoming trial. There is no basis to exclude them simply because the particular owner did not testify. Likewise, TET lacks a basis to exclude documentary evidence showing TET directly instructed 31 other non-testifying owners to stop paying at the time they defaulted. They claim it would be "impossible" without testimony for a jury to assess if the instruction caused them to stop paying, even though the documentary evidence include admissions by TET or statements by owners showing that the owners defaulted because of TET's instructions.

For example, after Michelle Bamfield was sent a "welcome" email from TET telling her "our attorney strongly advises you to not make those payments to your timeshare," she replied that she "stopped any further payment to Westgate."[11]  Seventeen other owners who did not testify in this case stopped paying after receiving similar "welcome" emails or other emails from TET strongly advising or suggesting they breach their Westgate contracts.[12]  In other TET records – forms, emails, and entries in its CRM database – TET expressly admits that another 15 owners stopped paying Westgate at TET's behest.[13]

---

[11] Emails betw. Michelle Bamfield & TET (Sept. 17 & 29, 2015) (**Ex. "8"**).
[12] *See* **Comp. Ex. 9**.
[13] *See* **Comp. Ex. 10**.

These admissions and contemporaneous oral and written recordings of communications are clearly relevant to show TET instructed or influenced these owners to stop paying. This evidence is the equivalent, if not superior as to timeliness, specificity, reliability, and sufficiency, to owner deposition testimony elicited years after the events to which the testimony pertained. Westgate is entitled to present to the jury the documentary and other evidence – TET's own business records – relating to the 89 Westgate owners because they are directly relevant to proving both liability and damages regardless of whether or not they testified.

TET's recordings and documents are also clearly admissible, contrary to TET's conclusory assertion that they are hearsay. For one thing, TET did not raise a single hearsay objection to any call recording, email, or other TET document on Westgate's Exhibit List that is related to one of the 89 owners. *See* DE 315-1. Thus, any such argument is waived, pursuant to this Court's Case Management & Scheduling Order. DE 55 at 8.[14] Additionally, TET ignores that all of these communications contain statements of its employees on matters within the scope of their employment that are excluded from the definition of hearsay under Rule 801(d)(2)(D); *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560 1565 (11th Cir.

---

[14] *See Kuzma v. City of Ft. Myers*, 151 Fed. Appx. 911, 915 (11th Cir. 2005) (unpublished) (finding that a party waived any objections to exhibits where it never objected to the exhibits on the exhibit list, and the case management and scheduling order required that all objections to exhibits appear on exhibit list or be waived).

1991) ("no longer necessary to show that an employee or agent declarant possesses 'speaking authority[.]' ").

Moreover, TET cannot refute that the recordings and documents containing these communications constitute TET's business records under Rule 803(6).[15] This evidence Westgate has designated as Category 2 and 3 comes from TET's own records, just like the "fact pattern sheets" that TET claims can be deemed business records under Rule 803(6).  Mot. at 20-23.  It is entirely inconsistent for TET to argue that its call recordings and written communications with customer statements – all regularly maintained in its CRM – do not qualify as business records, while seeking an affirmative ruling that fact pattern sheets are admissible as business records.[16]

Even if the recordings and documents of TET's communications with owners were not business records, they would still be admissible for the statements of TET's employees as admissions of a party opponent.  The customer statements in those communications should be considered an integral part of conversations containing party admissions that are not hearsay under Rule 801(d)(2)(D).  But even if they are not, the words of the TET's customers, preserved verbatim in the call recordings and written communications maintained in TET's CRM, fit squarely in the residual

---

[15]TET has filed multiple declarations in this case articulating in great detail how it maintains and keeps these records of its communications with owners in the ordinary course of its business in its CRM  and in multiple call recording platforms.  *See* Decl. Chasity Porter (DE 112-19) at ¶¶11-12; Decl. Chasity Porter (DE 163-6) at 3; Decl. Chasity Porter (DE 112-19) at ¶¶5-17.

[16] As shown below in Section II, these self-serving documents irrelevant to the issues in this case and do not qualify as business records on the grounds claimed by TET, as shown below in Section II.

hearsay exception of Rule 807.   The customers' statements have sufficient guarantees of trustworthiness under Rule 807 because they are contemporaneous, real-time recordings of TET's conversations with customers who had personal knowledge of the events related.  *See ADT Security Servs. v. Security One Intl. Inc.*, 2013 WEL 4766401, at **5-6.   (N.D. Cal. Sept. 5, 2013) (call recordings with customers admissible because they were "at least as reliable as other types of hearsay statements admitted through recognized hearsay exceptions").[17]

In summary, as to the 45 owners who did not testify, as well as the 44 who did, there is no legal basis for excluding the compelling documentary evidence, including direct admissions by TET from their own audio recordings and customer service database, which conclusively establish both liability and damages.

2.    **Advertising Is an Integral Part of TET's Deceptive Business Practices and Relevant to the Circumstances in Which TET Instructed the 89 Owners to Stop Paying**

Westgate offers a modest sampling of TET's advertising among its trial exhibits to provide context for TET's stop-payment instructions to the 89 Westgate owners.  Contrary to TET's arguments in the Motion, the majority of the 44 owners who testified TET instructed or influenced them to stop paying also testified they were influenced by TET advertising, and, in particular, TET's

---

[17] TET also ignores that each call or written communication offered by Westgate is unique and may qualify for other hearsay exceptions when considered on a case-by-case basis.  As such, there is no grounds for wholesale exclusion of these business records as hearsay, even if TET had not failed to timely or validly assert hearsay objections to them.

promise to negotiate directly with Westgate to secure a safe and legal exit at no risk because TET provided a 100% money-back guarantee.[18]   These false and deceptive advertising claims are relevant to the circumstances in which these owners were instructed to stop paying.

In their Motion, TET offers the same argument as prior motions, citing the Court's inadvertent entry of summary judgment on Westgate's FDUTPA claim (DE 143 at 3-5, 7-8), later vacated, as grounds to exclude all evidence of TET's advertising: "[s]ince Plaintiffs were unable to succeed on their Lanham Act claim on the theory of false advertising, it necessarily follows that Westgate's FDUTPA claim which is based on the same alleged advertisements too must fail."  Mot. at 2-3.  But Westgate's claims under FDUTPA have not failed.  Summary judgment on FDUTPA was vacated.  *See* DE 156 at 4-5.  Westgate is entitled to prove what it pled in support of its claims for damages – that TET's advertising is the first link of the unbroken chain of deceptive acts and practices designed to influence TET's customers to act on TET's instructions or suggestions to stop paying Westgate in breach their timeshare contracts.  As this Court noted:

> As noted above, Westgate claims that TET has engaged in unfair and deceptive acts and practices by, inter alia, instructing owners of Westgate timeshare interests to stop making payments to Westgate. (Doc. 69, ¶¶ 6, 50, 82, 104, 135(b), 145(b)). In doing so, TET allegedly fails to inform the owners that non-payment will likely result in foreclosure. Instead, **TET**

---

[18] *See e.g.* Depo. Denise Stewart at 28:11-14, 28:21-29:4, 29:6-8; Depo. Marcelito Arreola at 8:10-11, 15-18, 9:7-10; Depo. Edgar Annett at 7:14-8:3; Depo. Pattie Burns at 9:2-10, 10:20-24.

**deceives owners' into believing that non-payment will help TET safely and legitimately exit them from their timeshares**. But, according to Westgate, TET's exit process is neither safe nor legitimate because it merely involves getting owners to default on their obligations, hiring an outside attorney to cut off communications between the owners and Westgate, and then waiting for Westgate to foreclose so that TET can spuriously claim that it has achieved an exit on the owner's behalf.

DE 156 at 6 [emphasis added].  Thus, TET's advertising – which uniformly promises "safe" and "legitimate" exits – is one aspect of TET's deceptive practices that a jury could reasonably find influenced specific owners to act on TET's instructions or suggestions to stop paying their timeshare contracts.  *Id.* at 11; *see In re Samuels*, 176 B.R. 616, 628 (Bankr. M.D. Fla. 1994) (defendant's unauthorized practice of law, including advertising unlicensed services, constituted deceptive practices in violation of FDUTPA).

3.    **TET's Request to Exclude Any Evidence of Punitive Damages Is Procedurally and Substantively Defective**

TET argues that Westgate should be prohibited from offering evidence in support of punitive damages based on a Florida statute governing the pleading of punitive damages.  Mot. at 11-12 (citing Fla. Stat. §768.72).  The argument is legally defective.  By arguing that Westgate failed to offer or proffer evidence showing a reasonable basis for punitive damages as a condition precedent to plead them under Florida law, TET misconstrues the law applicable to seeking punitive damages in federal court.  The Eleventh Circuit has held that the statute upon which they rely conflicts with Federal Rule of Civil Procedure 8(a)(3), and

12

therefore does not apply.  *Cohen v. Office Depot, Inc.*, 184 F.3d 1292, 1298 (11th Cir. 1999); *see also Ward v. Estaleiro S/A*, 5241 F. Supp. 2d 1344, 1350 (M.D. Fla. 2008) (§768.72 is not applicable in federal court).  Thus, their entire argument is based on an inapplicable statute and must be rejected.

TET offers no substantive argument to refute Westgate claims for punitive damages for the tortious interference claim.  Given that this is an intentional tort, Westgate is entitled to recover punitive damages for each of the Defendants' intentional misconduct or gross negligence if it prevails on this claim.  Fla. Stat. § 768.72(2); *Nephron Pharm. Corp. v. Hulsey*, 2020 WL 7684863, at *24 (M.D. Fla. Oct. 7, 2020).  The evidence supports punitive damages because TET has collected and continues to collect large, upfront fees from Westgate timeshare owners for "exit services" TET knows it has no legitimate means of achieving without getting owners to default on their contracts.  Thus, TET's entire business model as to Westgate owners is predicated on intentional misconduct – falsely promising Westgate owners safe and legal "exits" from their timeshares and instructing them to breach those contracts by stopping payment.

Westgate opposes TET's alternative request to bifurcate the trial as to liability and punitive damages, as the evidence of the amount of punitive damages and the compensation paid to the individual TET principals is

13

probative of their liability and motivation for perpetuating and participating in TET's deceptive and unfair business practices.

**4.      TET Waived Objections to Testimony of Four Owners Inadvertently not Asked Cross Questions by their Inconsistent Acts and Per Rule 32(d)(4)**

TET seeks to exclude testimony from four timeshare owners because court reporters inadvertently failed to ask cross questions propounded by TET pursuant to Fed. R. Civ. P. 31(b), claiming its use would violate their due process rights.   But they have no grounds to complain about due process.   Cross questions were mistakenly omitted by court reporters at depositions on written questions ("DWQs") for nine other owners, two of whom TET selected to re-depose and seven of whom they do not seek to exclude.   Apparently, TET does not like the testimony of Edgar Annett, Shawna Cochran, Anthony Kincaid, and Arnold Mullins.   They admit they *chose* not to pursue deposing these four owners.   Mot. at 16.   But they made a "strategic decision" over a year ago not to pursue completing DWQs of four select owners despite having ample opportunity to do so.   Their request to exclude their testimony, used repeatedly in this case, must be rejected as a waiver.

A party waives a legal right, even rights guaranteed by the U.S. Constitution, by taking action that is inconsistent with that right.   *Schoeff v. R.J. Reynolds Tobacco Co.,* 232 So. 3d 294, 305 (Fla. 2017).   A motion to suppress a

43684798

deposition on the grounds that an opportunity to cross-examine was denied has been held untimely when filed more than three months after receipt of the deposition. *Fortenberry v. Bd. of School Trustees*, 149 F. Supp. 2d 542 (N.D. Ind. 2000). The federal rules expressly provide that a party waives any objection to how a deposition was conducted by failing to raise it promptly:

> "An objection to how the officer transcribed the testimony--or prepared, signed, certified, sealed, endorsed, sent, or otherwise dealt with the deposition--is waived unless a motion to suppress is made promptly after the error or irregularity becomes known or, with reasonable diligence, could have been known."

Fed. R. Civ. P. 32(d)(4).

TET failed to file a timely motion to exclude testimony of these four owners after they discovered cross questions had been omitted from their DWQs last January. On January 24, 2020, TET re-noticed Shawna Cochran[19] – whom they now seek to exclude – and two other owners for continued DWQs to ask the omitted cross questions, and asked Westgate's counsel to find out why cross questions were omitted. *Id.* at ¶¶6-7. Westgate's counsel found the omissions were due to court reporter errors but rejected TET's request to exclude testimony from the 13 witnesses and proposed instead jointly seeking leave to reopen discovery to complete them, which Westgate agreed to do at no cost to TET. *Id.*

---

[19] On February 7, 2020, they inexplicably cancelled the deposition of Ms. Cochran. Dec. Brian Cummings (Dec. 11, 2020) (**Ex. "11"**) at Ex. A.

at ¶¶8, 11-12.  They strategically rejected this proposal, advising they would move to exclude the transcripts for all purposes. *Id.* at ¶13.

Instead of filing a motion, TET repeatedly used the testimony of the four witnesses in their summary judgment briefing, never objected to Westgate's expert's use of the testimony in his expert reports, and furnished the transcripts to their two damages experts, who analyzed and discussed the testimony – including three of four witnesses TET now seek to exclude – as part of their expert reports.  Now they seek to exclude the testimony for all purposes, after having used them for their own purposes.  They should be estopped from doing so, having failed to file a motion "promptly" under Rule 32(d)(4).

5.     **Evidence Relating to the Better Business Bureau**

Westgate will withdraw its exhibits and deposition designations related to the Better Business Bureau, subject to use for impeachment purposes.

6.     **TET's Argument to Limit Testimony of Westgate's Expert Steve Wolf Is Moot & Misconstrues the Scope of Damages Being Sought**

Westgate has offered CPA expert, Steven Wolf, to present complex accounting data from Westgate so the factual information can be presented in an organized form that will assist the trier of fact in understanding delinquent timeshare accounts comprising Westgate's damages for tortious interference. While Mr. Wolf's original report related to Westgate's accounting information for

all 1,386 timeshare owners who hired TET, Mr. Wolf on May 28, 2021, provided an Update Expert Report presenting Westgate's accounting data only for the 89 owners for whom Westgate is now claiming damages for tortious inference.  *See* Update Expert Report (**Ex. 12**).  The updated report, which was furnished to TET on that same date, breaks down the damages for each of the 89 owners and presents them in three tables corresponding to the Category 1, 2, and 3 Damages as denominated by Westgate in Section 1 hereinabove.

TET's argument in this section misconstrues that Westgate is offering Mr. Wolf's testimony and a "barrage of other evidence" pertaining to 535 owners who have not testified.  That is incorrect, except to the 45 owners discussed herein. Mr. Wolf's testimony of Westgate's damages attributable to those 45 owners is admissible for the same reasons the direct evidence supporting Westgate's claims relating to those owners is admissible, as argued above in Section 1.  TET does not contest the admissibility of Mr. Wolf's testimony as to the 44 owners who testified TET instructed or influenced them to stop paying.

## II.    EVIDENCE DEFENDANTS SEEK TO ADMIT

Westgate opposes TET's attempt to prematurely admit into evidence so-called "Fact Pattern Sheets" purportedly completed by Westgate owners, most of whom have not testified in this case or are not subject of Westgate's damages.  As discussed in Section 1, the irony is inescapable: these documents TET wants pre-

admitted include the same type of documents, albeit inferior, that TET has asked the Court to prevent Westgate from offering.  This is a fence too wide for even TET to straddle.  As a glaring threshold matter – TET asks the Court to pre-admit documents that do not support any defense asserted by TET or negate any claim by Westgate – they are wholly irrelevant even if admissible, which they are not.[20] These documents do not address whether or not TET instructed or influenced owners to stop paying their timeshare contracts – the primary issue for the narrowed jury trial on damages.[21]

TET's argument that these unreliable, misleading documents are admissible under the business records exception to the rule against hearsay lacks merit.  As Westgate has shown, these "Fact Pattern Sheets" are forms specifically designed by TET to elicit complaints about Westgate from timeshare owners with leading questions and inaccurate and generalized negative statements about the pernicious nature of the timeshare industry.  *See Id.* at 6.  The forms are purportedly completed and signed by timeshare owners during the TET sales presentation, or at a later time, but many of the forms TET offers as exhibits do not identify the purported timeshare owners.  *See e.g., Id.* at Ex. 1.

[20] Westgate re-incorporates the arguments in its Amended Omnibus Motion in Limine (DE 318) seeking to exclude these very same documents as irrelevant, unfairly prejudicial, hearsay, and lacking foundation and authenticity.

[21] Indeed, as this Court found in striking TET's valuation expert, "[t]he fact that timeshare owners have good reasons to shed their timeshare interest has no bearing on whether Defendants instigated the default."  DE 177 at 2.

Courts frequently hold that written statements from customers like what is offered in the fact pattern sheets do not fall within the business record exception to the rule against hearsay. *Candy Craft Creations, LLC v. Gartner*, 2015 WL 6680883, \*2 (S.D. Ga. Nov. 2, 2015) (citing *Rowland v. Am. Gen. Finance, Inc.*, 340 F.3d 187 (4th Cir. 2003)). TET's reliance on *In re U.S. Truck Holdings, Inc.* to argue the fact pattern sheets are admissible as "surveys" is misplaced. Mot. at 22-23 (citing 341 B.R. 596 (E.D. Mich. 2006). In that case, a creditor in bankruptcy litigation that was a multi-employer pension plan and trust conducted a survey of its more than 3,000 employer-members seeking information that it was statutorily authorized and required to obtain. *U.S. Truck Holdings*, 341 B.R. at 610. The debtor sought to exclude the creditor's use the survey results in the litigation, even though the debtor had an opportunity to review and object to the survey questions, claiming they were hearsay. *Id.* at 612-613. The court found that surveys were admissible as business records under Rule 803(6) and also under Rule 807 "because of the 'circumstantial guarantees of trustworthiness' which exist given that they were provided in accordance with a statutory duty." *Id.* at 613.

The fact pattern sheets that TET claims as business records are nothing like the surveys in *U.S. Truck Holdings*. Obviously, Westgate never had an opportunity to review and object to the written questions on these forms that

19

TET presents to timeshare owners.  TET was clearly not collecting information pursuant to a statutory duty; in fact, there is no record of how these forms were presented or completed, or whether they were completed by owners or filled in by TET employees and presented to owners for signature.  Assuming the forms were in fact completed by the customers, the statements that are the basis of the fact pattern sheets are hearsay without an applicable exception, unlike the verbatim recordings of customer statements in TET's audio and written recordings of its communications with owners.  TET ignores that their customers' alleged statements do not fall into any hearsay exception.

There are no guarantees of trustworthiness, circumstantial or otherwise, in the unauthenticated statements contained in self-serving documents that TET offers as business records.  Their request for the Court to pre-admit them as business records lacks merit, and must be rejected.[22]

DATED:  June 15, 2021                        Respectfully submitted,

                                    By:    *Brian R. Cummings*
                                           RICHARD W. EPSTEIN
                                           (Trial Counsel)
                                           Florida Bar No. 229091
                                           MICHAEL E. MARDER
                                           Florida Bar No. 251887

---

[22] TET' claim that the Court in *Orange Lake* "found such documents were admissible" is a misrepresentation; the Court simply found that *Plaintiffs* failed to show the fact patterns sheet were *wholly inadmissible* on any grounds.  *See Orange Lake*, DE 448 at 3.

JEFFREY BACKMAN
Florida Bar No. 662501
BRIAN R. CUMMINGS
Florida Bar No. 25854
**GREENSPOON MARDER LLP**
201 East Pine St, Suite 500
Orlando, Florida 32801
Telephone: (407) 425-6559
Facsimile:  (407) 209-3152

and

200 East Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 491-1120
Facsimile: (954) 213-0140

and

401 E. Jackson Street, Suite 1825
Tampa, FL 33602
Telephone: (813) 769-7020
Facsimile: (813) 426-8582

Jeffrey.Backman@gmlaw.com
Khia.Joseph@gmlaw.com
Richard.Epstein@gmlaw.com
Maria.Salgado@gmlaw.com
Michael.Marder@gmlaw.com
Trisha.Snyder@gmlaw.com
Brian.Cummings@gmlaw.com
Moneka.Simpson@gmlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on this 15th day of June, 2021.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing electronically.

*/s/ Brian R. Cummings*

**SERVICE LIST**
John Y. Benford **(**john.benford@wilsonelser.com)
Amy L. Baker (amy.baker@wilsonelser.com)
**Wilson, Elser, Moskowitz, Edelman & Dicker, LLP**
111 N Orange Avenue, Suite 1200
Orlando, FL 32801-2361
Telephone: (407) 203-7599
Facsimile:  (407) 648-1376
*Counsel for Defendant Reed Hein & Associates, LLC,*
*Brandon Reed, Trevor Hein and Thomas Parenteau*

22